**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DENTONS US LLP** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| *v.* | ) |
| | ) Case No. 1:14-cv-1312-RDM |
| **THE REPUBLIC OF GUINEA et al.,** | ) |
| | ) |
| *Defendants.* | ) |
| _____ | ) |

<u>**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

Michael S. Sundermeyer (D.C. Bar No. 931873)
Ana C. Reyes (D.C. Bar No. 477354)
Leslie C. Mahaffey (D.C. Bar No. 1019782)
Williams & Connolly LLP
725 12th Street, NW
Washington, D.C.  20005
Tel. (202) 434-5000
Fax (202) 434-5029
msundermeyer@wc.com
areyes@wc.com
lmahaffey@wc.com

*Attorneys for Plaintiff Dentons US LLP*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTS AND PROCEDURAL HISTORY ................................................................ 2

    A.   The Parties ................................................................................................ 2

    B.   The Government's Engagement of Dentons To Provide Legal Services ...................... 3

    C.   Dentons' Performance of Valuable Legal Services for Defendants ............................ 5

    D.   Defendants' Cessation of Good Faith Efforts To Secure Funding, and Continuing Failure To Pay the Balance of the Fees They Owe Dentons ......................................... 6

    E.   Dentons' Resort To Filing Suit, After Giving Defendants Nearly a Full Additional Year To Pay the Outstanding Invoices .......................................................................... 8

ARGUMENT ............................................................................................................... 9

I.    Subject Matter Jurisdiction Exists Under the Commercial Activity Exception to the FSIA ............................................................................................. 9

    A.   Defendants' Commercial Activities Had a Direct Effect in the United States. ........... 10

        1.   Defendants' engagement of Dentons as legal counsel was a commercial activity ............................................................................ 10

        2.   Defendants' engagement of Dentons as legal counsel had a direct effect in the United States. ....................................................... 13

    B.   This Action Is Based Upon Acts Performed in the United States in Connection With Defendants' Commercial Activities. .................................................................. 17

    C.   Dentons Need Not Allege that Defendants Waived Their Sovereign Immunity. ........ 18

II.   The Complaint States a Cause of Action ............................................................... 23

    A.   The Complaint Alleges Defendants' Breach of Contract. ........................................... 24

    B.   The Complaint Alleges Each Element of the Additional Causes of Action. ............... 27

III.  The Court Should Accept Dentons' Chosen Forum. ............................................. 29

CONCLUSION ........................................................................................................... 32

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934 (D.C. Cir. 2008) ....................29

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 466 F. Supp. 2d 6 (D.D.C. 2006), *aff'd in relevant part* 528 F.3d 934 (D.C. Cir. 2008) ....................................30

*Belize Social Dev. Ltd. v. Government of Belize*, 5 F. Supp. 3d 25, 34 (D.D.C. 2013) ...................................................................................................................30

*Best Medical Belgium, Inc. v. Kingdom of Belgium*, 913 F. Supp. 2d 230 (E.D. Va. 2012)..................................................................................................................12

*Bloomgarden v. Coyer*, 479 F.2d 201 (D.C. Cir. 1973).................................................28

*Cont'l Transfer Technique Ltd. v. Federal Government of Nigeria*, 697 F. Supp. 2d 46 (D.D.C. 2010) ...............................................................................30, 31

*Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661 (D.C. Cir. 2010) ....................................................................................................14

*Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 764 F. Supp. 2d 155 (D.D.C. 2011) ..............................................................................................30

*de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013) .........................................2, 13

*Embassy of Federal Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136 (D.D.C. 2012) ..................................................................................................11, 14

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ..........................................................30

**I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184 (D.C. Cir. 2003) .......13, 14, 15, 16

**Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152 (D.D.C. 2013) ..............................................................11, 13, 14, 22, 23

*LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011) .......................................................2

*Osseiran v. Int'l Fin. Corp.*, 498 F. Supp. 2d 139 (D.D.C. 2007), *aff'd* 552 F.3d 836 (D.C. Cir. 2009) ..............................................................................................30

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009) ...........................................22

*Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000)..............................2

*Reichler, Milton & Medel v. Republic of Liberia*, 484 F. Supp. 2d 1 (D.D.C. 2007)..............11, 14

*Republic of Argentina v. Weltover, Inc., 504 U.S. 607 (1992) .......................................11, 12, 13

Saudi Arabia v. Nelson, 507 U.S. 349 (1993)..................................................................17

Scowcroft Grp., Inc. v. Toreador Res. Corp., 666 F. Supp. 2d 39 (D.D.C. 2009)........................25

Sununu v. Philippine Airlines, Inc., 792 F. Supp. 2d 39 (D.D.C. 2011)......................................28

TMR Energy Ltd. v. State Prop. Fund of Ukr., 411 F.3d 296 (D.C. Cir. 2005)............................30

Transamerican S.S. Corp. v. Somali Democratic Republic, 767 F.2d 998 (D.C. Cir. 1985) ..........................................................................................................10

## DISTRICT OF COLUMBIA CASES

Brown v. Brown, 524 A.2d 1184 (D.C. 1987) ...........................................................27

Burbridge v. Howard Univ., 305 A.2d 245 (D.C. App. 1973) .....................................25

Eagle Maint. Servs., Inc. v. D.C. Contract Appeals Bd., 893 A.2d 569 (D.C. 2006)...................28

Tsintolas Realty Co. v. Mendez, 984 A.2d 181 (D.C. 2009)....................................17, 26

TVL Assocs. v. A&M Constr. Corp., 474 A.2d 156 (D.C. 1984)................................................27

## FEDERAL STATUTES AND RULES

*28 U.S.C. § 1330(a) ..........................................................................................1, 9, 18

28 U.S.C. § 1330(b) ..............................................................................................9

28 U.S.C. § 1391(f)............................................................................................1, 29

28 U.S.C. § 1603(a) ..............................................................................................9

28 U.S.C. § 1603(d) ............................................................................................10

28 U.S.C. § 1605(a)(1).........................................................................................18

*28 U.S.C. § 1605(a)(2)..................................................................................... passim

28 U.S.C. § 1608(a)(3).........................................................................................9

Federal Rule of Civil Procedure 12(b)(1) .............................................................2, 32

Federal Rule of Civil Procedure 12(b)(3) ............................................................31, 32

Federal Rule of Civil Procedure 12(b)(6) ............................................................32

## INTRODUCTION

This is a straightforward breach of a commercial contract, for which Defendants the Republic of Guinea (the "Government" or "Guinea") and its Ministry of Mines and Geology (the "Ministry") (together, the "Defendants") are liable because they failed to pay $10,214,458.48 in legal fees and costs owed to Plaintiff Dentons US LLP ("Dentons").  Defendants refuse to pay these outstanding amounts, despite having accepted Dentons' legal services, having memorialized their obligation to pay for these services in a written agreement, and having repeatedly acknowledged that they owe the payments to Dentons.  Defendants now contend that: (1) the Court lacks jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"); (2) the Complaint fails to state a claim for breach of contract; and (3) the Court should decline to exercise its jurisdiction under the doctrine of forum non conveniens.

Each argument fails.  First, the Court has jurisdiction pursuant to 28 U.S.C. § 1330(a) because Defendants' activities—namely, entering into a contract for legal services with a U.S. law firm and failing to pay for those services via a U.S. bank account, as required—clearly fall within the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2).  Second, the Complaint alleges a contract between the parties, that Defendants breached that agreement, and that Dentons has suffered damages as a result, i.e., a breach of contract claim.  Finally, the Court is an appropriate venue for this Action under 28 U.S.C. § 1391(f), and Defendants have provided no reason to reject Dentons' choice of forum.  For these reasons, the Court should deny Defendants' Motion.

## FACTS AND PROCEDURAL HISTORY

As alleged in the Complaint, Defendants' actions fall within the commercial activity exception to the FSIA and constitute a breach of contract. The Court must accept the Complaint's allegations as true at this stage of the litigation, "drawing all reasonable inferences from those allegations in plaintiff[']s favor." *de Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013) (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)).[1] The following summary of allegations establishes that Defendants engaged Dentons to provide legal services and agreed to pay for those services, that Dentons provided such services to Defendants' satisfaction, that Defendants failed to pay for those services, and that Dentons has been damaged by the failure to pay in the amount of $10,214,458.48, plus interest, attorneys' fees, and costs.

### A.     The Parties

Plaintiff is a Delaware limited liability partnership of attorneys who practice law in Washington, D.C. and other U.S. locations. Compl. ¶ 8. Its presence in the United States dates back to 1906, and it has operated in the United States since that time under different names, including "Sonnenschein Nath & Rosenthal LLP" and "SNR Denton US LLP," which was its name at the time that it was engaged by Dentons. *Id.* Although SNR Denton US LLP was a member of the international legal practice then known as "Salans FMC SNR Denton Group," it was a separate and distinct U.S. legal entity. Compl. Ex. 4. On February 28, 2013, effective

---

[1] Although jurisdictional factfinding *may* be employed when addressing a motion to dismiss pursuant to 12(b)(1) on the ground of foreign sovereign immunity, "[i]f the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Here, Defendants do not challenge the factual underpinnings of Dentons' jurisdictional allegations—only their legal sufficiency. Mem. in Supp. of Mot. to Dismiss 20 ("Defendants maintain that the case should be dismissed based on the allegations and exhibits within the four corners of the Complaint.") Therefore, additional factfinding is inappropriate.

March 31, 2013, SNR Denton US LLP changed its name to Dentons US LLP.  Compl. ¶ 8.

References to "Dentons" herein include both SNR Denton US LLP and Dentons US LLP.

Defendants are the foreign sovereign Republic of Guinea and its Ministry of Mines and

Geology, a political subdivision of the Government.  *Id.* at ¶¶ 10, 12.

### B.    The Government's Engagement of Dentons To Provide Legal Services

Dentons first came into contact with Defendants during a series of meetings in late May

2012, as part of a World Bank engagement.  Compl. ¶¶ 22-24.  The World Bank had assembled a

group of consultants, including Dentons, to provide legal, financial and technical assistance to

the Government in connection with the development of a large-scale mining project in southern

Guinea—the Simandou Project.  *Id.* at ¶¶ 19, 22-23.  The Government's need for counsel arose

from a publicly disclosed settlement agreement the Government had entered into with the Rio

Tinto Group ("Rio Tinto"), a global mining and metals company, which required the parties to

negotiate a series of complex mining and infrastructure agreements related to the Project.  *Id.* at

¶¶ 20-21.  As the date by which these agreements were to be finalized approached, the

Government requested assistance with their completion from the World Bank.  *Id.* at ¶ 22.

Dentons' engagement as the legal arm of the advisory group was based on its expertise in

emerging markets transactions, mining, infrastructure, and project finance—specifically through

Washington, D.C.–based partner Jonathan Cahn.  *Id.* at ¶¶ 9, 23.

After the initial May 2012 meetings, the Government requested that Dentons provide

legal services to it directly—rather than through the World Bank advisory group—regarding

negotiation of the agreements and other complex matters involving the Simandou Project.  *Id.* at

¶ 25.  Dentons agreed to the representation.  *Id.* at ¶ 26.  Dentons and Defendants memorialized

the agreement for Dentons to provide legal services and Defendants to pay for those services in a

written contract, reflected in consecutive documentation executed in August 2012 (the "August Agreement") and December 2012 (the "December Agreement) (together, the "Retainer Agreement").  *Id.* at ¶¶ 2, 26-28, 31-36; *see* Compl. Exs. 2, 4.

The August Agreement acknowledged Dentons' engagement as legal counsel to the Ministry as of May 2, 2012.  Compl. ¶¶ 27-28; Compl. Ex. 2.  It took the form of a letter dated August 25, 2012, sent from then–Minister of Mines Mohamed Lamine Fofana, on the official letterhead of the Ministry and bearing the Ministry's official seal, to Mr. Cahn at Dentons' office in Washington, D.C.  *Id.*  Through it, Defendants agreed to arrange payment to Dentons for all work performed from May 2, 2012 through September 30, 2012, to the extent that the World Bank did not pay for the work.  Compl. ¶ 28.  Following the execution of this contract, Dentons invoiced Defendants for its legal fees and services, billing at its standard hourly rates.  *Id.* at ¶ 29.  Defendants did not dispute the accuracy or reasonableness of the invoices.  *Id.*

As contemplated in the August Agreement, Dentons and Defendants executed a supplemental written agreement on December 24, 2012, which continued the parties' contractual relationship and in which Defendants agreed to pay for, *inter alia*, the work Dentons continued to perform on Defendants' behalf after September 30, 2012.  *Id.* at ¶¶ 30-32; Compl. Ex. 4.  The agreement was issued from and signed by Mr. Cahn in Washington, D.C. on behalf of Dentons; Minister Fofana signed, initialed each page of, and placed the Ministry's official seal on the December Agreement on behalf of Defendants.  Compl. ¶ 31; Compl. Exs. 4, 6.  Attached to the December Agreement were, *inter alia*, invoices documenting Dentons' fees from May through October 2012 and a copy of Dentons' standard Terms of Business, including specific United States Location Terms.  Compl. ¶ 33; Compl. Ex. 4.

The December Agreement memorialized Defendants' instruction that Dentons continue providing legal services in connection with the Simandou Project and their renewed agreement to compensate Dentons in accordance with its standard hourly rates and for its costs, as set forth in monthly invoices.  Compl. ¶¶ 32, 36.  That document specifically provided that Dentons' "costs and fees [were] due upon receipt of [its] invoice."  *Id.* at ¶ 34; Compl. Ex. 4.  Dentons agreed to "defer collection of fees and expenses . . . until the appropriate financing [was] in place," but *only* as long as the Ministry continued to "implement in good faith all efforts necessary to secure funding for this representation, either through the Ministry's budget or through external funding."[2]  *Id.*  If Defendants ceased these good faith efforts, Dentons' obligation to defer collection was at an end, "not taking into account [Defendants'] lack of funding," and its costs and fees immediately became due.  *Id.*

### C.    Dentons' Performance of Valuable Legal Services for Defendants

In accordance with Defendants' requests and the Retainer Agreement, Dentons provided legal services to Defendants, primarily in connection with the Simandou Project, beginning in May 2012.  Dentons' personnel in the United States were responsible for the majority of the work performed on Defendants' behalf, and executed this work primarily from Washington, D.C. Compl. ¶ 37.  Defendants were aware that the engagement was being run by Mr. Cahn from the firm's Washington, D.C. office, and they routinely held phone calls and exchanged emails and hard-copy correspondence with Dentons' personnel located in the United States.  *Id.* at ¶¶ 9, 37.

Altogether, Dentons dedicated more than 10,000 attorney, staff, and subcontractor hours to its representation of Defendants.  *Id.* at ¶¶ 5, 39.  More than 7,500 of these hours were worked

---

[2] Defendants, via the December Agreement, "authorize[d]" Dentons to seek funding from third parties, but the December Agreement in no way required Dentons to find its own source of funding for work it performed on Defendants' behalf.  Compl. Ex. 4.

in the United States.  *Id.*  These hours were devoted to producing numerous reports, presentations, memoranda, drafts, negotiator notes, and other deliverables, including briefings to the Ministry of Mines, the Ministry of Finance, and a working group designated by President Alpha Condé. *Id.* at ¶ 5.  During the course of the engagement, Defendants often complimented Dentons on the quality and timeliness of its work product and repeatedly requested that the firm increase the scope of its deliverables.  *Id.*

Dentons provided Defendants with monthly invoices detailing the work it had performed on Defendants' behalf and the fees owed as a result.  *Id.* at ¶ 52.  Each invoice was issued from Dentons' Washington, D.C. office, signed by Mr. Cahn, and notarized by a Notary Public of Washington, D.C.  *Id.* at ¶ 53.  The invoices reflected amounts owed in U.S. dollars and requested payment via wire to a Dentons account in the United States.  *Id.* at ¶ 54.  Collectively, Dentons issued 15 invoices to Defendants—one for each month from May 2012 to June 2013, inclusive, as well as a single invoice for work performed by the "Tax Team" assembled by Dentons; these invoices total $12,214,458.48.  *Id.* at ¶¶ 43, 55-56.  To date, Defendants have made only one payment to Dentons—on or about April 1, 2013, via wire to Dentons' bank account in the United States—for $2,000,000.00.  *Id.* at ¶¶ 42, 57.  Therefore, Defendants continue to owe $10,214,458.48 in past-due fees and costs to Dentons.  *Id.*  at ¶¶ 2, 6, 59. They have never disputed that they requested the legal services reflected in the invoices or that Dentons performed those legal services.  *Id.* at ¶ 58.

### D.   Defendants' Cessation of Good Faith Efforts To Secure Funding, and Continuing Failure To Pay the Balance of the Fees They Owe Dentons

During the period that Dentons was spending significant amounts of time performing valuable legal services for Defendants, Defendants were obligated to "implement in good faith all efforts necessary to secure funding for this representation, either through the Ministry's

budget or through external funding" in order for Dentons to continue "defer[ing] collection of fees and expenses." Compl. ¶ 34; Compl. Ex. 4. Defendants ceased doing so by, at the latest, September 2013. Compl. ¶ 49.

In March 2013, approximately three months after the execution of the December Agreement, Dentons followed up with Defendants to ensure that they were fulfilling their obligation to make good faith efforts to secure financing for the representation. *Id.* at ¶ 40. Specifically, Mr. Cahn spoke with Minister Fofana via telephone on March 24, 2013, at which point Minister Fofana represented that Defendants were working to ensure payment of the outstanding invoices. *Id.* Defendants memorialized this conversation in a letter to Mr. Cahn, signed by Minister Fofana and bearing the seal of the Ministry, dated March 25, 2014. *Id.* The letter represented that Defendants expected Rio Tinto to pay Dentons' legal fees, but "in the event where Rio Tinto does not pay the fees . . . the Guinean State will pay such fees and expenses." *Id.* at ¶ 41; Compl. Ex. 8. The letter also reiterated the importance and urgency of the work Dentons was performing. *Id.* Because Defendants appeared in good faith to be working to secure funding, Dentons continued to defer collection at that point.

Further indicating that Defendants planned to take responsibility for the outstanding fees, Defendants made a single payment via wire to Dentons' U.S. bank account on or about April 1, 2013. Compl. ¶ 42. This $2,000,000.00 payment represented a fraction of what Dentons was owed. The firm credited the payment toward Defendants' outstanding balance. *Id.* at ¶¶ 42-43.

Following the single payment in April 2013, Defendants failed to make any additional payments to Dentons or to secure any third-party funding. *Id.* at ¶ 42. Because Dentons believed that Defendants continued to seek financing in good faith, however, the firm continued to

perform legal work on Defendants' behalf and continued invoicing Defendants for that work through June 2013.  *Id.* at ¶ 44.

In August 2013, the sincerity of Defendants' efforts to secure payment became suspect. In an August 7, 2013 email, Minister Fofana requested that Mr. Cahn travel to Guinea to discuss payment, explaining that "[t]he Government has taken the decision to pay everything."  *Id.* at ¶ 45; Compl. Ex. 9.  When the Dentons team arrived in Conakry, Guinea, however, they heard conflicting stories:  Minister Fofana said that he had instructed the Minister of Finance to pay Dentons, but then–Minister of Finance Kerfalla Yansane (current Minister of Mines) admitted that the Government had not budgeted for such a payment.  Compl. ¶¶ 46-47.  Minister Yansane posited that the World Bank would pay the invoices with funds it had budgeted for Guinea, and to the extent it did not, that the Government would pay the outstanding balance.  *Id.* at ¶ 47. Although Minister Yansane proposed this plan and appointed Special Advisor to the President Idrissa Thiam to work with Dentons to resolve the matter, Dentons never received any indication that the Government took any steps either to direct the World Bank to make funding available or to secure other third-party funding to pay the fees and costs.  *Id.* at ¶¶ 47, 49.

Instead, since at least September 2013, Defendants no longer sought funding in good faith, either from outside sources or through internal budgeting.  *Id.* at ¶ 49.  Therefore, according to the terms of the December Agreement, Dentons' agreement to defer collection ended at that point, and its outstanding invoices became due immediately.

### E.    Dentons' Resort To Filing Suit, After Giving Defendants Nearly a Full Additional Year To Pay the Outstanding Invoices

Although, according to the terms of the Retainer Agreement, Dentons could have sued Defendants as early as September 2013, the firm provided Defendants with nearly a full additional year to fulfill their obligation to obtain funding for or to pay their past-due legal fees.

8

But Defendants not only failed to make any payments, they also failed to make good faith efforts toward doing so or toward obtaining third-party funding.  Compl. ¶¶ 48-50.

Consequently, Dentons filed the present Complaint on August 1, 2014, alleging breach of contract—or, in the alternative, quantum meruit, unjust enrichment, or account stated—and seeking $10,214,458.48 in fees and costs, plus interest.  On November 7, 2014, Defendants filed a Motion to Dismiss the Complaint.

## ARGUMENT

Defendants present no argument that would support dismissal of the Complaint. Contrary to Defendants' unsupported contentions, the Court has jurisdiction under the commercial activity exception to the FSIA; the Complaint alleges a breach of contract claim, among others; and the doctrine of forum non conveniens does not apply.

## I.  Subject Matter Jurisdiction Exists Under the Commercial Activity Exception to the FSIA.

Defendants in this Action are "foreign state[s]," as defined by 28 U.S.C. § 1603(a).  *See* Compl. ¶¶ 10, 12.  Pursuant to the FSIA, United States District Courts have original jurisdiction over any nonjury civil action against a foreign state in which the foreign state is not entitled to immunity.  28 U.S.C. § 1330(a).  The Court has subject matter jurisdiction over this Action because, under the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), Defendants are not entitled to immunity.[3]  The FSIA's commercial activity exception provides that a foreign state is not immune to suit in the United States when "the action is based [(1)] upon a commercial activity carried on in the United States by the foreign state; or [(2)] upon an act performed in the United States in connection with a commercial activity of the foreign state

---

[3] The Court also has personal jurisdiction over Defendants under 28 U.S.C. § 1330(b) because it has subject matter jurisdiction over this Action and because Defendants were properly served pursuant to the requirements of 28 U.S.C. § 1608(a)(3).  *See* Dkt. Nos. 5, 6, 7, 8, 9, and 10.

elsewhere; or [(3)] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.*

"[T]he burden of proof in establishing the inapplicability of these exceptions is upon the party claiming immunity." *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985).  Defendants' Motion to Dismiss does not sustain their burden. Defendants' commercial activities had a direct effect in the United States, and, separately, Defendants engaged in commercial activity by contracting with Dentons in the United States to act as their legal counsel.

**A.      Defendants' Commercial Activities Had a Direct Effect in the United States.**

Defendants' activities fall within the third clause of the commercial activity exception, as the Action is "based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act cause[d] a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Defendants' engagement of Dentons to provide legal services, and their failure to pay for those services, as required by the Retainer Agreement, constituted commercial activity and had a direct effect in the United States.

**1.      Defendants' engagement of Dentons as legal counsel was a commercial activity.**

The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act," and explains that "[t]he commercial character of an activity shall be determined by reference to the nature of the . . . transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).  The proper inquiry for the Court is "whether the particular actions that the foreign state perform[ed] (whatever the motive behind them) are

the *type* of actions by which a private party engages in 'trade and traffic or commerce.'"
*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (citation omitted).

In this District, it is well established that a foreign sovereign acts "in the manner of a
private player" when it retains a law firm to provide counsel, *see id.*, and that "[a] contract for
the provision of legal services constitutes 'commercial activity' under section 1605(a)(2)," *Lanny
J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 159 (D.D.C.
2013); *see also Embassy of Federal Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 141
(D.D.C. 2012) ("Contracts for legal services have been found to constitute commercial activity
when the claim against the foreign state arose from the state's failure to pay legal fees.");
*Reichler, Milton & Medel v. Republic of Liberia*, 484 F. Supp. 2d 1, 2 (D.D.C. 2007) (finding
that a foreign state's "contracts for legal services constitute 'commercial activity' within the
meaning of the FSIA").

Here, Dentons and Defendants unquestionably entered into a commercial contract for
legal services—just as Dentons would with a private party. *See* Compl. ¶¶ 2-6, 26, 30, 31-33;
*see also* Compl. Exs. 2, 4. And the subject matter of this Action is Defendants' failure to pay or
to secure third-party funding to cover the outstanding balance owed Dentons for legal services,
as required under the Retainer Agreement. *See id.* at ¶¶ 6, 48-50, 59. As numerous decisions
from this District hold, "[c]ontracts for legal services . . . constitute commercial activity when the
claim against the foreign state [arises] from the state's failure to pay legal fees." *Ugwuonye*, 901
F. Supp. 2d at 141.

Defendants fail to acknowledge the consensus within this District that contracts for legal
services constitute commercial activity under the FSIA. Instead, they contend that Dentons'
provision of legal advice concerned governmental matters—namely "the development and

11

financing of the Simandou iron ore mining project and its related infrastructure, port and railroad"—thereby rendering the activity underlying this suit governmental, rather than commercial in nature. Mem. in Supp. of Mot. to Dismiss 12. They cite only one opinion to address this proposition: *Best Medical Belgium, Inc. v. Kingdom of Belgium*, 913 F. Supp. 2d 230 (E.D. Va. 2012), an out-of-circuit, district court decision involving inapposite facts. In that case, which did not involve the provision of legal services, the court determined that the government of Belgium's promotion of domestic commerce was a governmental, rather than commercial, activity. *Id.* at 237-38. Such activity is not comparable to Defendants' engagement of Dentons to provide legal services in connection with a mining development. Defendants do not even attempt to argue that it is.

Defendants assert that the Court should find that their activities were governmental, rather than commercial, because the Retainer Agreement is "not an ordinary commercial contract" due to its unique payment provision, designed to accommodate Defendants' urgent need for legal counsel and inadequate financing. Mem. in Supp. of Mot. to Dismiss 13. They also argue that the fact that Dentons' legal counsel concerned "negotiations with international organizations to develop national assets and build national infrastructure" makes the act of contracting for legal services governmental in nature. *Id.*

These arguments ignore the leading Supreme Court case on this subject, as well as the clear consensus of courts within this District. In *Weltover*, the Supreme Court specified that, when determining the commercial character of an activity, "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," but rather "whether *the particular actions that the foreign state performs* (whatever the motive behind them) are the type of actions by which a private party engages in

'trade and traffic or commerce.'"  504 U.S. at 614 (emphasis added) (citation omitted).  Thus, the nature of the objectives Defendants sought to achieve by engaging Dentons to provide legal services is irrelevant; *that Defendants particularly acted like a private party by contracting to retain legal counsel makes their activities commercial.  See id.*; *see also, e.g.*, *Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 159.  Furthermore, the terms of that contract—whether they included unique payment provisions or recognized the urgent nature of the services being provided—have no bearing on whether the activity is governmental or commercial.  Defendants fail to cite a single case to the contrary.

For these reasons, Defendants' activities in hiring lawyers are commercial.

### 2.    Defendants' engagement of Dentons as legal counsel had a direct effect in the United States.

The second requirement under the third clause of 28 U.S.C. § 1605(a)(2) is that the activity upon which a suit is based had a "direct effect in the United States."  That requirement is also met in this Action.

*Weltover* recognizes that "an effect is direct if it follows as an immediate consequence of the defendant's activity."  504 U.S. at 618 (alterations and internal quotation marks omitted).  It specifically holds that, when a party enters into a contractual obligation that designates the United States as the place of payment, and that party makes payments in accordance with that requirement, the party's failure to fulfill its ultimate payment obligations in the United States "necessarily [has] a 'direct effect' in the United States."  *Id.* at 619.  Following *Weltover*, the D.C. Circuit's direct effect cases involving alleged breaches of contract have turned on whether the contract in question established the United States as a place of performance.  *See, e.g.*, *de Csepel v. Republic of Hungary*, 714 F.3d 591, 600-01 (D.C. Cir. 2013); *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1190 (D.C. Cir. 2003); *see also Cruise Connections*

13

*Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661, 665 (D.C. Cir. 2010) (finding that a foreign state's termination of a contract created a direct effect in the United States because "revenues that would otherwise have been generated in the United States were not forthcoming" (internal quotation marks and citation omitted)). That court has reiterated that a foreign state's failure to meet a payment obligation required to be made in the United States—a circumstance that renders "the involvement of a U.S. bank . . . immediate and unavoidable"—qualifies as an act that causes a direct effect in the United States under the FSIA. *I.T. Consultants*, 351 F.3d at 1190.

A foreign state's failure to make a payment required to be directed toward the U.S. bank account of its legal counsel constitutes a direct effect in the United States. *See Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 160 (holding that because "Equatorial Guinea's payments . . . were made in U.S. currency to banks in the United States," the foreign state's "failure to pay caused a 'direct effect' here"); *Ugwuonye*, 901 F. Supp. 2d at 141; *Reichler, Milton & Medel*, 484 F. Supp. 2d at 2 (holding that "because payment for . . . legal services was to be made to a banking institution in the United States, Liberia's failure to meet its payment obligation under this contract qualifies as an act that 'causes a direct effect in the United States' under the FSIA").

This precedent demonstrates that the direct effect requirement is met here. As the Complaint plainly states, Defendants were required to fulfill their payment obligations by sending amounts described in United States currency to a Dentons bank account in the United States. Compl. ¶¶ 16, 42, 54. The invoices Dentons issued to Defendants, which Defendants accepted on a periodic basis, specified this payment method, and payment pursuant to these invoices was specifically contemplated by the Retainer Agreement. *See id.* at ¶¶ 16, 32-34, 52-56; *see also* Compl. Ex. 4. Defendants did not challenge this method of payment; to the

contrary, they made their only payment toward Dentons' legal fees in U.S. dollars via wire to a Dentons' bank account in the United States, in accordance with the invoices' directive.  Compl. ¶¶ 16, 42, 57.  Thus, this Action is on all fours with every case in this District in which a court has considered a foreign state's nonpayment of legal fees required to be paid in the United States, and the Court should likewise find that Dentons' suit is based on commercial activities that had a direct effect in the United States.

Defendants also ignore on-point case law from this District in arguing that their commercial activities did not have a direct effect in the United States.  They assert that "[t]he contract does not state that the payments are to be made to the United States."  Mem. in Supp. of Mot. to Dismiss 15.  They fail to acknowledge, however, that the invoices Defendants received specified that payments were to be made to Dentons' account in the United States, Compl. ¶¶ 16, 42, 54; and that Defendants agreed to receive and pay according to those invoices in the December Agreement, Compl. Ex. 4 ("[O]ur costs and fees are due upon receipt of our invoice"; "[o]ur next invoices will be sent to you on a periodic basis.").  They also ignore that, when making their one payment to Dentons, Defendants demonstrated they understood and agreed to the invoices' payment terms by complying with the directive to pay via wire to a U.S. bank account.  Compl. ¶¶ 16, 42, 57.  The place of Defendants' performance pursuant to its agreements with Dentons was therefore the United States.  And, as explained *supra*, breaching a contract that establishes the United States as a place of performance will have an "immediate and unavoidable" effect here.  *See I.T. Consultants*, 351 F.3d at 1190.

Defendants further argue that no direct effect existed because the contract for legal services was between the international law firm "SNR Denton" and Defendants, rather than the United States member of that legal practice group.  Mem. in Supp of Mot. to Dismiss 14.  This

15

argument has neither legal relevance nor a factual basis.  As an initial matter, the D.C. Circuit's direct-effect analysis in the breach-of-contract context focuses on whether the United States was the place of performance, not on the nationalities of the contracting parties.  *See I.T. Consultants*, 351 F.3d at 1189-90.  Defendants' contention is therefore immaterial.

Their argument is also premised on an incorrect reading of the Complaint and its exhibits. Defendants engaged the United States law firm then known as "SNR Denton US LLP"—a Delaware limited liability partnership that has operated in the United States since 1906 under various names.  Compl. ¶ 8.  The Terms of Business attached to the December Agreement clearly state that "SNR Denton is the collective trade name for an international legal practice including . . . SNR Denton US LLP . . . which is a *separate and distinct legal entity*."  Compl. Ex. 4 (emphasis added).  The Terms of Business also explain that "SNR Denton Group . . . does not itself provide legal or other client services."  *Id.*  Although attorneys in other affiliated entities of SNR Denton worked on Defendants' behalf, the Retainer Agreement was between Defendants and a United States entity, Compl. Exs. 2, 4; a United States-based partner— Jonathan Cahn—was in charge of the engagement and executed the agreements, Compl. ¶¶ 9, 27, 31; *see also* Compl. Exs. 2, 4; and U.S. attorneys and staff performed most of the work for Dentons primarily in the United States, including 7,500 of 10,000 hours billed toward the matter, Compl. ¶¶ 5, 9, 16, 37-39.  For these reasons, Defendants' arguments about direct effect fail both legally and factually.

Thus, the Court has subject matter jurisdiction over this Action pursuant to the third clause of 28 U.S.C. § 1605(a)(2), because this action is based upon Defendants' commercial activities that had a direct effect in the United States.

**B.    This Action Is Based Upon Acts Performed in the United States in Connection With Defendants' Commercial Activities.**

In the alternative, Defendants are not entitled to immunity under the second clause of the commercial activity exception, namely because this suit is "based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2).  As previously explained, Defendants engaged in commercial activity by contracting with Dentons to act as their legal counsel.  *See supra* Section I.A.1.  This suit is based upon acts performed in the United States in connection with that commercial activity.

A suit against a foreign sovereign may proceed under clause two if the act performed in the United States in connection with a commercial activity of the foreign state elsewhere "establishes a fact without which the plaintiff will lose."  *Kirkham v. Societe Air France*; 429 F.3d 288, 293 (D.C. Cir. 2005); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993).  To establish a claim for breach of contract—the primary cause of action alleged here—a plaintiff must allege facts demonstrating its performance under the contract and the defendant's breach. *See Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).  Here, both of those acts occurred in the United States.

First, Dentons' performance under the contract occurred largely in the United States.  As explained above, Defendants contracted with a U.S. legal partnership, organized under U.S. law and operating in the United States.  Compl. ¶¶ 8, 27, 31; *see also* Compl. Exs. 2, 4.  The partner in charge of the matter was Jonathan Cahn, a Washington, D.C.–based attorney.  Compl. ¶¶ 9, 25, 27, 31.  Dentons performed the majority of its work on Defendants' behalf through United States personnel located in the United States, including more than 7,500 hours of the 10,000 hours spent on this matter.  *Id.* at ¶¶ 5, 9, 16, 37-39.  During its year-plus-long engagement, Dentons produced a large volume of work product on Defendants' behalf, and Defendants were

17

satisfied with its deliverables. *Id.* at ¶¶ 3, 5. The element of Dentons' performance, which happened in connection with Defendants' commercial activity, thus occurred in the United States.

Defendants' nonpayment under the contract likewise occurred in the United States. *See supra* Section I.A.2. As explained above, Defendants were required to make payments to Dentons pursuant to the Retainer Agreement, Compl. ¶¶ 2, 32, 34, and they were directed, pursuant to Dentons' invoices, to make those payments to a United States bank account, *id.* at ¶¶ 16, 42, 54. Defendants demonstrated their understanding of this directive by complying with it when remitting their one payment to Dentons. *Id.* at ¶¶ 16, 42, 57. The element of Defendants' breach of contract therefore also occurred in the United States. For these reasons, the Court may find, in the alternative, that Defendants are not entitled to sovereign immunity because this Action is based upon acts performed in the United States in connection with Defendants' commercial activities.

In sum, pursuant to both clause three and clause two of the FSIA's commercial activity exception, Defendants are not entitled to sovereign immunity, and the Court "shall have original jurisdiction" under 28 U.S.C. § 1330(a).

## C. Dentons Need Not Allege that Defendants Waived Their Sovereign Immunity.

As alleged in the Complaint, and explained herein, Dentons has adequately pleaded that Defendants are not entitled to sovereign immunity because of the commercial activity exception to the FSIA. It is curious, then, that Defendants devote six pages of their Memorandum to countering an assertion that Dentons has never made: that Defendants explicitly or impliedly waived their sovereign immunity pursuant to 28 U.S.C. § 1605(a)(1). The Court need not

address this argument because waiver is immaterial if the Court finds that Defendants' activities fall within the commercial activity exception.

That said, the contentions Defendants advance under this heading—which, in large part, have nothing to do with sovereign immunity—warrant a response. Defendants seem to have purposefully set up the straw man of 28 U.S.C. § 1605(a)(1) in order to assert that "the Retainer Agreement gives every indication that the parties agreed that Guinea and its Ministry would *not* be haled into any court for nonpayment of fees, much less an American federal court." Mem. in Supp. of Mot. to Dismiss 5-6. This claim is both inapposite and unsupportable.

Defendants assert four reasons as to why the Retainer Agreement purportedly evidences an agreement by Dentons not to sue Defendants: (1) because Dentons agreed to seek payment from third parties; (2) because the firm agreed to defer collection of its fees and expenses; (3) because the December Agreement provided information as to which Dentons attorneys Defendants should contact if they had "any concern about any aspect of [Dentons'] services, including [its] invoices"; and (4) because neither the Retainer Agreement nor the incorporated Terms of Business designated the governing law or jurisdiction in the event of a dispute over fees. Nothing of this attempt at creative lawyering establishes that Dentons somehow "waive[d] . . . any possible right it may have had to bring a collection suit in a United States court." Mem. in Supp. of Mot. to Dismiss 10. Nevertheless, Dentons will address each point.

First, Dentons never agreed to seek payment from third parties, and it certainly did not do so in a way that would relieve Defendants of their obligation to compensate Dentons for the legal services it provided. In the December Agreement, Defendants agreed that Dentons was "entitled to transfer . . . its invoices, in whole or in part to third parties," and "authorize[d] the Firm to seek, with third parties, various options for the financing of its representation . . . in which case

19

the Ministry [would] consider the proposals, in good faith." Compl. Ex. 4.  Dentons further

agreed to deduct any amount it received from a third party from the amount owed by Defendants.

*Id.*  These provisions, however, by their plain terms, do nothing more than permit Dentons to

seek third-party financing.  They do not obligate Dentons to do so, nor do they indicate that

Dentons' ability to seek third-party financing in any way mitigated Defendants' obligation to pay.

    Moreover, although Dentons agreed to defer collection of fees and expenses from

Defendants, it committed to do so *only* "as long as the Ministry continue[d] to make [certain]

efforts," namely to "implement in good faith all efforts necessary to secure funding for this

representation, either through the Ministry's budget or through external funding."  *Id.*  According

to the December Agreement, Dentons' agreement to defer collecting on its invoices was to end

upon the Ministry's failure to seek funding in good faith, at which point Dentons' "costs and fees

[became] due upon receipt of [its] invoice."  *Id.*  The Agreement explicitly recognizes that

Dentons' fees would become due upon this event "not taking into account the lack of funding"—

meaning that, even if Defendants remained financially unable to pay their legal bills, Dentons

would not continue to defer its collection of the past-due invoices if Defendants did not continue

to seek funding in good faith.  *Id.*  Thus, Dentons did not agree to unconditionally relieve

Defendants of their obligation to pay.

    To summarize, the Agreement *permitted*, but did not require, Dentons to seek third-party

funding and *deferred*, but did not excuse, Defendants' payment obligation.  To argue that any of

these provisions constituted an agreement by Dentons not to "hale[] [them] into any court for

nonpayment of fees" makes no sense.  Mem. in Supp. of Mot. to Dismiss 6.

    Second, Defendants claim that Dentons cannot bring this claim for breach of contract

because Dentons "failed to obtain 'approved funding' or 'appropriate financing'" for its

representation.  *Id.*  This argument fails for essentially the same reasons that Defendants'

previous argument fails:  Dentons was not obligated under the Retainer Agreement to obtain its

own third-party sources of funding for the legal services it provided to Defendants.  *See* Compl.

Ex. 4.  It was permitted to do so, but as explained above, the responsibility to pay or in good faith

to secure payment for the representation belonged solely to Defendants.  *See id.*

Third, Defendants argue that "the Retainer Agreement contemplates a complaint and

dispute resolution process outside of the court system" and that Dentons forfeited its ability to

bring suit in a U.S. court by not adhering to this so-called complaint and dispute resolution

process.  Mem. in Supp. of Mot. to Dismiss 6-7.  Not so.  The Retainer Agreement provides for

no such "complaint and dispute resolution process."  Rather, it names two Dentons attorneys

whom Defendants could contact if they had "any concern about any aspect of [Dentons']

services, including [its] invoices."  Compl. Ex. 4.  It also informed Defendants of the availability

upon request of Dentons' "formal complaints procedure."  *Id.*  These two sentences are nothing

more than a courtesy from a service provider to its client, supplying information about whom the

client can contact within the firm in the event it is dissatisfied with services provided or bills

received.  Neither party was obligated to take advantage of the "formal complaints procedure" in

the event of a dispute, nor did either agree to refrain from filing a lawsuit in any court.  Thus, this

argument also fails.

Finally, Defendants make two principal claims based on the fact that neither the Retainer

Agreement nor Dentons' Terms of Business designate the governing law or jurisdiction in which

a suit must be brought in the event of a dispute:  (1) that Defendants did not explicitly waive

their sovereign immunity, Mem. in Supp. of Mot. to Dismiss 9; and (2) that, in the absence of

such a designation, "Guinean law and a Guinean forum are mandated by law," *id.* at 7.[4]  As

previously explained, Dentons does not contend that Defendants explicitly waived their

sovereign immunity.

Defendants also offer no legal support for their fleeting contention that Guinean law

would apply in this Action.  Precedent from within this Circuit and District makes clear that it

would not and that D.C. law applies.  In the D.C. Circuit, "courts considering issues governed by

state substantive law in FSIA cases should apply the choice-of-law rules of the forum state."

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009).  Therefore, D.C. choice-

of-law analysis applies here.  "In applying [D.C. choice-of-law] analysis to breach of contract

disputes in which the contract lacks an effective choice-of-law provision, D.C. courts apply the

five factors outlined in the Restatement:  (1) the place of contracting, (2) the place of negotiation

of the contract, (3) the place of performance of the contract, (4) the location of the subject matter

of the contract[,] and (5) the place of incorporation and the place of business of the parties."

*Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 162 (second alteration in original) (internal

quotation marks omitted).

---

[4] Defendants further contend that the Terms of Business "generally indicate that the law of [a] foreign locality is to be applied" in the event of a dispute "and that courts of the foreign locality shall have exclusive jurisdiction over any dispute."  Mem. in Supp. of Mot. to Dismiss 8.  They mistakenly assume that the Location Terms apply based on the "matter or client" involved.  *Id.* at 9.  They are incorrect.  Rather, the Terms of Business specifically provide that "[d]ifferent Location Terms apply *depending on the jurisdiction in which Practices operate*, and differ to meet local practicing, ethical, tax and regulatory requirements."  Compl. Ex. 4 (emphasis added).  Because Defendants contracted with the United States member Practice—a legally separate entity—the only Location Terms relevant to this Action are the United States Location Terms, which "apply to the legal practices of SNR Denton US LLP operated from all locations within the United States."  *Id.*  Those Terms include neither a choice-of-law nor a choice-of-jurisdiction provision.  Instead, as explained herein, the law of this Circuit establishes that D.C. law is applicable to this dispute and that the Court is a proper venue.

*Lanny J. Davis & Associates* is factually analogous to this Action, involving a suit against a foreign sovereign for nonpayment of legal fees, in which the contract did not have a choice-of-law provision.  In that case, the court applied the above-specified D.C. choice-of-law analysis and found that D.C. law applied when:  the parties each signed a contract for legal services in their respective locations, one in Washington, D.C. and the other in Equatorial Guinea; negotiations took place via email from the parties' respective locations; the vast majority of the work under the contract took place in Washington, D.C.; and the attorney worked from his principal place of business in Washington, D.C.  *Id.*  Upon these facts, the court held that "[o]n balance, each factor favors the application of D.C. contract law."  *Id.*

So too here.  As demonstrated in Sections I.A and I.B, *supra*, the parties to this Action signed and negotiated both parts of the Retainer Agreement from their respective locations, one of which was Washington, D.C.; Dentons performed the vast majority of its work on Defendants' behalf in Washington, D.C.; and the partner in charge of Defendants' matter was based in and primarily worked out of Washington, D.C.  Therefore, as in *Lanny J. Davis & Associates*, D.C. law applies here.  Defendants' unsupported contention that Guinean law would apply to this Action is unfounded.  Neither it, nor any of the other straw-man arguments has merit.

## II.    The Complaint States a Cause of Action.

Defendants next claim that, even if they are not entitled to sovereign immunity in this Action—which, as Dentons has established, they are not—the Court should dismiss the Complaint for failing to allege that Defendants breached the Retainer Agreement.  To the contrary, the Complaint fully alleges that Defendants failed to meet their obligations to Dentons.

23

It bears highlighting, moreover, that Dentons states three causes of action in addition to breach of contract: quantum meruit, unjust enrichment, and account stated.  Defendants do not contend that Dentons failed to state a claim for any of these, nor could they.

### A.  The Complaint Alleges Defendants' Breach of Contract.

Defendants assert that the Complaint fails to allege that Defendants' obligation to pay Dentons ever materialized.  They claim that Dentons agreed to defer collection of its fees "unless and until 'appropriate financing' was arranged in one of two ways: (1) an increase to the Ministry's budget; or (2) a third party source was identified by the Firm and approved by Guinea."  Mem. in Supp. of Mot. to Dismiss 17.  Defendants misread the contract.

As set forth *supra*, and as the plain language demonstrates, Dentons agreed, "not taking into account the lack of funding, [to] defer collection of fees and expenses billed in accordance with this Letter and in accordance with the Terms and Conditions until the appropriate financing is in place" "as long as the Ministry continue[d] to make [certain] efforts"—namely, to "implement in good faith all efforts necessary to secure funding for this representation, either through the Ministry's budget or through external funding."  Compl. Ex. 4.  The salient obligation imposed on Defendants is, on an ongoing basis, to "implement in good faith all efforts necessary to secure funding for this representation."  Dentons agreed to defer collecting its fees until financing was in place *only* if Defendants continued to employ "all efforts necessary" to secure funding "in good faith."

Thus, Defendants are incorrect that obtaining financing was the only contingency that could trigger their obligation to pay.  The language of the December Agreement demonstrates that Defendants' failure to "implement in good faith all efforts necessary to secure funding" ended Dentons' agreement to defer collection of fees, whether or not funding was in place—i.e.

"not taking into account the lack of funding"—and reverted to the default payment terms:  that Dentons' "costs and fees are due upon receipt of [its] invoice."[5]

Defendants seem tacitly to concede that Dentons' interpretation of the contract is correct by next arguing that the Complaint does not allege that Defendants ceased "implement[ing] in good faith all efforts necessary to secure funding"—the contingency that triggered their immediate obligation to pay Dentons.  To the contrary, the Complaint specifies that, despite having acknowledged their obligation to compensate Dentons and communicated that "[t]he Government has taken the decision to pay everything," Compl. ¶ 45; Compl. Ex. 9, Defendants "had not budgeted for the owed amounts," Compl. ¶ 47; "failed to pay or to provide a plan for payment of the amounts owed under the Retainer Agreement," *id.* at ¶ 48; *and, most importantly, had "not implemented in good faith efforts to secure funding for the representation," by having "since at least September 2013, ceased any efforts to secure funding to pay the invoices," id.* at ¶ 49.  Thus, according to the terms of the Retainer Agreement and the Complaint allegations, Dentons' agreement to defer collection of fees ceased in September 2013 at the latest, and Defendants have been in breach of contract for nonpayment since that date.  Dentons provided Defendants with nearly a full year to cure this breach—during which time Defendants did not engage in good faith efforts to pay or secure funding—before finally resorting to filing suit.

---

[5] Dentons contends that the contract language is unambiguous, and the Court should find that, as a matter of law, it means exactly what Dentons says it means.  Even if the Court disagrees with Dentons' interpretation, however, Defendants' interpretation of the contract is neither plain nor obvious.  As an alternative argument, then, Dentons contends that the contract language is therefore at least ambiguous, meaning "the provisions in controversy are[] reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C. 1973).  If the contract is ambiguous, at this stage of the litigation and "[g]iving [the] Plaintiff the benefit of the doubt and accepting its allegations as true," the Court must deny Defendants' Motion to Dismiss on this ground.  *See, e.g.*, *Scowcroft Grp., Inc. v. Toreador Res. Corp.*, 666 F. Supp. 2d 39, 43-44 (D.D.C. 2009).

Defendants' argument that the Complaint fails to support this narrative is based on a mischaracterization of when Dentons alleges the breach occurred.  Defendants claim that the Complaint demonstrates their good faith efforts to secure financing in the following allegations: (1) on March 24, 2013, Minister Fofana represented that Defendants were working on arranging payments for the outstanding invoices, Compl. ¶ 40; (2) as of March 24, 2013, Defendants were in negotiations with Rio Tinto to pay Dentons' fees, *id.* at ¶ 41; and (3) on April 1, 2013, Defendants made a single payment of $2,000,000.00 to Dentons, *id.* at ¶ 42.  But Dentons does not contend that Defendants were in breach as of March or April 2013.  Defendants' obligation to "implement in good faith all efforts necessary to secure funding" was "continu[ing]," and the Complaint plainly alleges that their efforts ceased as of at least September 2013.  *Id.* at ¶ 49; Compl. Ex. 4.  Defendants' breach—by ceasing to seek funding in good faith and subsequently failing to pay the outstanding invoices—occurred by that time.  *See* Compl. ¶ 49.  The Complaint fully supports this claim.

Dentons has properly alleged all four elements of a claim for breach of contract.  Under D.C. law, those elements are: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).  Here, the parties entered into a valid contract, in the form of the Retainer Agreement, which was memorialized in the August and December Agreements.  Compl. ¶¶ 2, 4, 26-28, 31-36, 61; *see also* Compl. Exs. 2, 4. Second, under the Retainer Agreement, Dentons was obligated to provide legal services to Defendants, and Defendants were obligated to pay for those legal services.  Compl. ¶¶ 2, 26, 28, 32, 34, 36, 61; *see also* Compl. Ex. 2, 4.  The Retainer Agreement included a provision pursuant to which Dentons agreed to defer collection of its fees *only* if Defendants, in good faith and using

26

"all efforts necessary," sought financing to pay for those legal services.  Compl. ¶ 34; *see also* Compl. Ex. 4.  If Defendants ceased these efforts, Dentons' invoices became due upon receipt, regardless of Defendants' financial situation.  *Id.*  Third, whereas Dentons performed the legal services contemplated under the Retainer Agreement, Defendants failed to pay Dentons' invoices and, as of at least September 2013, ceased all good faith efforts to secure funding for the representation.  Compl. ¶¶ 3-7, 30, 37-39, 48-51, 56-59, 63-65.  Thus, and as explained *supra*, Defendants breached the contract.  Dentons was damaged by this breach in the amount of $10,214,458.48 in unpaid legal fees.  *Id.* at ¶¶ 2, 6-7, 59, 66.

**B.     The Complaint Alleges Each Element of the Additional Causes of Action.**

The only one of the Complaint's four causes of action with which Defendants take issue is the breach of contract count.  As demonstrated above, the Complaint fully states such a claim. While Defendants do not allege that the remaining causes of action are deficient, we set forth the allegations supporting each briefly below.

First, the Complaint properly alleges quantum meruit.  *See* Count II.  This cause of action has four elements under D.C. law:  "(1) valuable services must be rendered by the plaintiff; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged, and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, expected to be paid. *TVL Assocs. v. A&M Constr. Corp.*, 474 A.2d 156, 159 (D.C. 1984) (alterations and internal quotation marks omitted).  "A promise to pay will be implied in law when one party renders valuable services that the other party knowingly and voluntarily accepts."  *Brown v. Brown*, 524 A.2d 1184, 1186 (D.C. 1987).

Dentons has stated such a claim.  Specifically, Dentons rendered valuable legal services to Defendants for their benefit and at their request, Compl. ¶¶ 3-5, 30, 37-39, 58, 68; Defendants knowingly and voluntarily accepted these services and derived value from them, *id.* at ¶¶ 3-5, 30, 37-39, 51, 58, 69; and Dentons, by issuing invoices to Defendants and frequently communicating with them regarding billing and payment, made clear that it expected to be compensated for its work—a fact Defendants frequently acknowledged, *id.* at ¶¶ 4-7, 29, 34, 40-59, 70-71.

Second, Dentons has adequately stated a claim of unjust enrichment.  *See* Count III. Unjust enrichment has three elements under D.C. law:  "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted and retained the benefit; and (3) it would be unjust for the defendant not to pay the plaintiff the value of the benefit." *Sununu v. Philippine Airlines, Inc.*, 792 F. Supp. 2d 39, 53-54 (D.D.C. 2011) (internal quotation marks omitted); *see also Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C. Cir. 1973).

All three elements are properly alleged in the Complaint:  (1) Dentons performed valuable legal services for Defendants' benefit, Compl. ¶¶ 3-5, 30, 37-39, 58, 76; (2) Defendants accepted the benefit of these services and acknowledged the value and quality of Dentons' work, *id.* at ¶¶ 3-5, 30, 37-39, 51, 58, 77; and (3) where Dentons spent tens of thousands of hours working on Defendants' behalf, and issued unpaid invoices to Defendants totaling $10,214,458.48—an amount Defendants do not dispute—it would be unfair for Defendants not to compensate Dentons, *id.* at ¶¶ 78-80.

Third, Dentons has also properly alleged facts necessary for recovery under the doctrine of account stated.  *See* Count IV.  "An account stated is a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." *Eagle Maint. Servs., Inc. v. D.C. Contract Appeals Bd.*, 893 A.2d 569, 582 (D.C. 2006) (internal quotation marks omitted).

28

Pursuant to this doctrine, compensation is warranted when a party acknowledges or admits that a certain sum is due, and assents, expressly or impliedly, to the accuracy of the balance. *Id.*

The Complaint alleges all of these requirements, as well. Dentons provided Defendants with invoices detailing the fees and expenses for the work performed on its behalf, Defendants accepted each of these invoices, and Defendants repeatedly acknowledged that the amounts reflected in the invoices were due. Compl. ¶¶ 6, 29, 40-41, 44-46, 55-59, 83-89. The unpaid statements that Defendants admit they owe Dentons amount to $10,214,458.48. *Id.* at ¶ 88.

Because the Complaint allegations state a claim for breach of contract, as well as for the three alternative causes of action, the Court should deny Defendants' Motion to Dismiss.

## III.    The Court Should Accept Dentons' Chosen Forum.

In a final attempt to secure dismissal of the Complaint, Defendants ask the Court to exercise discretion to dismiss pursuant to the doctrine of forum non conveniens. In doing so, they fail to recognize that, as an initial matter, venue is proper in this Court because "[a] civil action against a foreign state . . . may be brought . . . in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f). Defendants further provide no valid justification that would overcome the substantial presumption in favor of Dentons' choice of forum. They fail even to argue that the first element necessary for a court to invoke the doctrine is met here. *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008).

In deciding whether to apply the doctrine of forum non conveniens, the Court must determine (1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal. *Id.* "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should

rarely be disturbed." *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 764 F. Supp. 2d 155, 160 (D.D.C. 2011) (alteration in original) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

Defendants do not even attempt to establish that the courts of Guinea provide an adequate alternative forum.  Defendants have not contended, much less supported, the required propositions that a Guinean court would have "jurisdiction over the entire dispute" and that Guinean courts could provide Dentons with "full relief." *Cruise Connections*, 764 F. Supp. 2d at 160; *Osseiran v. Int'l Fin. Corp.*, 498 F. Supp. 2d 139, 148 (D.D.C. 2007), *aff'd* 552 F.3d 836 (D.C. Cir. 2009); *see also TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 303 (D.C. Cir. 2005) ("[O]nly a court of the United States (or one of them) may attach the commercial property of a foreign nation located in the United States.").  Nor do Defendants contend that Guinean courts can adequately apply D.C. law, which applies to this matter. *See supra* Section I.C.

Courts within this District routinely reject forum non conveniens arguments in the FSIA context because a defendant has not demonstrated the existence of an adequate alternative forum. *See, e.g.*, *Belize Social Dev. Ltd. v. Government of Belize*, 5 F. Supp. 3d 25, 34 (D.D.C. 2013) (rejecting forum non conveniens argument because no adequate alternative forum existed); *Cont'l Transfer Technique Ltd. v. Federal Government of Nigeria*, 697 F. Supp. 2d 46, 57-58 (D.D.C. 2010) (rejecting forum non conveniens argument "because the defendants have not established the existence of an adequate alternative forum"); *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 466 F. Supp. 2d 6, 27-28 (D.D.C. 2006) (rejecting forum non conveniens argument because defendant failed to demonstrate that Russian courts would provide an adequate

alternative forum), *aff'd in relevant part* 528 F.3d 934 (D.C. Cir. 2008).  The same result is

appropriate here.

The primary argument Defendants make in support of their motion is that "[f]oreign

policy considerations also weigh against courts in the United States presuming to act as world

courts."  Mem. in Supp. of Mot. to Dismiss 19.  To the contrary, by creating the commercial

activity exception to the FSIA, Congress determined that this Court should be open to litigants

seeking to vindicate their rights against foreign governments.  *Cf. Cont'l Transfer Technique*

*Ltd.*, 697 F. Supp. 2d at 58 (rejecting forum non conveniens claim that plaintiff was attempting to

turn this Court into "the courthouse to the world or an international court of claims" because "by

ratifying the New York Convention, Congress, not the plaintiff, determined that this court and

others in the United States should be open to foreign litigants seeking to enforce arbitral awards"

(internal quotation marks omitted)).  Nor would it be, in Defendants' word, "presumptuous," for

the Court to consider Dentons' claims.  The Court routinely handles disputes between private

litigants and foreign governments, precisely as Congress envisioned.

Without having established that an adequate alternative forum exists, Defendants cannot

succeed on their forum non conveniens claim.  Nor have Defendants cited any support for the

proposition that they are entitled to additional time "to develop the record."  Mem. in Supp. of

Mot. to Dismiss 20.  Defendants had the opportunity to support their Motion prior to filing it,

particularly with respect to whether Guinea is an adequate forum, and failed to do so.  They had

no need to seek permission to investigate the adequacy of their own Guinean courts to adjudicate

this dispute, and there is no justification for the Court now to delay this Action by affording

Defendants additional time to perform research about facts within their control.  The Court

should deny Defendants' Motion on the ground of Federal Rule of Civil Procedure 12(b)(3).

**CONCLUSION**

For the reasons explained above, the Court should deny Defendants' Motion to Dismiss this Action on the grounds of foreign sovereign immunity, pursuant to Federal Rule of Civil Procedure 12(b)(1); failure to state a claim, pursuant to Rule 12(b)(6); and forum non conveniens, pursuant to Rule 12(b)(3).

Respectfully submitted,

 /s/ Michael S. Sundermeyer
Michael S. Sundermeyer (D.C. Bar No. 931873)
Ana C. Reyes (D.C. Bar No. 477354)
Leslie C. Mahaffey (D.C. Bar No. 1019782)
Williams & Connolly LLP
725 12th Street, NW
Washington, D.C.  20005
Tel. (202) 434-5000
Fax (202) 434-5029
msundermeyer@wc.com
areyes@wc.com
lmahaffey@wc.com

*Attorneys for Plaintiff Dentons US LLP*

Dated:  December 8, 2014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2014, a copy of the foregoing **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was filed electronically via ECF.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ Michael S. Sundermeyer
Michael S. Sundermeyer (D.C. Bar No. 931873)
Williams & Connolly LLP
725 12th Street, NW
Washington, D.C.  20005
Tel. (202) 434-5000
Fax (202) 434-5029
msundermeyer@wc.com