**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DENTONS US LLP,**
                                        **Plaintiff,**

   **v.**                                               Case No. 1:14-cv-1312-RDM

**THE REPUBLIC OF GUINEA, and**

**THE MINISTRY OF MINES AND
GEOLOGY,**
                                        **Defendants.**
_____

**THE REPUBLIC OF GUINEA, and**

**THE MINISTRY OF MINES AND
GEOLOGY,**
                   **Counterclaim Plaintiffs,**

**v.**

**DENTONS US LLP,**                                     **DEFENDANTS THE REPUBLIC OF
                   **Counterclaim Defendant,**          **GUINEA and THE MINISTRY OF
                                                        MINES AND GEOLOGY'S
                                                        ANSWER, COUNTERCLAIM and
**SALANS FMC SNR DENTON GROUP,**                        THIRD PARTY CLAIM**
   Zollikerstrasse 226
   CH 8008
   Zurich, Switzerland

**DENTONS EUROPE, LLP,**
   Association d'Avocats à Responsabilité
   Professionnelle Individuelle (AARPI)
   112 Avenue Kleber
   75116 Paris, France

**DENTONS UKMEA LLP,**
   One Fleet Place
   London EC4M 7WS
   United Kingdom
                   **Third Party Defendants.**

## DEFENDANTS' ANSWER TO COMPLAINT, COUNTERCLAIM, and THIRD-PARTY CLAIM

Defendants, by and through their undersigned counsel, hereby respond to Plaintiff's Complaint as follows:

### GENERAL DENIAL

The Defendants deny each and every allegation contained in the Complaint, and each and every part thereof, unless expressly admitted in the Specific Responses below, and, in this connection, the Defendants deny that Plaintiff has been injured or damaged in any sum, or at all.

### SPECIFIC RESPONSES TO ALLEGATIONS

**Defendants hereby respond to the specific allegations contained in the Complaint, as follows:[1]**

1.      Plaintiff Dentons US LLP (f/k/a SNR Denton US LLP) (herein, "Dentons") as and for the Complaint against defendants the Republic of Guinea and its Ministry of Mines and Geology (together, the "Defendants") alleges as follows.

**ANSWER:  Defendants neither admit nor deny the allegations in this paragraph as the paragraph does not contain allegations of fact.  Defendants do not waive their right to contest whether the Complaint properly identifies the real parties in interest and such an affirmative defense is asserted in this Answer.**

2.      This action arises from Defendants' refusal to pay $10,214,458.48 in legal fees and costs that Defendants have repeatedly acknowledged they owe Dentons.  The parties entered into a written contract, reflected in consecutive documentation executed in August 2012 and December 2012 (together, the "Retainer Agreement"), for the provision by Dentons of professional services and, in exchange, for Defendants to pay Dentons its legal fees and costs.  Dentons seeks to recover the value of those legal fees and costs.

---

[1]      For the convenience of the Court, the Defendants provide the Plaintiff's allegations as single-spaced quoted text, and provide the Answers to the allegations as double-spaced text to conform to the Court's Local Rules, LCvR 5.1(d).

**ANSWER:  Defendants generally deny the allegations of this paragraph.  Defendants admit that documents were executed in August and December 2012 which purport to create an Agreement for legal services, but deny that the Plaintiff was to provide those services.**

3.      Defendants contracted with Dentons in connection with the development of a large-scale mining and infrastructure project in southeastern Guinea ("the Simandou Project" or "the Project") having a cost publicly estimated at $20 billion.  In support of the Project, Dentons has rendered valuable professional services to Defendants, at Defendants' direction, for Defendants' benefit, and with Defendants' knowledge and approval.

**ANSWER:  Defendants deny that they contracted with "Dentons" as that word is defined in the Complaint.  Defendants also deny the allegation that Dentons has rendered valuable professional services to Defendants.**

4.      Dentons performed professional services on behalf of Defendants at standard hourly rates, as agreed to by the parties, and upon Defendants' instruction and with their approval, recruited a team of specialist subcontractors to provide the multidisciplinary strategy and advice required by the Project's complexity, size and economic value.  Pursuant to the Retainer Agreement, Dentons periodically invoiced Defendants for its services and those of its subcontractors, and the invoices were due upon receipt.

**ANSWER:  Defendants deny that they contracted with "Dentons" as that word is defined in the Complaint.  Due to the Plaintiff's misidentification of the contracting parties and the confusion that such identification creates in the Complaint, Defendants deny the remaining allegations of this paragraph.**

5.      Defendants repeatedly requested that Dentons increase the scope of its deliverables, and Defendants often complimented Dentons, the quality and timeliness of Dentons' work product, and the team's dedication and commitment to the Project.  During more than a year of work, the Dentons team protected Guinea's legal interests and supported Guinea's efforts to advance the Project. The lawyers on the team, in addition to the subcontractors enlisted in the effort, dedicated more than 10,000 hours to working with the Government, its Ministers and representatives, including more than 7,500 hours spent in the United States.  The team produced scores of reports, presentations, memoranda, drafts, negotiator notes and other deliverables including briefings to the Ministry of Mines, the Ministry of Finance, the inter-ministerial working group convened by the Ministry of Mines, and a working group designated by the President of Guinea, which

provided real value to the Defendants.  Defendants repeatedly asked Dentons to continue with its work, in light of the advocacy and advice that Dentons provided. Even though unpaid, the team, and its subcontractors, continued to work to support Guinea in reliance on the Government's assurances that it would pay its invoices.

**ANSWER:  Defendants deny that they contracted with "Dentons" as that word is defined in the Complaint.  Due to the Plaintiff's misidentification of the contracting parties and the confusion that such identification creates in the Complaint, Defendants deny the remaining allegations of this paragraph. Defendants deny that it provided assurances that it would pay its invoices.**

6.      Defendants currently owe Dentons $10,214,458.48 plus interest for past due invoices comprising legal fees, out-of-pocket expenses, and the costs of investment banking, engineering, tax specialist and other specialist subcontractors retained by Dentons on behalf of Defendants. Prior to September 2013, Defendants continually acknowledged this debt and made repeated assurances to Dentons that they would arrange payment to Dentons of all amounts owed. Defendants have not, however, paid the outstanding amounts due to Dentons.  Despite multiple requests, Defendants have failed to make the required payments.

**ANSWER:  Defendants deny the allegations of this paragraph.**

7.      In light of Defendants' continued failure to pay invoices they have admitted they owe, Dentons has been forced to file this lawsuit.

**ANSWER:  Defendants deny the allegations of this paragraph.**

8.      Plaintiff Dentons US LLP is a law firm authorized to do business in the District of Columbia, with an office located at 1301 K Street, N.W., Suite 600, East Tower, Washington, D.C. 20005. It is a Delaware limited liability partnership.  Dentons' presence in the United States dates back to 1906. Since that time, Dentons has lawfully operated under different names, including "Sonnenschein Nath & Rosenthal LLP" and "SNR Denton US LLP."  During a time period relevant to this Complaint, on February 28, 2013, the firm changed its name from "SNR Denton US LLP" to "Dentons US LLP."

**ANSWER:  Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

9.      Dentons operates from sixteen locations in the United States, including an office in Washington, D.C.  The Washington, D.C. office of Dentons employs more than 120 legal and support professionals.  Jonathan D. Cahn, a partner in Dentons' Washington, D.C. office and an acknowledged expert in emerging markets transactions, was the partner in charge of Dentons' engagement with the Republic of Guinea.  Mr. Cahn directed a team of Dentons lawyers specializing in mining, infrastructure and project finance and supervised a consortium of subcontractors, including investment banking firm Lazard Freres, engineering firm Khatib & Alami, a Tax Experts Group led by noted authority on mining fiscal regimes, James Otto, and other specialist subcontractors recruited by Dentons at Defendants' instruction.

**ANSWER:  Defendants lack knowledge and information sufficient to form a belief as to the**

**truth of the allegations contained in this paragraph.**

10. Defendant the Republic of Guinea is a foreign sovereign state.

**ANSWER:  Defendants admit this allegation.**

11. The President of the Republic of Guinea, Alpha Condé ("President Condé"), was contemporaneously aware, in each instance, that the Ministry of Mines was executing the contractual documentation of the Retainer Agreement in August 2012 and December 2012, that Dentons was providing services to Defendants, that Defendants derived benefit from these services, and that Dentons was and is owed its fees in connection with Dentons' engagement.

**ANSWER:  Defendants deny the allegations in this paragraph.  Defendants did not derive**

**benefit from the services of Dentons and Defendants do not owe fees to Dentons.**

12. Defendant the Ministry of Mines and Geology of the Republic of Guinea ("Ministry of Mines" or the "Ministry") is a political subdivision of the Republic of Guinea.  Under 28 U.S.C. § 1603 (2012), political subdivisions are integral parts of the state itself.  The Ministry of Mines is headquartered in Conakry, Guinea; its official address is BP 295, Conakry, The Republic of Guinea. From January 2011 to January 2014, Mohamed Lamine Fofana ("Minister Fofana") served as the Minister of Mines.  On January 20, 2014, Kerfalla Yansane (previously the Minister of Finance) ("Minister Yansane") became the new Minister of Mines and currently serves in that position.

**ANSWER:  Defendants admit the allegations in this paragraph.**

13. The Minister of Mines has actual and apparent authority to execute commercial contracts on behalf of, and binding upon, the Republic of Guinea and the Ministry.  Pursuant to Presidential Decree and in accordance with the Constitution of the Republic of Guinea, the President of the Republic of Guinea granted responsibility to the Ministry of Mines to negotiate and to enter into agreements related to the management of the Republic of Guinea's mineral resources for the benefit of, and binding upon, the Republic of Guinea.

**ANSWER:  The allegations of paragraph 13 are allegations of law relating to legal authority.  Defendants neither admit nor deny these legal conclusions, but reserve objection to the paraphrasing of such legal conclusions.**

14. Defendants took all of the actions referred to herein pursuant to authorities delegated to the Ministry of Mines by the Republic of Guinea.  At all times, the Ministry of Mines acted on behalf of each Defendant.

**ANSWER:  Defendants deny the actions alleged by Dentons and therefore cannot admit that they took any such disputed actions pursuant to the alleged legal authorities.**

15. The Republic of Guinea and the Ministry of Mines each accepted the services provided by Dentons and each derived substantial benefit from them.

**ANSWER:  Defendants deny the allegations in this paragraph.**

16. This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1330(a) (2012), since Defendants are not entitled to immunity pursuant to 28 U.S.C.  § 1605. Defendants have waived sovereign immunity pursuant to 28 U.S.C. § 1605(a)(2) for the reasons alleged in this Complaint, including but not limited to, the following facts:  the contract and requests for services that form the bases for Dentons' claims constitute commercial activity of a foreign state; with Defendants' knowledge and at their request, Dentons carried on a substantial portion of the work it performed on Defendants' behalf through its United States-based attorneys and staff and in the United States; Defendants' commercial activity has had a direct effect in the United States; Dentons' invoices requested payment in United States dollars via wire to a Dentons bank account in the United States; and, *inter alia*, Defendants made their one payment in United States dollars to a Dentons bank account located in the United States.

**ANSWER:  Defendants moved to dismiss on the jurisdictional issue of sovereign immunity. The Court has issued a preliminary ruling that the motion to dismiss is denied on the grounds that Dentons was providing commercial services.  Defendants do not waive the issue, but reserve the right to assert a renewed motion following discovery. Defendants generally deny the allegations in this paragraph.**

17.     This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1330.  Each Defendant is subject to service of process pursuant to 28 U.S.C. § 1608(a).

**ANSWER:  Defendants recognize the Court's ruling on jurisdiction, but reserve the right to contest jurisdiction following discovery.**

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) which permits an action against a foreign state and a political subdivision thereof to be brought in this Court.

**ANSWER:  Defendants recognize the Court's ruling on venue, but reserve the right to contest venue at a later stage of the case.**

19.     Since at least 1997, the Republic of Guinea has sought to develop one of the largest mining projects in the world, the Simandou Project.  According to public reports from Rio Tinto Group ("Rio Tinto"), this multi-billion dollar project involves the development of one of the world's largest iron ore mines in the mountains of Southern Guinea, a 650 kilometer trans- Guinean railway, and a port capable of handling capsized vessels.  The investors in the Project include Rio Tinto (50.35 percent), the China Aluminum Corporation (44.65 percent), and the World Bank's International Finance Corporation (5 percent).

**ANSWER:  Defendants admit that they have taken steps to try to develop the Simandou Project, but deny the specific allegations about the project as the project remains in the early stages and the investment in the project remains incomplete.**

20.     As the Simandou Project progressed, disputes arose between Rio Tinto and the Republic of Guinea.  In April 2011, Rio Tinto, its subsidiary Simfer S.A., and the Government of the Republic of Guinea entered into a publicly disclosed settlement agreement (the "2011 Settlement Agreement") intended to resolve their disputes concerning the Project.

**ANSWER:  Defendants admit that the Defendants entered into a written agreement with Simfer S.A., but deny the characterization of that agreement, as the document will speak for itself.**

21.     Among other obligations, the 2011 Settlement Agreement obliged the parties to negotiate a series of complex mining and infrastructure agreements (the "Investment Framework Agreements").  The Investment Framework Agreements were to transform the agreed-upon principles established in a 2002 Convention de Base and the 2011 Settlement Agreement into new agreements complete with the necessary detail, transparency, and legal form to support the Project.

**ANSWER:  Defendants admit that the Defendants entered into a written agreement with**

**Simfer S.A., but deny the characterization of that agreement, as the document will speak for**

**itself.**

22.      In early 2012, Defendants requested help from the World Bank in connection with the Project and implementation of the 2011 Settlement Agreement.  In response, the World Bank engaged financial advisory firm Taylor-DeJongh to assemble a team to evaluate the Republic of Guinea's need for legal, financial, and technical advisory services.

**ANSWER:  Defendants admit the allegations of paragraph 22.**

23.      At Defendants' request, Taylor-DeJongh and its advisors attended a series of in- person meetings in late May 2012 with Guinean government officials.  Dentons, originally as a member of the Taylor-DeJongh-led advisory group, attended these meetings to assess the Republic of Guinea's need for legal services in connection with the 2011 Settlement Agreement.

**ANSWER:  Defendants admit the allegations of paragraph 23.**

24.      Dentons was first introduced to Defendants during these May 2012 meetings.

**ANSWER:  Defendants lack knowledge of the truth of the above allegations.**

25.      Taylor-DeJongh and the other advisors undertaking the needs assessment, including a Dentons team led by Jonathan Cahn, met from June 10 through 15 in Paris with a Government of Guinea delegation led by Minister Fofana and then–Minister of Finance Yansane.  During these meetings, Defendants requested that Dentons provide counsel directly to the Republic of Guinea on a number of complex matters related to the Simandou Project and the   2011 Settlement Agreement.  On information and belief, Defendants consulted with the World  Bank about whether they could retain Dentons directly.  The World Bank confirmed to Defendants  that the World Bank had "no objection" to Defendants' retaining Dentons, as Dentons did not have a direct engagement with the World Bank.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the above allegations.**

26.      Defendants thereafter retained Dentons to represent their interests in connection   with the Simandou Project and the implementation of the 2011 Settlement Agreement.  Dentons  agreed to this representation and invoiced Defendants at Dentons' standard hourly rates.  Defendants agreed to the payment of Dentons' services in writing.  On August 25, 2012,  Defendants memorialized the retention of Dentons in writing by executing a "Letter of  Appointment as Legal Counsel to the Ministry of Mines and Geology – Simandou Project –  Conakry, Guinea" (the "August Agreement").  The August Agreement memorialized Dentons'  engagement as counsel to the Republic of Guinea, through its Ministry of Mines, as of May 2, 2012 and continued that

engagement through September 30, 2012, the extended completion date of the separate and then-ongoing World Bank assessment.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

27.    Minister Fofana—following consultations with President Condé, the President's Director of Large Projects Mamadi Condé, and other Ministry of Mines representatives, including the Ministry's Legal Counsel Saadou Nimaga—signed and placed the Ministry's official seal on the August Agreement on behalf of Defendants and issued it under the letterhead of the Republic of Guinea, Minister of Mines & Geology.  Minister Fofana addressed the August Agreement to Mr. Cahn's attention and to Dentons' Washington, D.C. office at 1301 K Street, N.W., Suite 600, East Tower, Washington, D.C. 20005-3364.

**ANSWER:  Defendants neither admit nor deny allegations that purport to describe communications covered by the attorney-client privilege.  Defendants admit that an August Agreement exists and that the contents of that document speak for itself.  Defendants neither admit nor deny the characterization of that document.**

28.    In the August Agreement, Defendants agreed to arrange payment to Dentons for all work performed from May 2, 2012 through September 30, 2012, to the extent that such work was not otherwise paid by the World Bank.  A true and correct redacted copy of the August Agreement is attached as Exhibit 1.[2]  A true and accurate translation from French to English of Exhibit 1 is attached as Exhibit 2.

**ANSWER:  Defendants admit that an August Agreement exists and that the contents of that document speak for itself.  Defendant neither admits nor denies the characterization of that document.  Defendants neither admit nor deny the assertions made in the footnote contained in this paragraph.**

29.    For the period from May 2, 2012 through September 30, 2012, Dentons invoiced $2,120,884.46 in legal fees and services to Defendants.  Defendants did not dispute the work performed as reflected in Dentons' invoices or the reasonableness of the invoices.

---

[2]    The redactions of Exhibits to this Complaint are intended to preserve the confidentiality of information pursuant to Rule of Professional Conduct 1.6(e)(5).  Defendants have previously received and/or sent unredacted copies of each French language Exhibit cited herein.

**ANSWER:  Defendants deny that the legal services were performed or properly invoiced and Defendants deny the allegation that they did not dispute the work allegedly performed or the reasonableness of the invoices.  Defendants admit invoices were received and that the documents best speak for themselves.  Defendants deny the characterization of such invoices.**

30.     At the request of, and at the direction of Defendants, Dentons continued to provide legal and professional services, including from Dentons' Washington, D.C. office, to Defendants after September 30, 2012 with the understanding that the parties would enter into a supplemental agreement covering all work performed on or after October 1, 2012.  Defendants expressly confirmed this understanding.

**ANSWER:  Defendants admit that they requested that Dentons complete the legal work after September 30, 2012, but deny any "understanding" that the parties would enter into a supplemental agreement or that any such understanding was binding.**

31.     On or about December 24, 2012, the parties executed a supplemental written agreement, which continued the parties' contractual relationship (the "December Agreement").  Minister Fofana signed, initialed each page, and placed the Ministry's official seal on the December Agreement on behalf of Defendants with, on information and belief, the express approval of President Condé.  The December Agreement was issued on Dentons' letterhead and was signed by Mr. Cahn in Washington, D.C.

**ANSWER:  Defendants admit that the December Agreement exists and that the contents of that document speak for itself.  Defendants neither admit nor deny the characterization of that document.  Defendants deny any allegation that "Dentons letterhead" was used as the identity of "Dentons" remains disputed.**

32.     The December Agreement represented a continuation of Dentons' work for the Republic of Guinea under the August Agreement, which was attached as Schedule B, and expressly included Dentons' work as of October 1, 2012.  It memorialized both Defendants' instruction that Dentons continue its representation in connection with the Simandou Project and Defendants' renewed agreement to pay in accordance with Dentons' standard hourly rates pursuant to Dentons' invoices. The December Agreement further confirmed Defendants' prior agreement to cover all amounts Defendants owed Dentons for work performed from May 2, 2012 through September 30, 2012.

**ANSWER:  Defendants admit that the December Agreement exists and that the contents of**

**that document speak for itself.  Defendants neither admit nor deny the characterization of**

**that document.**

33.     Schedule A to the December Agreement was a copy of Dentons' Global Terms of
Business, which included conditions applicable to the United States and was incorporated by
reference in the December Agreement.  Attached as Schedule B to the December Agreement was  a
copy of the August Agreement.  Attached as Schedule C to the December Agreement was a
summary of unpaid invoices for the period from May 2, 2012 through October 31, 2012 totaling
$3,012,126.00.  A true and correct redacted copy of the December Agreement is attached as
Exhibit 3.  A true and accurate translation from French to English of Exhibit 3 is attached as
Exhibit 4.  A true and correct copy of the redacted version of the December Agreement
countersigned by Defendants is attached as Exhibit 5.[3]   A true and accurate translation from
French to English of Exhibit 5 is attached as Exhibit 6.

**ANSWER:  Defendants admit that the December Agreement exists and that the contents of**

**that document speak for itself.  Defendants neither admit nor deny the characterization of**

**that document.  Defendants neither admit nor deny that the translations of the Exhibits are**

**true or accurate, and until fully verified with expert analysis, Defendants deny such**

**allegations.  Defendants do not admit or deny the allegations in the footnote.**

34.     The December Agreement confirmed that Dentons' fees and costs were due upon  receipt of
its invoices.  The December Agreement also served as Defendants' acknowledgement  that they
owed Dentons the unpaid invoices incurred from May 2, 2012 through October 31, 2012.  As an
accommodation, Dentons agreed to defer payment on its forthcoming invoices (*i.e.*,  those covering
the time period from October 1, 2012 forward) as long as the Ministry implemented and continued
"in good faith all efforts necessary to secure funding for this  representation, either through the
Ministry's budget or through external funding."

**ANSWER:  Defendants admit that the December Agreement exists and that the contents of**

**that document speak for itself.  Defendants neither admit nor deny the characterization of**

**that document.  Defendants admit that Dentons informed Defendants that payment of the**

**invoices would be deferred.**

---

[3] The countersigned version of the December Agreement does not reflect Dentons' letterhead
information because of a printing issue at the Ministry of Mines.

35.     Pursuant to the Retainer Agreement, Defendants authorized Dentons to engage advisors and experts as required by the Project in order adequately to advise Defendants. In accordance with the December Agreement and as instructed by Defendants, Dentons assembled a team with not only the legal, but also the financial, fiscal, and engineering, expertise to represent Defendants.

**ANSWER:   Defendants admit that the Retainer Agreement exists and that the contents of that document speak for itself.  Defendants neither admit nor deny the characterization of that document.**

36.     By executing the Retainer Agreement, Defendants agreed to pay Dentons its standard hourly fees and its costs, including costs for advisors and experts that Dentons retained on behalf of Defendants.

**ANSWER:  Defendants admit that the Retainer Agreement exists and that the contents of that document speak for itself.  Defendants neither admit nor deny the characterization of that document.**

37.     Dentons' personnel located in the United States performed a substantial amount of the work for Defendants and did so primarily in the United States, and in particular in Washington, D.C. Defendants routinely held telephone calls with Dentons' personnel located in the United States, exchanged emails with Dentons' personnel located in the United States, and exchanged hard-copy correspondence with Dentons' personnel located in the United States. In addition, on at least two occasions, Special Advisor to the President of Guinea, Idrissa Thiam, traveled to Dentons' Washington, D.C. office to meet with Dentons' personnel to discuss Dentons' services and fees. Defendants' activities in the United States primarily occurred with Dentons' Washington, D.C. attorneys located at its District of Columbia address.

**ANSWER:  Defendants lack knowledge as to who performed work that was billed and where such work was performed.  Defendants admit that Special Advisor to the President of Guinea traveled to Washington, D.C. to discuss legal services that Defendants expected to receive.**

38.     In response to the Republic of Guinea's requests for assistance, members of Dentons' multi-disciplinary team, including attorneys and staff from Dentons' offices in the United States, worked on behalf of Defendants and at their direction.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

39.     Dentons' legal team dedicated more than 10,000 hours to its representation of Defendants in support of the Simandou Project.  More than 7,500 of those hours were worked in the United States.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

40.     As of March 2013, Defendants had not paid any of the invoices submitted by Dentons.  On March 24, 2013, Mr. Cahn spoke by telephone with Minister Fofana regarding payment of Dentons' outstanding invoices.  Minister Fofana represented that Defendants were  working on arrangements for payment of the outstanding invoices and reiterated Defendants'  commitment to ensure payment for all of Dentons' past and continuing work.  Defendants  memorialized this discussion in a signed letter to Mr. Cahn dated March 25, 2013, bearing the  official seal of the Ministry of Mines of the Republic of Guinea.

**ANSWER:  Defendants deny the characterization of the telephone conference.  Defendants**

**admit that a March 25, 2013 letter exists, but deny the characterization of that letter.  The**

**letter is a legal document that best speaks for itself.**

41.     In the March 25 letter, Defendants affirmed the validity of the Retainer Agreement that Defendants entered into with Dentons and once again reiterated Defendants' intention to comply with their payment obligations under the agreement.  Minister Fofana further represented that Rio Tinto had agreed to fund the fees for Dentons' services.  He assured Dentons, however, that if Rio Tinto did not fund the fees, the Republic of Guinea would do so:

> Further to our telephone conversation of Sunday, March 24, 2013, around 5pm, I am honored to confirm with you that the Republic of Guinea, as client, is prepared to perform all of its contractual obligations contained in the agreement between you and the Ministry of Mines and Geology in terms of providing support and advice in monitoring, negotiating, drafting and implementing the undertakings relating to the Simandou file.
>
> In this regard, I would like to reassure you that it is agreed that Rio Tinto will pay your fees and all expenses duly approved by the competent bodies of the State, actually incurred in the performance of your missions and having taken delivery of documents required by the Guinean State, through its divisions involved in the Project, mainly the Ministry of Mines and Geology.
>
> However, in the event where Rio Tinto does not pay the fees and expenses as indicated above, the Guinean State will pay such fees and expenses which, as with the other fees shall be included in the costs of the Simandou Project.

> Lastly, I would like to draw your attention to the urgency of the delivery of the documents and the pressing need to comply with all delivery timetables agreed to for the required documents, some of which are a critical part in completing the project.

A true and correct copy of the March 25, 2013 letter is attached as Exhibit 7.  A true and accurate translation from French to English of Exhibit 7 is attached as Exhibit 8.

**ANSWER:  Defendants admit that a March 25, 2013 letter exists, but deny the characterization of that letter.  The letter is a legal document that best speaks for itself.**

42.     On or about April 1, 2013, and pursuant to President Condé's instruction, Defendants made a partial payment of $2,000,000.00 against the amounts they then owed pursuant to the Retainer Agreement.  Defendants recognized that this payment was only, and Dentons accepted this payment only as, a partial payment against the invoices, with the remaining outstanding amounts still due and owing.  This was the first and only payment Defendants made or arranged.  Pursuant to the direction in Dentons' invoices, Defendants made this partial payment in United States dollars via wire to Dentons' bank account in the United States.

**ANSWER:  Defendants deny that the Government of the Republic of Guinea made a "partial payment" of $2,000,000 on or about April 1, 2013, but admit that an "advance" of $2,000,000 was made in response to demands by SNR Denton and its affiliates on the understanding that the advance would be repaid once SNR Denton received the funds from another source.  Defendants deny the remainder of the allegations contained in this paragraph.**

43.     At Defendants' request, on or about April 9, 2013, Dentons sent Defendants invoices for the work performed from May 2012 through March 2013, which included an invoice for a specially created group of third party experts called the "Tax Team."  Those invoices totaled $9,193,947.58, an amount that did not reflect the partial payment of $2,000,000.00 made only days earlier.  Dentons subsequently applied the partial payment of $2,000,000.00.

**ANSWER:  Defendants admit that an April 9, 2013 document exists, but deny the characterization of that document.  The April 9, 2013 correspondence contained legal documents that best speak for themselves.  Defendants lack knowledge of how the $2,000,000 was used.  All other allegations contained in this paragraph are denied.**

14

44.     In July 2013, Dentons invoiced Defendants for the work Dentons performed from April 2013 through June 2013.  Those invoices totaled an additional $3,020,510.90.  While Defendants have acknowledged that they owe the amounts invoiced, they have not made payment on these invoices.

**ANSWER:  Defendants admit that a July 2013 invoice exists, but deny the characterization of that document.  The July 2013 correspondence contained legal documents that best speak for themselves.  All other allegations contained in this paragraph are denied.**

45.     On August 7, 2013, Minister Fofana requested by email that Mr. Cahn travel to the Republic of Guinea, stating, "I am requesting you to be in Conakry on Friday August 9, 2013 for discussion about your payment.  The Government has taken the decision to pay everything."  (Emphasis added.)  A true and correct copy of the email is attached as Exhibit 9.

**ANSWER:  Defendants admit that an August 7, 2013 email exists, but deny the characterization of that document, including the emphasis on and implication of the underlined sentence.  All other allegations contained in this paragraph are denied.**

46.     A Dentons team, which included Mr. Cahn, traveled to the Republic of Guinea in response to this request.  Minister Fofana represented to the Dentons team that he had instructed the Ministry of Finance of the Republic of Guinea to pay the invoices and had made funds available to the Ministry of Finance to make the payments.  In an August 10 meeting attended by Minister Fofana and then–Minister of Finance Yansane, Minister Fofana acknowledged that Defendants owed the moneys to Dentons and urged Minister Yansane, in his capacity as Minister of Finance, to make the payment.

**ANSWER:  Defendants deny the allegations and implications included in this paragraph, except Defendants admit that an August 10, 2013 meeting was held.**

47.     At the meeting, Minister Yansane admitted that the Government had not budgeted for the owed amounts.  To address this failure, he proposed that the World Bank review the invoices and make payment to Dentons in accordance with funding made available to the Government of the Republic of Guinea for this purpose by the Bank.  To the extent the Bank did not pay the invoices, Minister Yansane stated that the Government of Guinea would do so.  Minister Yansane designated Special Advisor to the President Thiam to work with Dentons to resolve the matter.

**ANSWER:  Defendants deny the allegations and implications included in this paragraph, except Defendants admit that an August 10, 2013 meeting was held.**

48.     Despite Dentons' continuing efforts to work with Defendants on a payment plan and to obtain third-party financing for the fees, Defendants have failed to pay or to provide a plan for payment of the amounts owed under the Retainer Agreement.

**ANSWER:  Defendants deny the allegations and implications included in this paragraph.**

49.     Defendants have not implemented in good faith efforts to secure funding for the representation.  To the contrary Defendants have, since at least September 2013, ceased any efforts to secure funding to pay the invoices and have not paid them.

**ANSWER:  Defendants deny the allegations and implications included in this paragraph.**

50.     Neither the World Bank nor any other third party has paid any of Dentons' invoices on behalf of the Republic of Guinea.

**ANSWER:  Defendants lack knowledge or information as to whether the Plaintiff has met its**

**contractual obligation to secure payment from the World Bank or some other third party.**

51.     Dentons' legal and professional services were performed for the benefit of Defendants, with the knowledge of Defendants, and on behalf of Defendants.

**ANSWER:  Defendants deny the allegations and implications included in this paragraph.**

52.     Dentons sent invoices to Defendants with respect to the legal work it performed for Defendants.  Those invoices described in detail the attorney, paralegal or other timekeeper who performed the work; the hourly rate of the timekeeper; the work performed; the amount of time worked; and the costs and expenses associated with the engagement.  Dentons translated the descriptions of work into French for Defendants' convenience.

**ANSWER:  Defendants admit that invoices were received, but deny the accuracy of such**

**invoices and deny the characterization of such invoices.**

53.     Dentons' invoices were issued from its Washington, D.C. office, were signed by Mr. Cahn, and were notarized by a Notary Public of Washington, D.C.

**ANSWER:  Defendants admit that the invoices were received that purport to have Mr.**

**Cahn's notarized signature.**

54.     The invoices reflected amounts in United States dollars and requested payment via wire to a Dentons account in the United States.

**ANSWER: Defendants admit that the invoices exist, but neither admit nor deny the characterization of the contents of such invoices as the documents speak for themselves.**

55.    Dentons tendered the following invoices to Defendants:

| Invoice | Amount |
|---|---|
| May 2012 | $44,388.19 |
| June 2012 | $570,748.96 |
| July 2012 | $221,085.10 |
| August 2012 | $398,078.46 |
| September 2012 | $886,583.75 |
| October 2012 | $779,334.17 |
| November 2012 | $904,429.56 |
| December 2012 | $1,007,653.47 |
| January 2013 | $1,570,354.87 |
| February 2013 | $1,528,158.65 |
| March 2013 | $815,460.40 |
| Tax Team | $467,672.00 |
| April 2013 | $1,150,900.67 |
| May 2013 | $1,268,556.68 |
| June 2013 | $601,053.55 |

**ANSWER:  Defendants admit that the invoices exist, but neither admit nor deny the characterization of the contents of such invoices as the documents speak for themselves.**

56.    Defendants received each of the invoices listed in paragraph 55, and such invoices total $12,214,458.48.

**ANSWER:  Defendants admit that the invoices exist, but neither admit nor deny the characterization of the contents of such invoices as the documents speak for themselves.**

57.    Defendants have made a single payment of $2,000,000.00 against the amounts owed.

**ANSWER:  Defendants admit that an advance of $2,000,000 was made, but deny the characterization of that payment.**

58.    Defendants never disputed that they requested the legal services associated with the invoices and never disputed that Dentons performed the legal services for Defendants.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

59.     A total of $10,214,458.48 in fees and costs plus interest remains past due and owing to Dentons.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

## COUNT I

60.     Paragraphs 1 to 59, *supra*, are incorporated and re-alleged as if fully set forth herein.

**ANSWER:  Defendants' responses to paragraphs 1 through 59 are incorporated as if fully set forth herein.**

61.     Dentons and Defendants entered into an enforceable contract, whereby Dentons agreed to provide legal services and Defendants agreed to pay for them.

**ANSWER:  Defendants deny the legal conclusion asserted in this paragraph and respond that the enforceability of the contract and the obligations of the parties are legal issues that are disputed by the Defendants.**

62.     The professional services contracted for and requested by Defendants are purely commercial activities, a substantial portion of which were carried on in the United States and which also had a direct impact in the United States, in performance of which or non-performance of which the Republic of Guinea is not entitled to sovereign immunity, as provided in 28 U.S.C. § 1605(a)(2).

**ANSWER:  Defendants deny the allegations contained in this paragraph, but acknowledge that the Court has determined that the activity involved was "commercial" activity outside of the limits of sovereign immunity.  Defendants note a denial of the allegations contained in this paragraph to preserve the issue for appeal.**

63.     Dentons fully performed its obligations under the parties' contract by providing the legal services in a manner conforming to the requirements of those contracts.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

64.     Defendants have breached their contractual obligations by failing to pay fully for the legal services provided by Dentons as reflected in the invoices identified above.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

65.    Defendants have breached their contractual obligations by failing to undertake good faith efforts to obtain the financing to pay fully for the legal services provided by Dentons as reflected in the invoices identified above.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

66.    Dentons has been damaged by Defendants in an amount equal to $10,214,458.48, plus pre- and post-judgment interest as provided by the terms of the parties' contractual agreements and by law.  Dentons also has been damaged by incurring the expense of bringing this action, including reasonable attorneys' fees.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

### COUNT II

67.    Paragraphs 1 to 66, *supra*, are incorporated and re-alleged as if fully set forth herein.

**ANSWER:  Defendants' responses to paragraphs 1 through 66 are incorporated as if fully set forth herein.**

68.    Dentons provided valuable services for the benefit of Defendants and at the request of Defendants.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

69.    Defendants were aware that Dentons was providing these services, which Defendants accepted and from which they benefited.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

70.    Dentons engaged in frequent communications with Defendants and sent statements of its services.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

71.    Defendants knew that Dentons expected to be paid for its services.

**ANSWER:  Defendants deny the implication that Dentons expected Defendants to pay for Dentons' services, and Defendants lack knowledge of Dentons' expectations.**

72.    Defendants did not pay Dentons for all of the services they received from Dentons.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

73.     The reasonable value of the services for which Defendants did not pay equals or exceeds $10,214,458.48.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

74.     Dentons has been damaged by Defendants in an amount equal to $10,214,458.48, plus pre- and post-judgment interest as provided by the terms of the parties' contractual agreements and by law. Dentons has also been damaged by incurring the expense of bringing this action, including reasonable attorneys' fees.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

## COUNT III

75.     Paragraphs 1 to 59, *supra*, are incorporated and re-alleged as if fully set forth herein.

**ANSWER:  Defendants' responses to paragraphs 1 through 59 are incorporated as if fully set forth herein.**

76.     Through its legal work, Dentons conferred substantial benefits on Defendants.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

77.     Defendants accepted and retained the benefits of Dentons' services.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

78.     Defendants did not pay Dentons for all of the services and benefits that they received from Dentons.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

79.     The value of the benefits that Defendants did not pay for equals or exceeds $10,214,458.48.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

80.     Under the circumstances, it is unjust for Defendants to retain the benefit of Dentons' services without payment.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

81.     Dentons has been damaged by Defendants in an amount approximating $10,214,458.48, plus pre- and post-judgment interest as provided by the contract and by law. Dentons has also been damaged by incurring the expense of bringing this action, including reasonable attorneys' fees.

**ANSWER**:  **Defendants deny the allegations contained in this paragraph.**

## COUNT IV

82.     Paragraphs 1 to 59, *supra*, are incorporated and re-alleged as if fully set forth herein.

**ANSWER:  Defendants' responses to paragraphs 1 through 59 are incorporated as if fully**

**set forth herein.**

83.     Over the course of thirteen months, Dentons sent invoices to Defendants for the legal services Dentons was performing at Defendants' request and on Defendants' behalf.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

84.     Those statements set forth the work performed and the amounts due.

**ANSWER**:  **Defendants deny the allegations contained in this paragraph.**

85.     Defendants accepted the statements, did not object to them, and induced Dentons to continue to provide services.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

86.     Defendants agreed to pay for the legal services that Dentons performed at their request and for their benefit, according to the monthly statements that they received and to which they did not object.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

87.     While Defendants have repeatedly indicated their intention to pay the amounts due, Defendants have failed to pay Dentons for the amounts due in these statements.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

88.     The unpaid statements currently amount to $10,214,458.48.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

89.     By Defendants' failure to pay the unpaid statements, Dentons has been damaged by Defendants in an amount equal to $10,214,458.48, plus pre- and post-judgment interest as provided by the parties' Agreements and by law.  Dentons has also been damaged by incurring the expense of bringing this action, including reasonable attorneys' fees.

**ANSWER:  Defendants deny the allegations contained in this paragraph.**

WHEREFORE, Defendants respectfully request that the Plaintiff's Complaint be dismissed, that each and every prayer for relief be denied, and for such further relief as this Court deems just, including the award of attorney fees reasonably necessary to defend this action.

## AFFIRMATIVE DEFENSES

1.    Defendants assert Plaintiff has failed to state a claim upon which relief may be granted as required by Fed. Rule of Civ. Pro. Rule 12(b)(6).

2.    Defendants hereby preserve their affirmative defense of a lack of personal jurisdiction over the sovereign Defendants.

3.    Defendants assert that Plaintiff has failed to name as a party the real party in interest as required by Fed. Rule of Civ. Pro. Rule 17, as Plaintiff is not the contracting party.

4.    Defendants assert improper venue and reserve its prior *forum non conveniens* argument.

5.    Defendants assert the affirmative defense of waiver.

6.    Defendants assert the affirmative defense of estoppel.

7.    Defendants assert the affirmative defense of unclean hands.

8.    Defendants assert the affirmative defense of a prior breach of the contract terms by Plaintiff.

9.    Defendants assert the affirmative defense of the failure to include an indispensable party, such that there remains the risk of inconsistent judgments or incomplete relief.

10.   Defendants assert the affirmative defense of offset or setoff.

11.   Defendants assert the affirmative defense that Plaintiff assumed the risk that it would not recover its attorney fees from Defendants or from third parties.

12.   Defendants assert that the Plaintiff's suit is based on an official document and such

document lacks proper legal authority under Guinean law, due to a failure to obtain the signature of the Finance Minister of the Republic of Guinea.

13.     Defendants assert that the signature of the Finance Minister is a condition precedent to the enforcement of a contract against the Defendants.

14.     As described in the Counterclaim, Defendants assert "fraud in the inducement" as a complete defense to any damage claim under the alleged contract.

### COUNTERCLAIM AND THIRD PARTY CLAIM

The Republic of Guinea and its Ministry of Mines and Geology (collectively "Guinea") hereby assert the following Counterclaim and Third Party Claim against Plaintiff Dentons US LLP (f/k/a SNR Denton US LLP) (herein, "Dentons US") and the following affiliates of Dentons US that claim to have provided legal services to Guinea and contracted to provide for such legal services: Dentons Europe LLP, Dentons UKMEA LLP, and Salans FMC SNR Denton Group.

### JURISDICTION

1.     Dentons US filed the instant law suit seeking to recover for legal services that it alleges were performed by Dentons US when in fact the contract for legal services was entered into with an international law firm that was affiliated with Dentons US.  To the extent that this Court has determined that it has jurisdiction over the initial Complaint against Guinea, this Court also has jurisdiction over any counterclaims and third party claims that arise from the same set of contested facts as the original controversy, involve a foreign state, and satisfy diversity of citizenship requirements. 28 U.S. C. §§ 1330, 1332, 1367(a).

### PARTIES

2.     Salans FMC SNR Denton Group (hereafter referred to as the "Denton Group") is a Swiss Verein which is comprised of several affiliated firms to form a global legal practice

providing client services worldwide through its member firms and affiliates, including Dentons Canada LLP, Dentons Europe LLP, Dentons UKMEA LLP, Dentons US LLP, and their subsidiaries and affiliates, each of which is a separate business entity and each of which conducts its own legal practice. These unique legal entities shall hereafter be referred to collectively as "SNR Denton" or "the Firm," as they are collectively identified in the SNR Denton Terms of Business appended to the Retainer Agreement.

3.      The contract at issue in the Complaint is a contract between the global legal practice, the Firm, and the Ministry of Mines and Geology of the Republic of Guinea and the Denton Group.

4.      The work alleged to have been performed was performed not solely by Dentons US, but also by several affiliated members of SNR Denton.

5.      The Retainer Agreement unambiguously states that Guinea was retaining the services of the international firm, SNR Denton, with all of its affiliates.

6.      The invoices received by Guinea unambiguously reflect that legal services were provided by Dentons Europe LLP, Dentons UKMEA LLP, and Dentons US LLP, and their respective predecessor firms.

7.      Counterclaim Defendant Dentons US LLP is a Delaware limited liability partnership and a law firm authorized to do business in the District of Columbia, with an office located at 1301 K Street, Northwest, Suite 600, East Tower, Washington, D.C. 20005.

8.      Plaintiff/Counterclaim Defendant Dentons US has failed to name as parties to this dispute Denton Group, Dentons Europe LLP, or Dentons UKMEA LLP, despite the fact that such parties are indispensable and necessary parties to the dispute.

9.      Third Party Defendant Denton Group is a Swiss Verein, headquartered at Zollikerstrasse 226 CH 8008, Zurich, Switzerland.

10.     Third Party Defendant Dentons Europe, LLP, Association d'Avocats à Responsabilité Professionnelle Individuelle (AARPI)  is a limited liability partnership with an address at 112 Avenue Kleber, 75116, Paris, France.

11.     Third Party Defendant Dentons UKMEA LLP, is a limited liability partnership with an address at One Fleet Place, London EC4M 7WS, United Kingdom.

12.     The Third Party Claim relates to claims asserted against the third parties jointly, severally or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences, and there are questions of law and fact common to all defendants. Fed. R. Civ. Pro. Rule 20(a)(2).

13.     Guinea has suffered damages arising from the actions and purported legal services provided by Dentons US, Denton Group, Dentons Europe LLP, and Dentons UKMEA LLP.

14.     Guinea therefore joins the affiliated entities as necessary parties to this pleading entitled "Counterclaim and Third Party Claim."

**FACTS**

15.     Guinea sought legal counsel to aid its efforts to develop its sovereign natural resources that were discovered in the Simandou area of the country.  The undertaking, known as the Simandou Project, was sponsored by several investors and the World Bank.

16.     The World Bank and the Simandou Project sponsors wanted Guinea to retain legal counsel experienced in the development of sovereign resources to advise the government on the development of resources and infrastructure necessary to develop the nationally-owned mineral resources of Guinea.

17.     SNR Denton convinced Guinea to retain the Firm as an international law firm with experienced attorneys in its Washington, London, and Paris offices.

18.     SNR Denton confirmed in its Retainer Agreement that "the Firm understands that neither the Ministry nor the Government of the Republic of Guinea currently have the necessary funds to pay for the costs and fees of the representation," but the Firm chose to proceed with the work on the understanding that it would secure funding through "external" means.

19.     SNR Denton agreed to "defer collection of fees and expenses billed in accordance with [the Retainer Agreement] and in accordance with the Terms and Conditions until the appropriate financing is in place," "as long as the Ministry continues to make these efforts" to secure funding. Compl. ¶ 16, Exs. 3-4. The original Retainer Agreement is attached to the Complaint as Exhibit 3. An English translation thereof is attached to the Complaint as Exhibit 4. Compl. Exs. 3-4 ("the Retainer Agreement").

20.     Guinea authorized SNR Denton to communicate directly with Rio Tinto, a project sponsor, to secure payment of the legal invoices that SNR Denton generated. SNR Denton failed to secure payment from Rio Tinto.

21.     Guinea authorized SNR Denton to seek funding from the World Bank or from any Simandou Project sponsor.  SNR Denton failed to secure payment from the World Bank.

22.     SNR Denton received confirmation that the project sponsors agreed to pay the cost of legal and other advisors with respect to the Simandou Project.

23.     Guinea made a $2 million advance payment to SNR Denton in a good faith effort to allow SNR Denton time to arrange for third party funding.

24.      In an email from SNR Denton attorney Jonathan Cahn on August 2, 2013, SNR Denton told Rio Tinto and Guinea that "[t]he Government [of Guinea] made a substantial advance

to the advisors in April [of $2,000,000].   That payment was to ensure the continuation of the advisors' work.   Upon the sponsors fully paying outstanding invoices, this advance will be reimbursed in full to the Government." Email from Jonathan Cahn, Dentons, to Kerfala Yansane, Minister of Mines and Geology, Republic of Guinea (August 3, 2013, 13:47 CET).

25.     With the benefit of hindsight and the efficient work that was later completed by Clyde & Co, it is apparent that SNR Denton unduly delayed the ultimate completion of the legal work and did not perform work that was ultimately useful.

26.     SNR Denton created further delays when it refused to turn over its work product to Guinea or its successor counsel.  Despite a specific request from the Minister of Mines and Geology for the work product, the Firm directly refused the request.

27.     These improper actions by SNR Denton delayed the review of the agreements by successor counsel and the finalization of the investment framework, which was the basis for securing financing. Such delay occurred at a particularly disadvantageous time period as Guinea missed a window of opportunity when the commodities market was highly valued and SNR Denton's actions delayed the time when revenue could begin to flow from the Simandou Project to benefit the Republic of Guinea and its citizens.  Such delay has caused substantial harm to Guinea.

28.     Guinea advanced every good faith effort available to it during the tenure of the SNR Denton contract to secure funding for the Simandou Project and associated legal expenses; however no funding for the counterproductive work by SNR Denton was ever obtained.

29.      SNR Denton failed and refused to repay the advance of $2,000,000 to Guinea.

30.     On information and belief, SNR Denton has distributed Guinea's $2 million advance to each of the separate legal entities which claimed to have performed legal services for

Guinea – including Third Party Defendants Dentons Europe LLP and Dentons UKMEA LLP, and

Counterclaim Defendant Dentons US LLP.

31.     SNR Denton failed to secure payment from any third party due to its own actions

that inflated the size of the invoices and delayed the formation of an agreement among the project

sponsors and Guinea.

32.     Rio Tinto, a project sponsor, refused to pay SNR Denton's outrageously inflated

and unwarranted legal invoices that appeared to be generated in an effort to undermine the

negotiations and to set up a more costly (and more profitable to SNR Denton) litigation against

Rio Tinto.

33.     After SNR Denton was unable to secure any payment from Rio Tinto or the World

Bank, SNR Denton withdrew as counsel and failed to turn over the files and records that would

aid a successor counsel.  This left Guinea without sufficient funds and without an agreement with

the Simandou Project sponsors to proceed on the project of vital national interest.

34.     Subsequent to SNR Denton's withdrawal as counsel, Guinea was forced to retain

new counsel and to complete the work without the benefit of various files and work product of

SNR Denton.

35.     Guinea was forced to retain the international law firm Clyde & Co. to perform the

same tasks that SNR Denton was obligated to perform under the Retainer Agreement.

36.     Clyde & Co. was forced to start the legal work and the negotiations anew.  Clyde

& Co. also had to repair the relationships that SNR Denton had damaged by its threats of

litigation strategy.

37.     Despite the disadvantages described above, Clyde & Co. completed the work from scratch that Dentons was originally retained to perform in less than six months and billed Guinea approximately $1,200,000 for the entire project.

## COUNT I – BREACH OF CONTRACT

38.     Guinea restates the allegations in the preceding paragraphs and incorporates the allegations in such paragraphs herein as if stated in full.

39.     SNR Denton and its affiliates, including Dentons Europe LLP, Dentons UKMEA LLP and Dentons US LLP, entered into an agreement to provide legal services to Guinea – specifically to negotiate an agreement for the development of national resources in the Simandou region of the Republic of Guinea.

40.     The Retainer Agreement was memorialized in the December 2012 Retainer Agreement.  Compl. ¶ 16, Exs. 3-4.

41.     The Retainer Agreement recognized that Guinea had "urgent needs" to obtain accelerated legal services and also that SNR Denton "understands that neither the ministry nor the Government of the Republic of Guinea currently have the necessary funds to pay for the costs and fees of representation."  Compl. ¶ 16, Exs. 3-4.

42.     Despite knowledge of Guinea's urgent needs and inability to pay, SNR Denton failed to provide the expedited legal services needed by Guinea, delayed crucial submissions because Guinea was unable to pay for the services, and ultimately breached the contract by terminating services.

43.     SNR Denton, Denton Group, Dentons Europe LLP, Dentons UKMEA LLP, and Dentons US LLP, failed to fully perform the contract and withdrew as counsel before the task was completed.

44.    Guinea suffered damages from the failure to perform: Specifically,

(a)    Guinea advanced $2 million to SNR Denton with the understanding that SNR Denton would secure those funds from another source and repay Guinea, but Guinea was never repaid the $2 million advance.

(b)    Guinea was forced to pay $1.2 million to Clyde & Co. to perform the work that SNR Denton was retained to perform.

45.    But for SNR Denton's breach of the Retainer Agreement, Guinea would not have suffered these two financial losses totaling $3.2 million.

46.    Guinea's loss of $3.2 million occurred at a time when the country needed every available resource to address the Ebola epidemic that ravaged the country.  SNR Denton's breach left Guinea in a much weaker position to address the health crisis that paralyzed the nation and its economy. Guinea continues to struggle with Ebola; two new cases were discovered in the week this pleading was filed.

47.    According to a recent United Nations report, the virus has killed more than 11,000 people in Guinea and will not be over by year-end.  The U.N. is now planning for its Ebola response to last into mid-2016.

48.    The consequential damages caused by the loss of $3.2 million to the country in crisis were foreseeable and, although incalculable in the ordinary sense, the full extent of the loss will be proven at trial.

WHEREFORE, Counterclaim Plaintiffs and Third-Party Claim Plaintiffs respectfully request damages in the amount of not less than $3.2 million and not greater than $100 million and for such other and further relief as this Court deems just.

## COUNT II – BREACH OF FIDUCIARY DUTY

49.     Guinea restates the allegations in the preceding paragraphs and incorporates the allegations in such paragraphs herein as if stated in full.

50.     SNR Denton contracted for and assumed the role of a fiduciary to Guinea in agreeing to serve as counsel to the sovereign government.

51.     As a fiduciary, SNR Denton had a duty to place the interests of the Guinea first ahead of its own pecuniary interests and it bore Guinea the duty of utmost loyalty.

52.     SNR Denton breached its fiduciary duties and failed to abide by its fiduciary obligations in numerous respects:

(a)     SNR Denton deliberately and willfully overbilled and over-lawyered the Simandou Project because it knew that Guinea had no viable alternative and that Guinea was laboring under the belief that the amount of the bills did not matter because SNR Denton counseled that a third party external source of funding was available to pay the invoices.

(b)     SNR Denton pursued a strategy to head towards litigation rather than negotiation because such a path would result in the highest amount of legal services that could be billed to Guinea, and not because such a strategy was in Guinea's best interest.

(c)     Dentons US falsely characterized the transfer of an advance of $2 million by Guinea as a "payment" against the legal invoices, knowing that the $2 million was merely an advance paid under duress by Guinea to keep SNR Denton moving forward to the completion of the Simandou agreement, and that SNR

Denton had promised to repay the $2 million advance upon securing funding from a project sponsor.

(d)     SNR Denton used its inside information gathered during its representation of Guinea to its advantage to exert maximum pressure on Guinea to pay the improper invoices, including delaying critical submissions to the Simandou Project sponsors, and choosing to file suit in the District of Columbia and issue a press release during the U.S. – Africa Leaders Summit in DC when Guinea was attending the summit and seeking financing and business partners. SNR Denton threatened: "Again, absent payment by July 30th, it would be unfortunate that your Government's failure to meet its obligations will become public at the time of the African Leaders Summit in Washington and President Conde's pending visit to Washington." Email from Elliott I. Portnoy, Global Chief Executive Officer, Dentons, to Kerfala Yansane, Minister of Mines and Geology, Republic of Guinea (July 23, 2014, 06:28 CET).

(e)     SNR Denton refused to act in a timely manner to provide client files and work product to Guinea's successor counsel, despite a clear requirement under District of Columbia Bar Rules of Professional Conduct, Rule 1.8(i) that all files and work product must be turned over, without exception, if the client has become unable to pay, or when withholding the lawyer's work product would present a significant risk to the client of irreparable harm.  SNR Denton has acknowledged from the start of the attorney-client relationship that Guinea was unable to pay its fees and also acknowledged the urgency of the work and the harm that would come from any delay.

53.     Such false statements and disloyal actions are directly contrary to the fiduciary obligation of honesty and loyalty owed by SNR Denton to Guinea.

54.     The breach of fiduciary duties and disloyal actions contributed significantly to the delay of the Simandou Project, resulting in substantial consequential harm to Guinea, due in part to falling commodity prices during the period of delay and also due to a delay in starting the pipeline of income from the Simandou Project.

55.     Dentons US partner Jonathan Cahn recognized the fiduciary obligation that the Firm owed to Guinea when he made the following representation to a project sponsor:  "As professionals, our obligation is to render independent advice in the best interests of our client – irrespective of who is paying our fees."  Email from Jonathan Cahn, Dentons, to Kerfala Yansane, Minister of Mines and Geology, Republic of Guinea (August 3, 2013, 13:47 CET).  Despite such an express statement of knowledge, SNR Denton failed to act in the best interests of its client.

56.     As counsel to Guinea, SNR Denton was acting as an agent and fiduciary and an agent "is not entitled to be paid when he has not provided the loyalty bargained for and promised."

57.     Any funds received by SNR Denton are subject to disgorgement for breach of fiduciary duty and disloyalty. An attorney (or any fiduciary) who breaches his duty to his client forfeits his right to compensation.

WHEREFORE Guinea respectfully requests disgorgement of all funds paid to SNR Denton and its affiliates, as well as damages in the amount of $100 million, and such other and further relief as this Court deems just, including punitive damages, attorney fees and costs.

## COUNT III – FRAUD IN THE INDUCEMENT

58.     Guinea restates the allegations in the preceding paragraphs and incorporates the allegations in such paragraphs herein as if stated in full.

59.     SNR Denton made several false and fraudulent representations to induce Guinea to enter into the Retainer Agreements with the Firm, including the following:

(a)     In presenting the Retainer Agreement, SNR Denton made representations to Guinea that Guinea would not have to pay for services rendered by SNR Denton and its affiliates and that SNR Denton would seek payment from third parties for their own fees.

(b)     SNR Denton made representations that it knew Guinea could not afford to pay for its services, but that Guinea could rely on SNR Denton's expertise in securing payment from "external sources."

(c)     SNR Denton represented in its Retainer Agreement a clause that required Guinea to authorize "the Firm to seek, with third parties, various options for the financing of its representation and to present these options in the form of a written proposal to the Ministry for its consideration. . ." Guinea authorized SNR Denton to seek such funding, but SNR Denton failed to make a good faith effort to secure financing and failed to present any written proposal concerning financing to the Ministry.

(d)     SNR Denton and its affiliates falsely represented in the Retainer Agreement that they would not take any collection action against Guinea as long as Guinea made good faith efforts to secure funding.  SNR Denton, nonetheless, filed this law suit in direct contravention of its written representation and with the knowledge that

no funding sources were available because Dentons had itself sought and failed

to locate any such funding source.

(e)    SNR Denton falsely represented in the Retainer Agreement that its clients would

be entitled to a dispute resolution process with respect to any fee disputes, but

then failed to allow for such procedure when it sought to collect from Guinea.

60.    Such representations by SNR Denton proved to be false, but they served SNR

Denton's interest to allow for the representation of Guinea and the false representations also

convinced Guinea not to worry about or contest excessive bills, because Guinea had been assured

that it would not have to pay such bills.

61.    Guinea relied on the false representations of SNR Denton and retained the law firm

and did not contest the invoices as they were issued.

62.    The fraudulent representations caused Guinea to enter into an attorney/client

relationship with SNR Denton – an international law firm that purported to have expertise in

successfully handling negotiations for major infrastructure projects, but SNR Denton was unable

to negotiate a single agreement even after allegedly billing over $12 million in attorney fees to

accomplish that single goal.

63.    But for such fraudulent statements, Guinea could have and would have found

another law firm to represent its interests, as Guinea was eventually forced to do when it hired

Clyde & Co.

64.    As a result of the fraudulent statements that led Guinea to retain and continue the

relationship with SNR Denton, Guinea incurred substantial damages including the harm from a

period of substantial delay and the damage to its working relationship with the Simandou Project

partners.

WHEREFORE Guinea respectfully requests damages in the amount of $100 million and such other and further relief including punitive damages, attorney fees, costs as this Court may deem just.

### COUNT IV – INJUNCTIVE RELIEF

65.     Guinea restates the allegations in the preceding paragraphs and incorporates the allegations in such paragraphs herein as if stated in full.

66.     The governing Retainer Agreement sets forth an agreed upon process to resolve billing disputes.  Guinea seeks an injunction from this court to affirmatively require SNR Denton to abide by the terms of its Retainer Agreement.

67.     When it entered into the Retainer Agreement, the Firm agreed that "[a]ny invoicing related to this mandate will be in accordance with the approved funding terms."  And the Firm will "defer collection of fees and expenses . . . until the appropriate financing is in place." However, the Firm failed to obtain any "approved funding" or any "appropriate financing."

68.     The Retainer Agreement contemplates a complaint and dispute resolution process outside of the court system, which included any disputes over billing.

69.     The Retainer Agreement stated: "If at any time you have any concern about any aspect of our services including our invoices, kindly let Charles [Wood, Partner in London], Laurent [Lavigne du Cadet, Senior Advisor Washington, DC] or me know and we are committed to resolving any issue that will be raised by the Ministry.  We also have a formal complaints procedure and a copy of this procedure is available upon request." Compl. ¶ 16, Exs. 3-4.

70.     Despite request, the Firm failed to provide Guinea with a copy of a complaint procedure.

71.     When the instant billing dispute arose, the Firm's attorneys designated in the Retainer Agreement failed to resolve it and the Firm failed to follow its own "formal complaints procedure."  Compl. ¶ 16, Exs. 3-4.

72.     Neither the Retainer Agreement nor the "SNR Denton Terms of Business" attached to the Retainer Agreement designate the governing law or the jurisdiction of any particular country or court in the event of a fee dispute between Dentons and Guinea.  Article 20.1 of the SNR Denton Terms of Business specifies that "[t]he law governing an Engagement Agreement is specified under our Location Terms."  Article 20.2 specifies "the dispute resolution mechanisms for Engagement Agreements involving each Practice are listed in the Location Terms." Compl. ¶ 16, Exs. 3-4. The Firm, however, failed to follow through and specify either the governing law or the dispute resolution mechanism in any of the contract documents.

73.     While the standardized "SNR Location Terms of Business" specify how invoice disputes are to be resolved for its clients around the world, none of the provisions permits a dispute to be resolved by a U.S. court.   In fact, the Location Terms of Business generally indicate that the law of the foreign locality is to be applied and that the courts of the foreign locality shall have exclusive jurisdiction over any dispute between the Firm and its client.

74.     SNR Denton did not defer collection, as promised, but chose to have its United States affiliate file suit in the United States, contrary to the terms of the Retainer Agreement.

75.     In the absence of injunctive relief, Guinea shall suffer irreparable harm that the dispute resolution provisions were designed to prevent or minimize, including publicity and public disclosure of the dispute and  additional attorney fees incurred when Guinea must muster all of its resources to recover from the Ebola epidemic.

WHEREFORE Guinea respectfully requests that this Court enter an injunction barring any further proceedings on the Complaint until SNR Denton exhausts the dispute resolution process that is mandated in its own Retainer Agreement and its SNR Location Terms of Business and for such other relief as this Court deems just.


October 16, 2015                                          Respectfully submitted,


       s/ David H. Dickieson
David H. Dickieson (DC Bar No. 321778)
Robert Spagnoletti (DC Bar No. 446462)
SCHERTLER & ONORATO, LLP
575 – 7th Street, N.W.
Suite 300 South
Washington, DC 20004
Telephone:  (202) 824-1222
Facsimile: (202) 628-4177
Email: ddickieson@schertlerlaw.com
       bspagnoletti@schertlerlaw.com

## CERTIFICATE OF SERVICE

On this 16th day of October, 2015, the foregoing pleading was served on opposing counsel, below, via ECF:

> Michael S. Sundermeyer (D.C. Bar No. 931873)
> Ana C. Reyes (D.C. Bar No. 477354)
> Leslie C. Mahaffey (D.C. Bar No. 1019782)
> Williams & Connolly LLP
> 725 12th Street, NW
> Washington, D.C. 20005
> Telephone:  (202) 434-5000
> Facsimile: (202) 434-5029
> Email:  msundermeyer@wc.com
>         areyes@wc.com
>         lmahaffey@wc.com
> *Attorneys for Plaintiff Dentons US LLP*

_____ /s/  David H. Dickieson _____