## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DENTONS US LLP** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | Case No. 1:14-cv-1312-RDM |
| **THE REPUBLIC OF GUINEA et al.,** | ) | |
| | ) | |
| *Defendants.* | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| | ) | |
| **THE REPUBLIC OF GUINEA, et al.,** | ) | |
| | ) | |
| *Counterclaim and Third Party Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| **DENTONS US LLP et al.,** | ) | |
| | ) | |
| *Counterclaim and Third Party Defendants.* | ) | |
| | ) | |
| | ) | |

## DENTONS US'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WILLIAMS & CONNOLLY LLP
Michael Sundermeyer (No. 931873)
Ana C. Reyes (No. 477354)
Leslie C. Vigen (No. 1019782)
Justin S. Rowinsky (No. 1028756)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
msundermeyer@wc.com
areyes@wc.com
lvigen@wc.com
jrowinsky@wc.com

*Attorneys for Plaintiff Dentons US LLP*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTS ................................................................................................................... 4

    A.    Material Facts ...................................................................................... 4

    B.    Procedural History .............................................................................. 4

LEGAL STANDARDS ........................................................................................... 8

ARGUMENT ......................................................................................................... 9

I.      THE COURT HAS SUBJECT-MATTER JURISDICTION. .................................... 9

    A.    The Parties' Attorney-Client Relationship and the Legal Services
          that Guinea Requested and Accepted from Dentons US Constitute
          Commercial Activity Under the FSIA. ........................................... 10

    B.    The Engagement Letter Was Entered Into and Ratified by
          Individuals with Actual Authority. ................................................. 16

          1.    The Minister of Mines Had Authority To Sign the Letter
               of Engagement. .................................................................... 16

          2.    Defendants Have Made Repeated Judicial Admissions that
               the Letter of Engagement Is a Valid Contract, and these
               Admissions Estop Defendants from Now Arguing the
               Opposite. ............................................................................. 19

    C.    Guinea Ratified the Letter of Engagement. ................................... 20

    D.    Defendants Have Waived Their Sovereign Immunity. .................... 25

          1.    Defendants Failed To Raise Timely Their Purported
               Sovereign Immunity Argument and Instead Actively Took
               Part in This Litigation. ........................................................ 26

          2.    Defendants Cannot Assert Sovereign Immunity for Claims
               that Arise from the Same Events as Their Third-Party
               Claims and Counterclaims. ................................................. 29

II.    SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF
      CONTRACT CLAIM IS INAPPROPRIATE BECAUSE GENUINE
      DISPUTES OF MATERIAL FACTS EXIST. ....................................... 31

CONCLUSION .................................................................................................... 34

## **TABLE OF AUTHORITIES**

### **CASES**

*Allfreight Worldwide Cargo*, 307 F. App'x 721, 722 (4th Cir. 2009) ....................................18, 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................9, 31

* *Ashraf-Hassan v. Embassy of France in the U.S.*, 40 F. Supp. 3d 94 (D.D.C. 2014), *aff'd per curiam*, 610 F. App'x 3 (D.C. Cir. 2015) ........................................26, 27, 28

*Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99 (D.C. Cir. 2015), *cert. denied* 137 S. Ct. 617 (2017).............................................................................................11

*Benetatos v. Hellenic Republic*, 2008 WL 2079191 (N.D. Cal. May 15, 2008)...........................12

*BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006) .........................................................30

*BP Chemicals Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677 (8th Cir. 2002).............................11, 16

*Cabiri v. Gov't of the Rep. of Ghana*, 165 F.3d 193 (2d Cir. 1999) ..............................................29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................8

*Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999).................................26

* *Dentons U.S. LLP v. The Republic of Guinea*, 134 F. Supp. 3d 5 (D.D.C. 2015)........5, 9, 10, 25

*Dentons U.S. LLP v. The Republic of Guinea*, 208 F. Supp. 3d 330 (D.D.C. 2016)................7, 19

*El Paso Nat. Gas Co. v. United States*, 750 F.3d 863 (D.C. Cir. 2014) .......................................19

*Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136 (D.D.C. 2012) .........................................................................................................12

*Flota Maritima Browning De Cuba, Sociadad Anonima v. Motor Vessel Ciudad de la Habana*, 335 F.2d 619 (4th Cir. 1964)...............................................27, 28

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 1988 WL 122568 (D.D.C. Nov. 8, 1998), *aff'd*, 905 F.2d 438 (D.C. Cir. 1990) .......................................26, 27

*Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370 (7th Cir. 1985) (per curiam) ...........................................................................................................26

**GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299 (11th Cir. 2017) ............20, 21, 22, 25

*Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 683 F. Supp. 2d 1 (D.D.C. 2010) ...................................................................................................29

*In re Fay*, 111 A.3d 1025 (D.C. 2015) (per curiam)................................................................12

*In re Lieber*, 442 A.2d 153 (D.C. 1982) ..................................................................................12

*In re Ryan*, 670 A.2d 375 (D.C. 1996)....................................................................................12

*Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d
   152 (D.D.C. 2013) ............................................................................................................12

*Lewis v. Wash. Metro. Area Transit Auth.*, 463 A.2d 666 (D.C. 1983)....................................32

*Lord Day & Lord v. Socialist Rep. of Vietnam*, 134 F. Supp. 2d 549 (S.D.N.Y.
   2001) .................................................................................................................................29

*McConnell v. Howard Univ.*, 818 F.2d 58 (D.C. Cir. 1987)....................................................33

*Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 535 F. Supp. 2d 60
   (D.D.C. 2008) ..................................................................................................................32

*Moses v. Howard Univ. Hosp.*, 606 F.3d 789 (D.C. Cir. 2010)..............................................20

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ....................................................................20

*Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17, 28 (D.D.C. 2017) .........................12

*Phaneuf v. Republic of Indonesia*, 106 F.3d 302 .............................................................18, 28

*Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000).....................5, 8

*Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987) ......................11

*Princz v. Fed. Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994) .........................................26

*Reichler, Milton & Medel v. Republic of Liberia*, 484 F. Supp. 2d 1 (D.D.C. 2007)..................12

*Reiss v. Societe Centrale du Groupe des Assurances Nationales*, 185 F. Supp. 2d
   335 (S.D.N.Y. 2002) ........................................................................................................20

*\* Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) ...........................................10, 11

*SACE S.p.A. v. Republic of Paraguay*, 243 F. Supp. 3d 21 (D.D.C. 2017) ...........................18, 28

*Telenor Satellite Servs. v. United States*, 71 Fed. Cl. 114 (Ct. Fed. Cl. 2006) ............................23

*TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013) ...................................18, 28

*Tsintolas Realty Co. v. Mendez*, 984 A.2d 181 (D.C. 2009)....................................................32

*Velasco v. Gov't of Indonesia*, 370 F.3d 392 (4th Cir. 2004)................................................18, 28

iii

*Walker v. England*, 590 F. Supp. 2d 113 (D.D.C. 2008) ...............................................................19

*Youming Jin v. Ministry of State Security*, 475 F. Supp. 2d 54 (D.D.C. 2007) ............................11

## OTHER AUTHORITIES

28 U.S.C. § 1330 ...........................................................................................................................8

28 U.S.C. § 1603 .........................................................................................................................10

* 28 U.S.C. § 1605 ...........................................................................................................8, 9, 10, 26

* 28 U.S.C. § 1607 ...........................................................................................................8, 26, 29, 30

*Black's Law Dictionary* (10th ed. 2014) ....................................................................................30

Fed. R. Civ. P. 56(a) .....................................................................................................................8

H.R. Rep. No. 94-1487 .....................................................................................................10, 26, 29

Restatement (Third) of Agency § 4.01 ........................................................................................20

Restatement (Third) of Foreign Relations Law § 453 .................................................................10

Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1-1 ............................................11

**INTRODUCTION**

For the first time in this multi-year litigation, Defendants the Republic of Guinea and its Ministry of Mines and Geology (collectively "Defendants" or "Guinea") claim that the Minister of Mines did not have authority to contract with Plaintiff Dentons US LLP ("Dentons US") for legal services without approval from the Minister of Finance, who supposedly never gave approval.  Defendants lob this assertion notwithstanding that:

- They do not dispute that an attorney-client relationship existed between the parties.

- The Minister of Finance and other Guinean officials repeatedly requested and accepted from Dentons US legal services covered by the Letter of Engagement between Dentons US and Guinea.

- The Minister of Finance and other Guinean officials repeatedly represented to third parties that Dentons US was its legal counsel.

- Defendants filed counterclaims and claims against foreign third parties on the express basis that the Letter of Engagement they now contest was valid and enforceable.

- And Guinea partially paid for Dentons US's legal services from Guinea's Central Bank, the funds of which can be disbursed only with approval by the Minister of Finance.

According to their new claim, Defendants' Motion for Summary Judgment resurrects their sovereign immunity and requires summary judgment on one of Dentons US's four causes of action.  But Defendants' motion fails for multiple independent reasons, each of them based on Defendants' own admissions and conduct.

*First*, Guinea indisputably requested and accepted legal services from Dentons US for more than a year, and by so doing participated in commercial activity sufficient to invoke

jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").  There is no resurrection.

The FSIA commercial activity exception contains no written contract requirement, and instead

encompasses more broadly any "commercial activity."  Here, Guinea knowingly engaged in

commercial activity by entering into an attorney-client relationship with Dentons US (a

relationship Guinea does not dispute in its motion), by holding out Dentons US internally and to

third parties as its legal representative, by requesting and receiving legal services from Dentons

US, and by accepting invoices and partially paying for those legal services.  *See infra* Part I.A.

*Second*, contrary to Defendants' new-found position, the Guinean Minister of Mines does

have the authority contractually to bind Guinea.  For proof, one need look no further than

Defendants' own counterclaims and third-party claims, in which they allege a breach of contract

claim expressly based on the very Letter of Engagement they now dispute, and they affirmatively

allege that Dentons US "entered into an agreement to provide legal services to Guinea."  *E.g.*,

Countercl. ¶¶ 3, 5, 18–19, 39–41, and 45.  Though an enforceable written contract is not

necessary for the FSIA commercial activity exception to apply, under Guinean law and by

Defendants' own judicial admissions, such a contract exists here.  *See infra* Part I.B.

*Third*, Guinea ratified the Letter of Engagement through its actions.  At every step,

including steps taken by the Minister of Finance, Guinea asked Dentons US to perform

extensive, time-sensitive work, to attend meetings worldwide as its agent, and to negotiate with

third parties on its behalf.  Guinea also held out Dentons US to outsiders as its attorneys, and

directed its main counterparty, Rio Tinto, to negotiate with Dentons US.  This ratification of the

parties' agreement independently triggers the commercial activity exception.  *See infra* Part I.C.

*Fourth*, Guinea voluntarily invoked this Court's jurisdiction to sue third parties, and it

based those claims, as well as counterclaims against Dentons US, on the Letter of Engagement it

now disavows.  It also actively participated in merits litigation for almost two years after its sovereign immunity motion was denied.  As a result, Dentons UKMEA LLP, Dentons Europe LLP, and the Swiss Dentons Verein were forced to defend the third-party claims.  Together with Dentons US, they produced more than 90,000 documents, and Dentons US and the Dentons Verein collectively provided more than 60 pages of interrogatory responses.  The FSIA does not permit foreign sovereigns to litigate their cases at will until they tire of them, and then belatedly to claim "immunity."  Every material fact in Defendants' motion was in their possession the moment this lawsuit was filed.  They cannot now appropriately resist continued participation in a suit in which they sued third parties while making the litigation longer, more expensive, and less efficient by their own conduct.  *See infra* Part I.D.

*Finally*, Defendants' alternative theory, that the Court can grant summary judgment on the merits of Plaintiffs' breach of contract cause of action, fails for many of the same reasons Guinea cannot hide behind sovereign immunity.  Most fundamentally, the theory ignores the written, signed contract between the parties, as well as Guinea's ratification of that contract.  Furthermore, the theory does not address, in any respect, Plaintiff's separately pleaded claims for unjust enrichment, *quantum meruit*, and account stated.  *See infra* Part II.

For these reasons, as explained further below, the Motion for Summary Judgment should be denied.

# FACTS

## A.    Material Facts

As required by the Federal Rules and the Rules of this Court, the material facts that require rejection of Defendants' Motion appear in the accompanying Statement of Material Facts.

## B.    Procedural History

Dentons US initiated this litigation in August 2014.  *See* Compl.  The Complaint alleges that "Dentons performed professional services on behalf of Defendants at standard hourly rates, as agreed to by the parties, and upon Defendants' instruction and with their approval, recruited a team of specialist subcontractors to provide [a] multidisciplinary strategy" to Guinea, *id*. ¶ 4; "Defendants repeatedly requested that Dentons increase the scope of its deliverables," *id*. ¶ 5; Dentons US "produced scores of reports, presentations, memoranda, drafts, negotiator notes and other deliverables including briefings to the Ministry of Mines, the Ministry of Finance, the inter-ministerial working group convened by the Ministry of Mines, and a working group designated by the President of Guinea, which provided real value to the Defendants," *id*.; and, *inter alia*, "Defendants repeatedly asked Dentons to continue its work, in light of the advocacy and advice that Dentons provided," *id*.  The Complaint alleges that the Minister of Mines had authority to "execute commercial contracts on behalf of, and binding upon, the Republic of Guinea . . . ."  *Id*. ¶ 13.  It also alleged that then-Minister of Mines Mohamed Lamine Fofana executed, in two parts, a Letter of Engagement appointing Dentons US as legal counsel to Guinea.  *Id*. ¶¶ 27–28, 31–33, Exs. 1–4.  The Complaint asserts claims for Breach of Contract (Count I), Quantum Meruit (Count II), Unjust Enrichment (Count III), and Account Stated (Count IV).

Defendants filed a Motion to Dismiss the Complaint on November 7, 2014.  *See* Defs.'
Mot. to Dismiss [Dkt. 15].  That motion claimed that Defendants were immune from suit, but did
not deny that Guinea requested and received legal advice from Dentons US.[1]  Nor did the motion
argue that the Letter of Engagement was not validly executed or say anything at all about the
Minister of Mines's authority to execute the parties' contract.  *See generally id*.  Instead, it
argued only that the "legal advice [Dentons US] provided to Guinea and its Ministry concern[ed]
matters solely governmental in nature," rather than commercial, and the activity did not have a
direct effect in the United States.  *Id*. at 12–16.  In an opinion issued September 22, 2015, Judge
Royce C. Lamberth rejected both of these arguments, finding that the activity was commercial in
nature and had a direct effect in the United States.  *Dentons U.S. LLP v. The Republic of Guinea*,
134 F. Supp. 3d 5, 8–10 (D.D.C. 2015).

Following the denial of Defendants' Motion to Dismiss, Guinea filed an Answer,
Counterclaim, and Third Party Claim.  *See* Ans., Countercl. and Third Party Cl. [Dkt. 25].  In
their Answer, Defendants recognized that the Court had ruled that it had jurisdiction over this
matter pursuant to the commercial activity exception to the FSIA, but they purported to "reserve
the right to assert a renewed motion following discovery."  Ans. ¶ 16.  Defendants did not,
however, specify what facts they needed discovery to elucidate, nor did they seek any form of
expedited jurisdictional discovery for the purpose of "assert[ing] a renewed motion."  *To the*

---

[1] Defendants were not limited to the four corners of the Complaint in filing their Rule 12(b)(1)
motion, and were permitted to dispute the factual allegations in the Complaint in challenging this
Court's subject-matter jurisdiction.  *See Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d
36, 40 (D.C. Cir. 2000) ("By moving to dismiss, the defendant may challenge either the legal
sufficiency or the factual underpinning of an exception [to immunity] . . . .").

*contrary, Defendants affirmatively alleged that the Letter of Engagement was valid and enforceable, including these judicial admissions*:

- "The Retainer Agreement[2] unambiguously states that Guinea was retaining the services of the international firm, SNR Denton, with all of its affiliates," Countercl. ¶ 5;

- "The invoices received by Guinea unambiguously reflect that legal services were provided by Dentons Europe LLP, Dentons UKMEA LLP, and Dentons US LLP, and their respective predecessor firms," *id.* ¶ 6;

- "SNR Denton and its affiliates, including Dentons Europe LLP, Dentons UKMEA LLP and Dentons US LLP, entered into an agreement to provide legal services to Guinea—specifically to negotiate an agreement for the development of national resources in the Simandou region of the Republic of Guinea," *id.* ¶ 39;

- "The Retainer Agreement was memorialized in the December 2012 Retainer Agreement," *id.* ¶ 40; and, *inter alia*,

- "SNR Denton contracted for and assumed the role of a fiduciary to Guinea in agreeing to serve as counsel to the sovereign government," *id.* ¶ 50.

Defendants asserted claims of Breach of Contract (Count I), Breach of Fiduciary Duty (Count II), Fraud in the Inducement (Count III), and Injunctive Relief (Count IV).

In filing the Third Party Claim, Guinea added three new parties to the litigation— Dentons UKMEA LLP ("Dentons UKMEA"), Dentons Europe LLP ("Dentons Europe"), and Salans FMC SNR Denton Group ("the Dentons Verein") (collectively, the "Third-Party

---

[2] Defendants refer to the parties' written contract as the "Retainer Agreement."  This is the same contract that Plaintiff term the "Letter of Engagement."

Defendants"). *See* Third Party Cl.  Guinea recognized that these three new parties were "unique

legal entities," *id.* ¶ 2, and it was required to serve each—none of which is a U.S. entity—to

compel their presence in a U.S. court, Decl. of L. Vigen ("Vigen Decl.") ¶¶ 4–6.  The Third-

Party Defendants moved to dismiss, and the Court granted the motion with respect to all of the

claims against Dentons UKMEA and Dentons Europe, and the majority of the claims against the

Dentons Verein.  *Dentons U.S. LLP v. The Republic of Guinea*, 208 F. Supp. 3d 330, 344–46

(D.D.C. 2016).  The Dentons Verein, however, remains a party in the litigation based solely on

Defendants' breach of contract claim.

     Prior to the resolution of the Third-Party Defendants' Motion to Dismiss, Defendants

sought discovery from Plaintiff and the Third-Party Defendants.  In February 2016, Defendants

sought 37 categories of documents from Dentons US.  Vigen Decl. ¶ 7.  In June 2016,

Defendants issued 39 unique requests for production to each of the Third-Party Defendants; they

also issued additional requests to Dentons US.  *Id.* ¶¶ 9–10.  The Court ordered the Third-Party

Defendants to produce documents despite the pending Motion to Dismiss, and by November

2016, Dentons US and the Third-Party Defendants produced more than 90,000 documents to

Guinea.  *Id.* ¶¶ 11, 13.

     Guinea also issued detailed interrogatories to Dentons US and the Dentons Verein in June

2017.  Vigen Decl. ¶ 15.  In July 2017, Dentons US and the Dentons Verein provided more than

60 pages of interrogatory answers.  *Id.* ¶ 16.  Shortly thereafter, Defendants filed their Motion for

Summary Judgment, which raised the entirely new claim under the FSIA, as well as a motion to

stay discovery.  Four days *after* filing the summary judgment motion, Defendants issued eight

deposition notices to Plaintiff, including to current and former employees of Dentons UKMEA and Dentons Europe.[3] *Id.* ¶ 18.

## LEGAL STANDARDS

Pursuant to the FSIA, U.S. courts have jurisdiction over actions against a foreign sovereign when the foreign state is not entitled to immunity.  28 U.S.C. § 1330(a).  As relevant here, a foreign sovereign is subject to suit in the United States when it has waived, explicitly or impliedly, its sovereign immunity, or when it has engaged in commercial activity that had a direct effect in the United States.  28 U.S.C. § 1605(a).  Nor may a foreign sovereign assert immunity against a counterclaim when it has initiated an action in a U.S. court.  28 U.S.C. § 1607(a).  The party claiming immunity bears the burden of demonstrating that an exception to the FSIA does not apply.  *See Phoenix Consulting Inc. v. Rep. of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).  Where a defendant has "challenged the factual basis of the court's jurisdiction," the court must "resolve any disputed issues of fact the resolution of which is necessary to a ruling" upon the jurisdictional issue.  *Id*.

A motion for summary judgment on the merits of a claim should be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of identifying materials "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets this requirement, the burden then shifts to the nonmovant to demonstrate "a genuine issue for trial."  *Id.*  "[D]isputes over facts that might affect the outcome of the suit under the governing law will

---

[3] Those depositions have not occurred due to the parties' agreement to postpone merits discovery.  Recent discovery has been limited during the pendency of the Motion for Summary Judgment.  *See* Stip. re: Pending Motions [Dkt. 90]; Vigen Decl. ¶ 18.

properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**ARGUMENT**

## I.    THE COURT HAS SUBJECT-MATTER JURISDICTION.

Judge Lamberth previously held that the commercial activity exception provides the Court with subject-matter jurisdiction in this matter.[4] *See Dentons U.S. LLP*, 134 F. Supp. 3d at 8–10.  Guinea now claims that the commercial activity exception does not apply solely because the Minister of Mines, who signed the Letter of Engagement between the parties, allegedly did not have actual authority to bind Guinea.  *See, e.g.*, Mot. for S.J. 12–13.  This argument is makeweight.  *First*, it is undisputed that Guinea, with the assent of the Minister of Finance, entered into an attorney-client relationship with Dentons US and accepted legal services from it. An attorney-client relationship and the exchange of legal services fall within the FSIA's definition of commercial activity regardless of whether the relationship arises from a written contract.  *Second*, the Minister of Mines did have authority to bind Guinea in contract, which is likely why Defendants have repeatedly confirmed the validity of the contract they now contest. *Third*, even if the Minister of Mines did not have actual authority to enter into the Letter of Engagement, it was subsequently ratified by the Government of Guinea.

This suit remains based on "commercial activity of [a] foreign state."  28 U.S.C. § 1605(a)(2).

---

[4] Guinea has not challenged Judge Lamberth's holding that the activities underlying the Complaint had a direct effect in the United States, "includ[ing] performance of services in the district as well as payment to be made to plaintiff's U.S. bank."  *Dentons U.S. LLP*, 134 F. Supp. 3d at 10.

### A.   The Parties' Attorney-Client Relationship and the Legal Services that Guinea Requested and Accepted from Dentons US Constitute Commercial Activity Under the FSIA.

The commercial activity exception to the FSIA provides:

> A foreign state shall not be immune . . . in any case . . . in which the action is based . . . upon an act outside the . . . United States in connection with the commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  The Supreme Court has clarified that whether conduct, a transaction, or an act qualifies as "commercial" turns on whether "a foreign government acts, not as regulator of a market, but in the manner of a private player within it."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).  Judge Lamberth previously held that Guinea engaged in commercial activity because it acted in the manner of a private party by "contract[ing] for legal services in support of funding and developing a mine."  *Dentons U.S. LLP*, 134 F. Supp. 3d at 9.

Because Defendants did not then challenge the validity of the parties' Letter of Engagement, Judge Lamberth's opinion focused on the act of contracting for legal services.   The existence of a contract, however, is not necessary for a foreign sovereign's activity to qualify as commercial pursuant to the FSIA.  "[C]ommercial activity" encompasses acts "by an agent of a foreign state that leads to an action for restitution, based on unjust enrichment."  H.R. Rep. No. 94-1487, 19, *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.  The Restatement (Third) of Foreign Relations Law recognizes that "[a]n activity is deemed commercial, even if carried out by a state or state instrumentality, if it is concerned with . . . *performance of* or contracting for the performance of *services* . . . ."  Restatement (Third) of Foreign Relations Law § 453, cmt. b (Am. Law Inst. 1987) (emphases added).  Albeit in a different context, the D.C. Circuit has

recognized that the term "'commercial' refers to 'matters or relationships, *whether contractual or not*, that arise out of or in connection with commerce.'"  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 104 (D.C. Cir. 2015) (emphasis added) (quoting Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1-1(e) (Am. Law Inst. 2010)), *cert. denied* 137 S. Ct. 617 (2017).

Case law confirms that a contract between a foreign sovereign and the party bringing suit against it is unnecessary for the foreign sovereign's conduct to constitute commercial activity.  *BP Chemicals Ltd. v. Jiangsu Sopo Corp.* is instructive.  285 F.3d 677 (8th Cir. 2002).  There, the Eighth Circuit held that a foreign sovereign defendant's "recruitment of American vendors to manufacture products" using plaintiff's proprietary information was commercial activity sufficient to permit the plaintiff's misappropriation of trade secrets claim to move forward.  *Id.* at 686.  And in *Youming Jin v. Ministry of State Security*, this Court held that a foreign sovereign's alleged interference with a contract between plaintiff and a third party constituted commercial activity under the FSIA.  475 F. Supp. 2d 54, 64–65 (D.D.C. 2007).  Nor is it necessary for the foreign sovereign to have any written obligation to pay the plaintiff.  In *Practical Concepts, Inc. v. Republic of Bolivia*, the D.C. Circuit held the "exchange of money for advice on the development of rural areas" constituted commercial activity under the FSIA even though a third party, not the foreign sovereign, was obligated to pay the plaintiff.  811 F.2d 1543, 1550 (D.C. Cir. 1987).  Instead, the salient question is "whether the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in trade and traffic or commerce."  *Weltover*, 504 U.S. at 614 (internal quotation marks omitted).

Courts in this District have uniformly held that contracting for legal services is a commercial activity within the meaning of the FSIA.[5]  Although these opinions address the contract for legal services, the holdings rest on the formation and performance of the attorney-client relationship, not the contract alone.[6]  For example, the court in *Nn aka v. Federal Republic of Nigeria* recognized that "retaining an attorney is the type of activity by which private parties engage in commerce."  238 F. Supp. 3d 17, 28 (D.D.C. 2017).  The court in *Embassy of Federal Republic of Nigeria v. Ugwuonye* observed that, "[i]n retaining Defendants' services for various legal transactions and services in the United States, the Embassy engaged in commercial activity."  901 F. Supp. 2d 136, 141 (D.D.C. 2012).  Courts in other jurisdictions have recognized that, when a foreign sovereign engages a law firm, the contract alone does not encompass the commercial activity.  *See Benetatos v. Hellenic Republic*, 2008 WL 2079191, at *4 (N.D. Cal. May 15, 2008) (finding that a law firm's "litigation of a real estate dispute" on a foreign sovereign's behalf constituted commercial activity).  Instead, both the FSIA and the case law interpreting it support the view that a foreign sovereign's formation of an attorney-client relationship, the law firm's performance in accordance with that relationship, and the foreign sovereign's acceptance of the law firm's services constitute commercial activity.

---

[5] *See, e.g.*, *Nn aka v. Fed. Republic of Nigeria*, 238 F. Supp. 3d 17, 28 (D.D.C. 2017); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 159 (D.D.C. 2013); *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 141 (D.D.C. 2012); *Reichler, Milton & Medel v. Republic of Liberia*, 484 F. Supp. 2d 1, 2 (D.D.C. 2007).

[6] A contract is not necessary to form an attorney-client relationship.  *See In re Fay*, 111 A.3d 1025, 1030 (D.C. 2015) (per curiam) ("The existence of an attorney-client relationship is not solely dependent on a written agreement . . . ."); *see also In re Lieber*, 442 A.2d 153, 156 (D.C. 1982).  Rather, "[a]ll that is required . . . is that the parties, explicitly or by their conduct, manifest an intention to create the attorney/client relationship."  *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996).

Here, Guinea undeniably formed an attorney-client relationship with Dentons US and requested and obtained legal services from it.  Officials throughout the Guinean government—including the President and the Minister of Finance—recognized both publicly and privately that Dentons US represented Guinea in connection with the Simandou matter.  Dentons US's Stmt. of Material Facts ("SMF") ¶¶ 40–42, 52–54, 57, 64–68, 70–76, 79, 84, 83–87, 90, 92, 95, 103, 106–07, 108–13, 115–17, 120–21, 127–28, 132, 136, 138, 144–47, 156.  Among other things, the Minister of Mines discussed the Dentons US Letter of Engagement with the President of Guinea, and received approval from the President to execute the Letter.  *Id.* ¶¶ 53, 74.  For months, Guinean officials, including the Minister of Finance and advisors to the President, requested and accepted Dentons US's legal services covered by the Letter.  *Id.* ¶¶ 57, 64–68, 70–71, 77–79, 81, 83–87, 106–07, 108–09, 112, 114–17, 120–21, 127–28, 132, 144–46.  At Guinea's request, Dentons US participated in numerous meetings between Guinean officials (including the Minister of Finance and his delegates) and third parties, and during these meetings Guinean officials introduced Dentons US as, and Dentons US acted as, Guinea's legal counsel.  *Id.* ¶¶ 40–42, 55–57, 66–67, 79, 108–10.  Dentons US attorneys traveled to Guinea and to Paris multiple times at Defendants' request, and during these trips met in person with Guinean officials including the Minister of Finance for the purpose of providing legal counsel.  *Id.* ¶¶ 51–54, 64–65, 69–71, 78, 81, 112, 116, 120–21, 127–28, 135, 145–46.  And Guinea made a partial payment to Dentons US in exchange for these legal services.  *Id.* ¶¶ 88–103.  Guinea also, as recently as February 2016, issued a "formal request for client files" to Dentons US, in which it acknowledged that Dentons US was its current law firm's "predecessor counsel" and requested "the legal files that [Dentons US] generated while they were representing Guinea."  Vigen Decl. ¶ 8.

13

Nowhere do Defendants claim that in Guinea only the Minister of Finance has authority to request and accept legal services from a law firm.  In any event, Minister of Finance Yansane was not only well informed about Dentons US's work on behalf of Guinea, he requested, directed and accepted that work.  Minister Yansane:

- Was aware of the Letter of Engagement, SMF ¶ 143; *see also id.* ¶¶ 52–53;

- Knew that Dentons US was performing legal work on behalf of Guinea, *id.* ¶¶ 40–42, 46–49, 52–53, 57–58, 64–68, 71, 75, 79, 81, 85–86, 91, 95–97, 103, 107, 108–111, 113, 142–144, 145–47;

- Accepted that work: "We were accepting that work, yeah," *id.* ¶¶ 52, 57, 64–68, 71, 79, 81, 85–86, 108–111, 113, 145–47;

- Attended PPMC meetings (*i.e.*, meetings between Guinea and Rio Tinto) with Dentons US acting on behalf of Guinea in Paris in June 2012, and separately met with Dentons US partner Jonathan Cahn to receive his advice about the meetings, *id.* ¶¶ 40–42;

- Was present, and did not object, when Guinean officials introduced Dentons US to Rio Tinto as its legal counsel with authority to act on its behalf, *id.* ¶¶ 57;

- Requested and accepted from Dentons US and its subcontractor Lazard Freres a strategy for fundraising for the Project, *id.* ¶ 71;

- Met with Dentons US in November and December 2012 in Conakry to prepare for upcoming PPMC meetings, *id.* ¶¶ 64–65;

- Requested and accepted advice from Dentons US in Paris during the December 2012 PPMC meetings, *id.* ¶¶ 66–68;

14

- Accepted advice from Dentons US in Paris during the January 2013 PPMC meetings, *id.* ¶¶ 79;

- Accepted advice from Dentons US in Abu Dhabi during the April 2013 PPMC meetings, *id.* ¶¶ 108–111;

- Accepted from Dentons US in March and April 2013 two versions of a tax report concerning the tax implications of the Investment Framework Agreements ("IFAs"), *id.* ¶¶ 85–86, 109;

- Was aware that Dentons US was participating with Guinean and Rio Tinto officials on official negotiating Working Groups, *id.* ¶¶ 111, 113;

- Was aware that Dentons US wrote, edited and delivered to Rio Tinto on behalf of Guinea drafts of the Investment Framework Agreements, which were required to start development of the Simandou Project, *id.* ¶¶ 107; and, *inter alia*,

- Continued to accept work from Dentons US even after he learned of an invoicing issue between the parties, *id.* ¶¶ 145–47.

The FSIA does not permit a foreign state to request and accept such legal services and then claim immunity on the basis that the very person who accepted the services did not formally sign a written agreement.

There is more. Dentons US's suit against Guinea is based upon Guinea's failure to pay Dentons US for activities it performed pursuant to the attorney-client relationship. The breach of contract claim is, of course, premised on the existence of a valid contract (which Dentons US maintains exists). But Dentons US's other three causes of action—unjust enrichment, *quantum meruit*, and account stated—are all based on (a) the attorney-client relationship between Dentons US and Guinea, and (b) the fact that, as a result of this relationship, Guinea requested legal

services, Dentons US provided them, Guinea accepted and retained them, but Guinea failed to pay for them. *See* Compl. ¶¶ 68–72, 67–80, 83–89. "[O]nly one claim or element of a claim need concern commercial activity in the United States to erode [a foreign sovereign's] presumptive immunity." *BP Chems. Ltd.*, 285 F.3d at 682. Accordingly, the commercial activity upon which Dentons US's claims are based—the attorney-client relationship between Guinea and Dentons US and Dentons US's provision of legal services to Guinea—is sufficient for the Court to reject Defendants' belated claim that they do not fall within the commercial activity exception. For this reason, the Court should deny Defendants' claim of sovereign immunity.

**B.      The Engagement Letter Was Entered Into and Ratified by Individuals with Actual Authority.**

**1.      The Minister of Mines Had Authority To Sign the Letter of Engagement.**

The Guinean Minister of Mines had actual authority to hire Dentons US and to sign the Letter of Engagement. Dr. Amara Soumah, an expert trained in Guinean law with experience dealing with the Guinean mining industry and the Government of Guinea, has opined that "the Minister of Mines is entitled to conclude any contract or convention with third parties within its jurisdiction." Rep. of Dr. A. Soumah ("Soumah Rep.") at 2, 4; SMF ¶¶ 157–62. Guinean law delegates authority to the Minister of Mines to enter into contracts on behalf of Guinea, and discovery has shown that the Minister of Mines takes advantage of that authority in practice. In Decree D/2008/040/PRG/SGG, the President imbued the Minister of Mines with the authority to negotiate and enter into agreements on Guinea's behalf within the mining sector. *See* SMF ¶ 159. Guinea's current Minister of Mines and Geology Abdoulaye Magassouba confirmed this by testifying that, in his role as Minister of Mines, he has authority to enter into contracts with external advisors, and does so. *See id.*

Contrary to Defendants' assertions, Guinea's Code of Public Procurement, Law L/2012/No. 020/CNT (Oct. 11, 2012), does not apply to the Letter of Engagement.  As Dr. Soumah explains, that provision applies only to "public procurement contracts and public service designations," such as "toll highway construction contracts, BOT contracts, [and] airport construction."  SMF ¶ 157.  In contrast, with respect to its engagement of Dentons US, the Government did not engage in a tender process.  *Id.* ¶ 158.  Instead, it participated in the marketplace for legal services as a private actor would.  *Id.*  As a result, Guinea's Civil Code, not the Code of Public Procurement, applies to the Letter of Engagement.  *Id.*  Defendants' arguments to the contrary—supported only by the self-serving testimony of their own client—are erroneous.

Consistent with this legal framework, Guinea has produced a letter of engagement by which it retained the law firm Jones Day.  That contract was signed by current Minister of Mines Magassouba, but *not* by the Minister of Finance.  Vigen Decl. Ex. 4.  In an interrogatory response, Guinea admits that the Minister of Finance did not sign the Jones Day contract, but states that the contract is nevertheless valid because "the Minister of Finance's signature was not required because no funds were paid out of the Guinean government budget."  Vigen Decl. Ex. 1 at 4–5.  Guinea's caveats aside about whether and how Guinea prepares its budgets, this evidence plainly demonstrates that the Minister of Mines has the authority to bind Guinea to an enforceable contract for legal services sufficient to invoke the commercial activity exception under the FSIA.

Further, the present case—in which a sitting Minister of Mines signed a contract that was performed openly and notoriously with the knowledge and approval of Guinea government officials at many levels—is readily distinguishable from Defendants' cited opinions in which

courts found an alleged agent lacked actual authority.[7]  In those cases, the plaintiff either

*conceded* that the actor in question did not have actual authority, *see SACE S.p.A. v. Republic of*

*Paraguay*, 243 F. Supp. 3d  21, 34 (D.D.C. 2017); *TJGEM LLC v. Republic of Ghana*, 26 F.

Supp. 3d 1, 10 (D.D.C. 2013); or the foreign sovereign immediately disavowed the actor's

conduct as soon as it was discovered, *see  Velasco v. Gov't of Indonesia*, 370 F.3d 392, 396–97

(4th Cir. 2004); *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 304 (9th Cir. 1997); *SACE*, 243

F. Supp. 3d at 26; or the actors were low-level employees of a government-owned business,

*Allfreight Worldwide Cargo*, 307 F. App'x 721, 722 (4th Cir. 2009) (per curiam) (unpublished).

None of these facts are present here.  Instead, there is no dispute that the Minister of Mines was a

confirmed Minister of State, duly appointed by the President of Guinea; that Guinean officials

ranging from the President himself to the Minister of Finance were aware of and participated in

Dentons US's engagement; and that they did so after they were demonstrably aware both of the

Letter of Engagement and of Dentons US's expectation to be paid pursuant to that contract.

SMF ¶¶ 40–42, 52–54, 57, 64–68, 70–76, 79, 84, 83–87, 90, 92, 95, 103, 106–07, 108–13, 115–

17, 120–21, 127–28, 132, 136, 138, 144–47, 156.

As Dr. Soumah succinctly opines, "[b]ecause the Letter of Engagement was validly

signed by Minister Fofana and is not subject to the requirements of Law L/2012/No. 020/CNT, it

---

[7] Guinea's argument that a governmental agent must possess "actual authority" to bind a foreign sovereign in a commercial contract, and thereby make the commercial activity that of the foreign state, is based largely on out-of-circuit precedent.  *See, e.g.*, *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 308 ("[A]n agent must have acted with actual authority in order to invoke the commercial activity exception against a foreign state.").  Although the D.C. Circuit has not opined on this issue, Defendants are correct that district courts within the Circuit have found such case law persuasive. *See SACE*, 243 F. Supp. 3d at 34–37; *TJGEM*, 26 F. Supp. 3d at 10.  Notably, in the *SACE* case, however, there was no dispute that the purported government agent was in fact perpetrating a fraud, that the foreign government never obtained any benefits from that fraud, and that the foreign government immediately disclaimed the contract as soon as it was alerted to its existence.  243 F. Supp. 3d at 41–42.

did not require the explicit approval or authorization of the Minister of Finance and is valid." *Id.*

¶ 160.

> ### 2. Defendants Have Made Repeated Judicial Admissions that the Letter of Engagement Is a Valid Contract, and these Admissions Estop Defendants from Now Arguing the Opposite.

Undoubtedly because the Minister of Mines is empowered to bind Guinea, Defendants

have, until just now, affirmatively alleged and admitted that there was a binding contract

between Guinea and Dentons US.  Guinea affirmatively alleged in its Counterclaim and Third-

Party Claim that Dentons US and Guinea had a binding, enforceable contract.  *See supra*, at 5–6.

These factual allegations are judicial admissions that bind Guinea.  As the D.C. Circuit has held,

"factual allegations in operative pleadings are judicial admissions of fact." *El Paso Nat. Gas Co.*

*v. United States*, 750 F.3d 863, 876 (D.C. Cir. 2014).

Defendants made these allegations to assert breach of contract claims against Dentons US

and the Dentons Verein.  In opposing the Third-Party Defendants' Motion to Dismiss,

Defendants argued that the Letter of Engagement, contained "the language of the contract that

governs the relationship between SNR Dentons and Guinea."  Opp. at 2.  They went further,

stating:

> Guinea incorporated the Retainer Agreement and its Terms of Business by
> reference in the Counterclaim. *See e.g.*, Countercl. ¶ 19 (citing Compl. Exs. 3-4).
> Thus, this Court must consider the representations and facts in the Retainer
> Agreement and the Terms of Business as part and parcel of the Counterclaim.

*Id*. at 2 n.1.  The Dentons Verein is in this case only because the Court accepted Defendants'

initial pleading—a clear judicial admission—that there was a contract and the Verein somehow

breached it.  *Dentons US LLP*, 208 F. Supp. 3d at 344–45.  Judicial estoppel prevents a party

precisely from "asserting [an] inconsistent position [to] derive an unfair advantage or impose an

unfair detriment on the opposing party if not estopped." *Walker v. England*, 590 F. Supp. 2d

113, 136 (D.D.C. 2008); *see also New Hampshire v. Maine*, 532 U.S. 742, 745 (2001); *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010).

Having successfully asserted, and then relied upon, the validity of the Letter of Engagement, and having benefited from the Court's ruling that they stated a breach of contract claim, Defendants cannot now say, á la Roseanne Roseannadanna, "Nevermind."

### C.    Guinea Ratified the Letter of Engagement.

Even if the Minister of Mines somehow lacked authority to execute the Letter of Engagement on Guinea's behalf, Guinea is bound by the contract because the Government of Guinea ratified it.

Ratification by a foreign sovereign of a contract that was unauthorized at the time of execution supports a finding of jurisdiction under the FSIA.  *See GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1308–10 (11th Cir. 2017); *see also Reiss v. Societe Centrale du Groupe des Assurances Nationales*, 185 F. Supp. 2d 335, 337–38 (S.D.N.Y. 2002).  Ratification occurs when a person with authority engages in "conduct that justifies a reasonable assumption that the person . . . consents" to the previously unauthorized agreement.  Restatement (Third) of Agency § 4.01(2)(b) (Am. Law Inst. 2006); *see GDG Acquisitions*, 849 F.3d at 1308.[8]  Such conduct includes retaining the benefits of a contract and making a payment for the contracted benefits. *GDG Acquisitions*, 849 F.3d at 1309; *see also* Restatement (Third) of Agency § 4.01 cmt. g.

Although the D.C. Circuit has not considered the issue of ratification under the FSIA, the Eleventh Circuit recently found that the government of Belize was not entitled to sovereign immunity when it had ratified a contract entered into by its Minister of Budget, regardless of

---

[8] Because the FSIA is a federal statute, courts look to federal common law to determine whether a foreign government ratified a contract so as to fall within the FSIA's commercial activity exception.  *GDG Acquisitions*, 849 F.3d at 1307, 1311.

whether the Minister originally had actual authority to bind the government.  *See GDG Acquisitions*, 849 F.3d at 1307–10.  Belize's Minister of Budget contracted with a private company to lease telecommunications equipment to the government.  *Id.* at 1302.  The company provided the equipment, and for a time, Belize made payments pursuant to the contract.  *Id.* at 1304.  At a certain point, however, the government ceased making payments and failed to return the leased equipment.  *Id.*  After the plaintiff brought suit, Belize disavowed the contract, claiming the Minister of Budget did not have the authority to execute it and that, as a result, the waiver of sovereign immunity provision did not apply.  *Id.* at 1302.

The Eleventh Circuit held that it need not reach the issue of whether the Minister of Budget acted with actual authority because the Government of Belize generally had ratified the contract.  *Id.* at 1308–10.[9]  Accordingly, even if the Minister did not act with authority, "his actions [were] given effect as if he had acted with actual authority."  *Id.* at 1308.  The government ratified the contract in two ways.  First, it retained the telecommunications equipment, which was part of the benefit it received pursuant to the contract.  *Id.* at 1310 ("The Government retained [the] benefits under the [contract] and, in doing so, consented to be bound by the legal consequences of the agreement.").  Second, it made payments pursuant to the contract.  *Id.* at 1309 ("The Government's conduct in making the payments . . . can be understood only on the assumption that the Government repeatedly consented to be bound . . . .").  Although Belize argued that the payments had been unauthorized, the Eleventh Circuit rejected this argument because, among other things, it was required to look to U.S. law, not foreign law, to determine whether ratification occurred pursuant to the FSIA.  *Id.* at 1311.

---

[9] The Eleventh Circuit appropriately considered that the "Government of Belize" was the principal that ratified the actions of the agent.  *See GDG Acquisitions*, 849 F.3d at 1309.

Because Belize ratified the contract through its actions, the court held it must be bound by the waiver of sovereign immunity. *Id.* at 1310.

This case is squarely on point with *GDG Acquisitions*. Like the government in *GDG Acquisitions*, Defendants here both retained the benefits of the Letter of Engagement and made a payment for those benefits. Accordingly, the Court should find that Guinea ratified the contract through these actions, regardless of whether the Minister of Mines originally possessed actual authority to enter into the Letter of Engagement. Officials at all levels of the Guinean government, including the Minister of Finance and advisors to the President, requested, accepted, and retained legal services from Dentons US. Both the Minister of Finance at the time, Kerfalla Yansane, and a senior advisor to the President at the time, Abdoulaye Magassouba (current Minister of Mines), acknowledged as much in their depositions. SMF ¶ 107. Dentons US attorneys attended numerous meetings with third parties at Guinea's request, during which it acted as Guinea's representative. *Id.* ¶¶ 40–42, 55–57, 66–67, 79, 108–10. Attorneys from the firm traveled multiple times to Guinea to meet with various Guinean officials in person, to help Guinea to solidify its negotiating strategy, to obtain information necessary to finalize draft contracts, to prepare Guinean officials for negotiations, and for various other reasons. *Id.* ¶¶ 51–54, 64–65, 69–71, 78, 81, 112, 116, 120–21, 127–28, 135, 145–46. The firm drafted numerous presentations, reports, briefing materials, and analyses it provided to representatives of Guinea. *Id.* ¶¶ 52, 59–60, 62–63, 70–71, 83–85, 112, 116, 120, 128, 145–46. It also drafted and provided several versions of draft contracts for use in negotiations with third parties. *Id.* ¶¶ 77–78, 81–82, 106–07. Guinea retained the benefit of all of this work. Through these actions, Guinea ratified the letter of engagement. *See GDG Acquisitions*, 849 F.3d at 1309–10.

Moreover, Guinean officials, including the Minister of Finance, continued to request and accept work product from Dentons US after they were aware of the Letter of Engagement. For example, the President had knowledge of the Letter of Engagement prior to its signing. SMF ¶¶ 53, 74. Testimonial evidence demonstrates that the Minister of Finance had knowledge of the Letter of Engagement by at the very latest March 2013.[10] *Id.* ¶ 97. Dentons US representatives had in-person meetings with the Minister of Finance in early August 2013 to discuss payment pursuant to the Letter of Engagement. *Id.* ¶¶ 137–144. And yet, as late as mid-August 2013, the Minister of Finance was still requesting and accepting work product from Dentons US. *Id.* ¶¶ 145–47. Guinea's ratification of the contract therefore took place with Government knowledge. *See Telenor Satellite Servs. v. United States*, 71 Fed. Cl. 114, 123 (Ct. Fed. Cl. 2006).

Finally, also like the government in *GDG Acquisitions*, Guinea ratified the Letter of Engagement by making a payment pursuant to it. It is undisputed that Dentons US received a wire transfer of $2 million from the Central Bank of Guinea in late March 2013. SMF ¶ 90. Saadou Nimaga, former legal counsel to the Minister of Mines and Guinea's official Rule 30(b)(6) witness on earlier issues in this case, recently testified about the Central Bank and its payment to Dentons US. The Bank is a Government entity and the Guinean treasury makes its payments through the Bank. *Id.* ¶ 94. The Minister of Finance—and only the Minister of Finance—must approve all payments from the Central Bank. *Id.* "[F]or anything which has to do with the Central Bank, it is the Minister of Finance who has to give his approval." *Id.* (quoting Vigen Decl. Ex. 7, Nimaga Dep. 44:24–45:1).

---

[10] Former Minister of Finance Yansane testified during his recent deposition that he was not aware of the Letter of Engagement until he became Minister of Mines in 2014. SMF ¶ 97. In light of other evidence to the contrary, such testimony is not credible. *See, e.g., id.* ¶¶ 53, 97, 143.

According to Mr. Nimaga, shortly before the Central Bank paid Dentons US $2 million, Mr. Nimaga asked Minister of Finance Yansane to make the payment. *Id.* ¶ 97.  Minister Yansane initially objected to making the payment, but shortly thereafter the payment was made. *Id.* ¶¶ 90, 97.  Mr. Nimaga does not know how the Minister of Mines could have made the payment.  *Id.* ¶¶ 98–99.  To the contrary, neither the President of Guinea nor any other minister besides the Minister of Finance can approve a Central Bank payment, and Government ministries do not have Central Bank accounts.  *Id.* ¶¶ 94, 98.  There is only one possible inference: notwithstanding Mr. Yansane's initial objection to the payment, he later approved it.

Mr. Nimaga's recent deposition testimony about the payment is confirmed by other evidence.  Abdoulaye Magassouba, advisor to the President, participated with Mr. Nimaga in facilitating the payment.  *Id.* ¶¶ 90, 95, 101.  Both Mr. Nimaga and Mr. Magassouba referenced decision makers from the Ministry of Finance and the Central Bank in contemporaneous communications.  *Id.* ¶¶ 90, 95; *see also* Cahn Decl. Exs. 22, 23.  Mr. Magassouba testified that the Ministry of Finance was part of the payment process, and that the President would have been aware that a $2 million transfer had been made to Dentons US.  SMF ¶ 96.  And in contemporaneous communications, Mr. Magassouba made clear that the Government wanted and intended the $2 million payment to apply to their outstanding invoices for legal services.  *Id.* ¶ 131; *see also* Cahn Decl. Ex. 37.  Even more, Jonathan Cahn, the Dentons US partner in charge of the Guinea engagement, had a conversation with Minister of Finance Yansane in August 2013 in which the Minister recounted reluctantly agreeing to a request from the President that he approve payment to Dentons US from the Central Bank.  SMF ¶ 142.  Although Minister Yansane expressed regret in his discussion with Mr. Cahn, he nevertheless confirmed that he had approved the payment.  *Id.*

24

Like Belize in *GDG Acquisitions*, Guinea now apparently takes the position that Guinea did not make the payment after all, and that an unknown third party somehow made the payment from the Government's Central Bank.  Vigen Decl. Ex. 1.  Despite repeated attempts by Dentons US to secure any evidence about this purported third-party source, however, Guinea has produced none.  Indeed, Guinea incredibly claims not to know who made the payment, apparently content to rest on the contention that $2 million materialized out of the blue, with no documentary confirmation whatsoever.  To no great surprise, Mr. Nimaga testified that he does not know of any other instance in which the Central Bank paid $2 million without anyone knowing the source of the money.  SMF ¶ 99.  Given Guinea's complete failure to produce *any* evidence supporting the claim that a third party made the payment to Dentons US, and the significant evidence demonstrating that the payment came from Guinea, the Court should find that Guinea ratified its contract with Dentons US by making the $2 million payment to the firm. *See GDG Acquisitions*, 849 F.3d at 1309.

Looking to U.S. legal principles, as required when interpreting a U.S. statute, Guinea ratified the Letter of Engagement with Dentons US, and should be bound by it.[11]  And because Guinea is bound by the contract, it is also subject to Judge Lamberth's holding that the commercial activity exception applies. *See Dentons US LLP*, 134 F. Supp. 3d at 9.

### D.     Defendants Have Waived Their Sovereign Immunity.

Finally with regard to sovereign immunity, Guinea has waived it for two independent reasons.  First, Guinea waived the current sovereign immunity argument by failing to raise it in its Motion to Dismiss and responsive pleading, and by actively participating in merits litigation

---

[11]  The principle of ratification also exists under Guinean law.  SMF ¶ 161.  Dr. Soumah opines that both the $2 million payment and Guinea's acceptance of legal services would constitute ratification under Articles 658 and 1015 of the Guinean Civil Code.  *Id.* ¶¶ 161–62.  Therefore, even if the Court determines it should look to Guinean law, Guinea ratified the contract here.

for almost two years thereafter.  *See* 28 U.S.C. § 1605(a)(1); *Ashraf-Hassan v. Embassy of France in the U.S.*, 40 F. Supp. 3d 94, 101–02 (D.D.C. 2014), *aff'd per curiam*, 610 F. App'x 3 (D.C. Cir. 2015).  Second, by invoking a U.S. Court's jurisdiction to sue the Third-Party Defendants in this case, Guinea has waived its immunity against claims "arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state."  28 U.S.C. § 1607(b).  Either of these grounds independently supports a finding of waiver.

> ### 1.      Defendants Failed To Raise Timely Their Purported Sovereign Immunity Argument and Instead Actively Took Part in This Litigation.

Under FSIA, a foreign state may waive its immunity "by implication."  28 U.S.C. § 1605(a)(1).  This is true "notwithstanding any withdrawal of the waiver which the foreign state might purport to effect."  *Id.*  The D.C. Circuit has recognized that "in most instances, a state's failure to assert sovereign immunity in a responsive pleading will constitute a waiver of the defense."  *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990); *see also* H.R. Rep. No. 94-1487.  Courts also find waiver where a foreign state demonstrates both "a conscious decision to take part in the litigation" and "a failure to raise sovereign immunity despite the opportunity to do so."  905 F.2d at 443–44 (quoting *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 378 (7th Cir. 1985) (per curiam)). Although the waiver provision is construed narrowly, *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999), a finding of waiver is appropriate where a foreign state has "indicated its amenability to suit," *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994).

*Ashraf-Hasan v. Embassy of France in the United States* is instructive.  There, the Court found that the defendant had impliedly waived its right to sovereign immunity when it had not raised the defense in its motion to dismiss and had actively litigated the case for three years after

that motion was denied.  40 F. Supp. 3d at 97–98, 101–02.  Both the defendant's "initial concession" that sovereign immunity did not apply and its "continued participation in this suit" led to the Court's conclusion.  *Id.* at 102.  That "participation" included "the filing of an answer," "conduct[ing] discovery," "attempt[ing] to solve the[] dispute through mediation," and "fil[ing] assorted motions and other pleadings" over the course of three years.  *Id.* at 97, 102.  Given this evidence of the defendant's purposeful choice to take part in the litigation, the Court refused to find that the defendant's purported reservation of "the right to raise its immunity should it be necessary to protect the confidential character of [] [its governmental] activities" in its motion to dismiss invalidated the waiver.  *Id.* at 98 (alterations in original).  Instead, the Court expressed skepticism that the defendant's "purported reservation of the right to withdraw [the waiver of sovereign immunity] is still valid at this late stage."  *Id.* at 102.[12]

Like the defendants in *Ashraf-Hasan*, Guinea here failed to raise its sovereign immunity argument "despite the opportunity to do so," and it has demonstrated "a conscious decision to take part in the litigation" since.  *See Foremost-McKesson*, 905 F.2d at 443–44.  These facts establish waiver.  Defendants insist that "discovery . . . has revealed" the alleged deficiency in the Letter of Engagement.  Mot. for S.J. 1.  Not so.  All of the purported factual and legal underpinnings of the current motion—all of the Guinean legal texts and all of the supposed

---

[12] Other courts have similarly considered the extent and length of a defendant's participation in the litigation when determining implied waiver.  *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 1988 WL 122568, at *6 & n.24 (D.D.C. Nov. 8, 1998) (basing a finding of no implied waiver, in part, on the facts that the case had "only recently been reactivated," "the parties [had] not had over three years to consider their positions as various motions [had] been filed," and that the defendant had not filed discovery requests), *aff'd*, 905 F.2d 438.  By contrast, *see Flota Maritima Browning De Cuba, Sociadad Anonima v. Motor Vessel Ciudad de la Habana*, 335 F.2d 619, 622, 625 (4th Cir. 1964) (finding waiver where defendants raised the issue of sovereign immunity only after having filed answers, motions, and litigated the case on the merits for more than three years).

recollections and opinions of Guinean officials—were at all times within Defendants' possession.  Nor has novel controlling authority issued since 2014, and none of the principal cases upon which Defendants rely are new.[13]  *See generally Allfreight Worldwide Cargo, Inc.*, 307 F. App'x 721; *Velasco*, 370 F.3d 392; *Phaneuf*, 106 F.3d 302; *TJGEM*, 26 F. Supp. 3d 1. There is no excuse for Defendants' decision not to raise this argument at the Motion to Dismiss stage, and their decision thereafter to participate actively in the litigation also establishes an implied waiver.

Instead of asserting their purported immunity claim, Defendants made a "conscious decision" to litigate this case actively for nearly two years, including filing an Answer, Counterclaim, Third-Party Claim, document requests, and interrogatories.  *See* Vigen Decl. ¶¶ 3– 18.  They opposed Plaintiff's and Third-Party Defendants' Motions to Dismiss the Counterclaim and Third-Party Claim, and they received more than 90,000 documents and 60 pages of interrogatory responses from Plaintiff and the Third-Party Defendants.  *Id.* ¶¶ 13, 16. Defendants even served Plaintiff with eight notices of deposition *after* filing the current Motion for Summary Judgment.  *Id.* ¶ 18.  Courts have found waiver in cases in which defendants litigated as extensively and proactively than Defendants have here.  *Flota Maritima Browning De Cuba*, 335 F.2d at 622, 625; *Ashraf-Hasan*, 40 F. Supp. 3d at 97–98, 101–02.  Through their actions, and by failing to raise a sovereign immunity argument that was fully available to them, Defendants waived their sovereign immunity.

---

[13] Defendants previously asserted that *SACE S.P.A. v. The Republic of Paraguay* was a "legal development" that spurred the current motion.  *See* Ninety Day Status Report [Dkt. 78].  As Dentons US pointed out in a response to that Status Report, however, *SACE* provides no new analysis relevant to Defendants' Motion.  *See* Response to Status Report [Dkt. 80].  Tellingly, Defendants cite the opinion only once in the Motion, for a proposition also supported by other opinions issued earlier in this District.  *See* Mot. for S.J. 11.

2.    **Defendants Cannot Assert Sovereign Immunity for Claims that Arise from the Same Events as Their Third-Party Claims and Counterclaims.**

Defendants also waived their sovereign immunity by pleading, serving, and litigating third-party claims and counterclaims arising from the same underlying events as Dentons US's Complaint.  FSIA provides that "[i]n any action brought by a foreign state . . . the foreign state shall not be accorded immunity with respect to any counterclaim . . . arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state."  28 U.S.C. § 1607(b).  The rationale underlying this provision is that a foreign state "should not obtain the benefits of litigation before U.S. courts while avoiding any legal liabilities claimed against it and arising from that same transaction or occurrence."  H.R. Rep. No. 94-1487, at 23.  Accordingly, courts find that foreign sovereigns are precluded from claiming sovereign immunity where they (1) bring claims in the United States and (2) the claims arise out of "essentially the same type of allegations" their opponent relies upon, even if those facts are presented "from a view unfavorable to [the opposing party]."  *Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 683 F. Supp. 2d 1, 8–9 (D.D.C. 2010); *accord Cabiri v. Gov't of the Rep. of Ghana*, 165 F.3d 193, 197–99 (2d Cir. 1999).  The application of this provision has been extended beyond sovereigns who initiate litigation; for example, a sovereign who filed an interpleader was precluded from claiming sovereign immunity as to cross-claims concerning the same subject matter pursuant to FSIA.  *See Lord Day & Lord v. Socialist Rep. of Vietnam*, 134 F. Supp. 2d 549, 557–58 (S.D.N.Y. 2001).

Defendants should not be permitted to claim sovereign immunity when they initiated litigation against third parties in a U.S. court, and those claims are based on the same events as Dentons US's claims against Guinea.  Both the plain language of FSIA's counterclaim provision and its underlying rationale support its application here.  As an initial matter, Defendants' Third-

29

Party Claim is an "action brought by a foreign state." 28 U.S.C. § 1607(b). An "action" is simply a "civil or criminal judicial proceeding." *Black's Law Dictionary* 35 (10th ed. 2014); *accord BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 n.3 (2006). To "bring an action" is "[t]o sue; institute legal proceedings." *Black's Law Dictionary* 231 (10th ed. 2014). Here, Defendants "institute[d] legal proceedings" against at least the Third-Party Defendants. Guinea had to serve each of the Third-Party Defendants to bring them into this action. *See* Vigen Decl. ¶ 6. As Defendants pleaded, each of those three parties is a separate legal entity distinct from Dentons US, Countercl. ¶ 2, and none would be involved in this action if Guinea had not affirmatively invoked the jurisdiction of this Court to bring them into this suit. Guinea's actions therefore satisfy the first requirement of FSIA's counterclaim provision.

As to the second requirement, it is beyond dispute that Defendants' Counterclaim and Third-Party Claim is based on the "same transaction or occurrence" underlying Dentons US's Complaint. The Complaint, the Third-Party Claim, and the Counterclaim all focus solely on Dentons US's provision of legal services to Guinea in connection with the Simandou Project. All allege that Guinea retained Dentons US to provide legal services on its behalf. Compl. ¶ 26; Countercl. ¶ 17. Just as Dentons US alleges breach of contract against Guinea, Compl. ¶¶ 60–66, Guinea claims breach of contract against the Third-Party Defendants and Dentons US. Countercl. ¶¶ 38–48. There are numerous additional examples of similarities between the allegations in the Complaint, the Third-Party Complaint, and the Counterclaim, establishing that they rest upon the same underlying events. Accordingly, waiver has occurred.

A finding of waiver comports with the rationale of the FSLA. Guinea has "obtained the benefits of litigation before U.S. courts," by haling foreign third-party defendants into this court, and by obtaining significant discovery from both the Third-Party Defendants and from Dentons

US.  For example, Dentons Europe and Dentons UKMEA produced over 12,000 documents—even though they were later dismissed from the litigation.  Vigen Decl. ¶ 11.  The Dentons Verein filed an answer, provided 19 pages of verified interrogatory answers (accompanied by a 177-page document production), and remains a party in the litigation.  Vigen Decl. ¶ 16.  And as discussed, Dentons US filed an answer, produced over 78,000 documents, and provided verified interrogatory answers totaling 49 pages.  Vigen Decl. ¶¶ 12, 13, 16.  After imposing these burdens and receiving these benefits of American jurisdiction, Guinea should not be permitted to "avoid[] any legal liabilities claimed against it" at this late date.

To undersigned counsel's knowledge, no court has addressed the exact situation that arises here:  A sovereign files third-party claims—which invoke the original jurisdiction of the Court—then pursues those claims for almost two years while it also litigates the entire case, and thereafter seeks to depart the litigation by a belated claim of sovereign immunity.  For the reasons above, the Court should find, on this issue of first impression, that Guinea is precluded from claiming sovereign immunity after it initiated litigation against third parties and asserted counterclaims, both allegedly arising from the same transactions and facts as Dentons US's claims against Guinea.

## II.    SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM IS INAPPROPRIATE BECAUSE GENUINE DISPUTES OF MATERIAL FACTS EXIST.

Defendants also argue that, even if the Court determines that it has subject-matter jurisdiction pursuant to the FSIA, it should nevertheless grant summary judgment on Plaintiff's breach of contract claim "because Minister Fofana lacked authority to contract on behalf of Guinea."  Mot. for S.J. 14.  As demonstrated above, however, there are at least genuine material disputes "over facts that might affect the outcome of the suit under the governing law," and these preclude summary judgment.  *See Anderson*, 477 U.S. at 248.

Under D.C. law, the elements of breach of contract are:  "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).  A valid contract may arise from subsequent ratification of a previously invalid agreement.  *See Lewis v. Wash. Metro. Area Transit Auth.*, 463 A.2d 666, 671–72 (D.C. 1983); *see also Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 535 F. Supp. 2d 60, 71–72 (D.D.C. 2008).

Defendants contend only that Dentons US cannot prove the first element of a breach-of-contract claim.  In fact, overwhelming evidence proves that a contract existed, both by authorized agreement and by ratification.  To avoid repetition, Dentons US incorporates here all of its factual arguments and citations at pages 13 through 25, *supra* to establish at least a genuine dispute of material facts.  For example, the above discussion cites specific evidence of:

- The Minister of Mines's authority to agree to contracts on behalf of Guinea, *supra*, at 16–19;

- The President's and the Minister of Finance's specific agreement to and/or knowledge of the Letter of Engagement, *supra*, at 13–14, 23;

- Judicial admissions by Guinea that the Letter of Engagement is a binding contract, *supra*, at 19–20;

- Repeated requests and acceptance by multiple Guinean officials, including the Minister of Finance and his agents, of legal services called for by the Letter of Engagement, *supra*, at 13–15;

- Payment from the Government's Central Bank for the legal services called for by the Letter of Engagement, *supra*, at 23–25;

32

- Inconsistent statements by Guinean officials about the Central Bank's payment for the Dentons US legal services, *supra*, at 23–25;

- Direct communications from Guinea to Dentons US proving that Guinea knew—and wanted—its Central Bank payment to apply to its contractual obligation to pay the firm's legal fees, *supra*, at 24.

Establishing much more than a material issue of fact, this evidence proves there is a contract by both agreement and ratification, and precludes granting summary judgment in Guinea's favor on the Dentons US breach of contract claim.[14] *See McConnell v. Howard Univ.*, 818 F.2d 58, 62 (D.C. Cir. 1987) (reversing grant of summary judgment on breach-of-contract claim due to disputed issues of fact).

---

[14] As noted at the outset, Defendants have not moved for summary judgment on the merits of Dentons US's claims for unjust enrichment, *quantum meruit*, and account stated.

**CONCLUSION**

Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted,

/s/ Ana C. Reyes
Ana C. Reyes (No. 477354)

WILLIAMS & CONNOLLY LLP
Michael Sundermeyer (No. 931873)
Ana C. Reyes (No. 477354)
Leslie C. Vigen (No. 1019782)
Justin S. Rowinsky (No. 1028756)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
msundermeyer@wc.com
areyes@wc.com
lvigen@wc.com
jrowinsky@wc.com.

*Attorneys for Plaintiff Dentons US LLP*

Dated: December 8, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2017, a copy of the foregoing **DENTONS US'S**

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY**

**JUDGMENT** was filed electronically via ECF.  Notice of this filing will be sent to all parties by

operation of the Court's electronic filing as indicated on the Notice of Electronic Filing.  Parties

may access this filing through the court's CM/ECF System.


/s/ Ana C. Reyes
  Ana C. Reyes (No. 477354)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DENTONS US LLP,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | Case No. 1:14-cv-1312-RDM |
| **THE REPUBLIC OF GUINEA et al.,** | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |
| | ) | |
| **THE REPUBLIC OF GUINEA et al.,** | ) | **[PROPOSED] ORDER** |
| | ) | |
| *Counterclaim Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| **DENTONS US LLP et al.,** | ) | |
| | ) | |
| *Counterclaim and Third Party Defendants.* | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

Upon consideration of Defendants' Motion for Summary Judgment, I find good cause to deny the Motion.  As such, it is

HEREBY ORDERED that Defendants' Motion for Summary Judgment is denied in all respects.

SO ORDERED,

_____
RANDOLPH D. MOSS
United States District Judge

Dated: _____