**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DENTONS US LLP,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| *v.* | ) |
| | ) Case No. 1:14-cv-1312-RDM |
| **THE REPUBLIC OF GUINEA et al.,** | ) |
| | ) |
| *Defendants.* | ) |
| ——————————————————— | ) |
| | ) |
| **THE REPUBLIC OF GUINEA et al.,** | ) |
| | ) |
| *Counterclaim and Third Party Plaintiffs,* | ) |
| | ) |
| *v.* | ) |
| | ) |
| **DENTONS US LLP et al.,** | ) |
| | ) |
| *Counterclaim and Third Party* | ) |
| *Defendants.* | ) |
| | ) |
| ——————————————————— | ) |

**DECLARATION OF JONATHAN D. CAHN, ESQ.**

I, Jonathan D. Cahn, declare as follows:

1.      I make this Declaration in support of Plaintiff's Opposition to Defendants'

Motion for Summary Judgment in the above-captioned action.  Unless otherwise stated, I have

personal knowledge of the facts stated in this Declaration.  If called upon to do so, I could and

would competently testify to these facts.

**INTRODUCTION**

2.      I am an attorney at law and a member in good standing of the bar of the District of

Columbia and bar of the State of Maryland.  I am also a solicitor authorized to practice law in

England and Wales.  I am currently a partner with the law firm of Reed Smith LLP in

Washington, D.C.

3.      Before becoming a partner at Reed Smith, I was a partner with the law firm of

Dentons US LLP in Washington, D.C.[1]  I was a partner with Dentons US until December 2016.

4.      My legal practice focuses on cross-border transactions, and I have extensive

experience in projects in emerging markets, including advising both governments and private

investors in connection with major cross-border investment transactions.  I have also advised

governmental entities with respect to policy as well as fiscal regime development.  For instance,

I served as legal counsel to the Republic of Kazakhstan in connection with the Project for the

Development of a Legal Framework for the Republic of Kazakhstan funded by the World Bank,

assisting in the drafting of more than 100 of that country's laws, including its foreign investment

framework and fiscal regime for mining and petroleum investment.  I separately advised

Kazakhstan on its law on external debt and the implementation of external debt policy, and led

many of that Government's efforts at privatization of their state-owned enterprises.  In that

capacity, I facilitated China's first-ever investment in Kazakhstan's energy resources.  I have

provided similar advice to other emerging-market governments and government

instrumentalities, as well as to many major investors in emerging markets.

---

[1] Dentons US LLP was known as "SNR Denton US LLP" before the firm changed its name to "Dentons US LLP" on February 28, 2013.  For simplicity, I refer to the firm as "Dentons US" throughout this Declaration.

## SIMANDOU PROJECT BACKGROUND

5.      While at Dentons US, I acted as the partner in charge of the firm's representation of the Republic of Guinea between May 2012 and approximately November 2013.[2]  Dentons US's role was to provide advisory services to the Government in connection with the Simandou Project, which was planned to be one of the largest mining projects in the world, led by international mining company Rio Tinto.  The Project comprised:  (i) an open pit iron ore mine in the Simandou Range in southeastern Guinea, approximately 600 kilometers from the Guinean coast; (ii) a trans-Guinean railway of approximately 670 kilometers in length to transport the ore from the mine to the Guinean coast; and (iii) a new port facility located south of Conakry in the Forécariah prefecture.  The rail line was central to the Government's plan for economic development of the country, and was viewed by the Government as a "development corridor" intended to catalyze Guinea's mining and other sectors, not only transporting Simandou's iron ore, but providing market access to other mining concerns along the rail line.

6.      As I came to learn, aspects of the Project had been contemplated since at least 1996, when Rio Tinto first began seeking exploration licenses for the Simandou region.  Rio Tinto discovered iron ore in 2002 and was granted a mining concession in 2006.  Following a period of political turmoil in Guinea, Rio Tinto and the Government executed a Settlement Agreement in 2011 in an attempt to clarify Rio Tinto's rights in the Project.  The Government entered into this Agreement without the advice of international legal counsel.  Ex. 1, DENUS00002095.

7.      Through the Settlement Agreement, Rio Tinto's Guinean subsidiary, Simfer, gained a concession to develop and operate the richest iron ore mines in the world and the related

---

[2] I will also refer to the Republic of Guinea as the "Government" in this Declaration.

strategic infrastructure, in exchange for a payment to the Government of $700 million and other commitments.  In 2012, the Aluminum Company of China, or "Chalco," acquired a 44.65 percent equity stake in the Project, joining Rio Tinto as a Project sponsor.  Ex. 1, DENUS00002095.  The Settlement Agreement set out key elements of the Simandou Project, and included a "Fiscal Annex" which established a tax regime for the mining concern and the rail and port infrastructure.

8.      The Settlement Agreement required the execution of a number of contracts referred to as "Investment Framework Agreements" or IFAs, which were to provide for the operation and financing of the Project.  By early 2012, Rio Tinto had submitted to the Government a number of proposed draft IFAs in accordance with the Settlement Agreement. These documents were long, complicated, involved, and required both legal and technical expertise to evaluate.  As of April 2012, the Government had not made any decisions—nor had it even begun investigating alternative options—regarding Rio Tinto's proposals.  During this time, it continued to operate without the assistance of international legal, technical, or financial advisors.  The Government was in desperate need of assistance.  Ex. 1, DENUS00002095.

## DENTONS US'S INTRODUCTION TO GUINEA

9.      I first became aware of the Simandou Project, and the Government's need for advisory services, in April 2012 through Laurent Lavinge du Cadet.  At the time, Mr. du Cadet was employed by the financial advisory firm Taylor-DeJongh.  (He later became a consultant to, and then a full-time employee of, Dentons US.)  Taylor-DeJongh was seeking a law firm to join it in a proposal to the World Bank to provide advisory services which Guinea had requested on an urgent basis.  Mr. du Cadet contacted me to invite Dentons US to serve as the law firm in the Taylor-DeJongh consortium.  Dentons US agreed, and I assumed the lead role within the firm

4

10.     On the basis of the Taylor-DeJongh proposal, the World Bank awarded Contract No. 7162670, dated May 2, 2012, to Taylor-DeJongh.  Through that contract, Taylor-DeJongh agreed to assemble a team of financial, technical, and legal advisors to support the Government in a series of upcoming meetings, and to assess the Government's future advisory needs with respect to the Simandou Project.  As explained, Dentons US would provide the legal expertise required by the team.  For a limited scope of work within a 90-day period, from May to July 2012, the World Bank would pay Taylor-DeJongh $250,175.00.  Taylor-DeJongh never provided any of these funds to Dentons US.

11.     Given the complexity, scope, and history of the Simandou Project, the learning curve was steep.  To participate effectively in meetings that were to happen shortly after Dentons US joined the consortium, Dentons US needed to quickly assemble a team and begin getting up to speed in order to advise the Government on a strategic approach to the Simandou Project.  This was no simple feat.  The Project's complexity required an integrated legal team with expertise in mining, rail infrastructure, port infrastructure, fiscal regime policy, and project finance.  Time was also a complicating factor.  The Settlement Agreement committed to a June 2015 Date of First Commercial Production, a deadline timed to coincide with the date of Guinea's next Presidential elections.  Annexure 2 to the Settlement Agreement, however, also provided for the finalization of the IFAs by no later than January 1, 2013, unless extended by the parties.  This left the Government approximately six months, from the time we were first engaged, in which to review, develop policy consensus on, prepare revisions to, and negotiate these agreements.

12.     Dentons attorneys first met representatives of the Government of Guinea in person during a series of meetings in Conakry, Guinea on May 28–29, 2012.  My colleague

Constantin Achillas, a Paris-based attorney with Dentons UKMEA LLP, attended these meetings. Representatives of Taylor-DeJongh and the World Bank also participated. These meetings introduced Dentons to the Government officials involved in the Simandou Project. It also provided Dentons with the initial basis for its assessment of the Government's need for legal services.

13.     I personally first met with representatives of the Government during a series of meetings in Paris from June 12–14, 2012. Ex. 2, DENUS00000051–56. Minister of Mines Mohammed Lamine Fofana had urgently requested that Dentons participate in these meetings because the government was without legal and technical support at the time, and Rio Tinto was pushing the Government to sign its draft agreements. Marian Hagler, a partner with Dentons US; Charles Woods, a London-based partner with Dentons UKMEA with expertise in regulated infrastructure; and Laurent Lavigne du Cadet, who joined Dentons US as a financial specialist, accompanied me to these meetings. Both Minister of Finance Kerfalla Yansane and Minister of Mines Fofana attended. Representatives from Taylor-DeJongh and Khatib & Alami, the engineering firm providing technical advice within the consortium, also attended.

14.     Ms. Hagler, Mr. Woods, Mr. du Cadet and I met with Government officials collectively and individually to provide legal advice and strategic counsel regarding the upcoming negotiations regarding the Investment Framework Agreements. We also represented the Government in meetings with Rio Tinto, Chalco, and the IFC, known as the "Project Sponsors." These meetings were known as the "PPMC" meetings.

15.     I had a direct conversation with Minister of Finance Yansane in a sidebar outside of the Paris meetings in which the Minister shared with me his goals for the negotiations with the Project Sponsors, and his thoughts about how Dentons could help achieve those goals. Minister

of Finance Yansane wanted to present the Government as investor friendly, and sought my advice as to how to do so.  During this one-one-one conversation, Minister of Finance Yansane was supportive of our role.

16.     All the while, Dentons attorneys were working on an extremely expedited schedule to devise a roadmap for the legal services the Government would need moving forward. We prepared this roadmap for the Initial Needs Assessment, which the consortium provided to the World Bank on June 26, 2016.  Taylor-DeJongh and later, the World Bank, provided the document to the Government.  In the Initial Needs Assessment, Dentons US recommended that the Government needed a legal advisor on an ongoing basis to, among other things:

- Determine the objectives the Government hoped to achieve from the Project;

- Engage in a detailed analysis of the current Rio Tinto proposed agreements;

- Develop counterproposals to Rio Tinto's proposed agreements;

- Revise and/or draft agreements reflecting these counterproposals;

- Provide legal and strategic advice concerning the financing of the Project; and

- Provide legal and strategic advice regarding international project finance.

Ex. 1, DENUS00002095.  These activities were outside the scope of the Taylor-DeJongh/World Bank contract.  And it was clear that any law firm seeking to complete these tasks would need to provide significant support to Government officials to enable them to participate effectively in negotiations with Rio Tinto and in the implementation of the Project once the Investment Framework Agreements had been executed.

## THE END OF THE WORLD BANK CONSORTIUM

17.     The funds allotted in the original World Bank contract were never intended to cover the level of advisory support required and being requested by the Government.  The initial

World Bank contract was designed only to underwrite a needs assessment.  Accordingly, John

Sachs of Taylor-DeJongh and I raised the subject of funding for the advisors with Minister of

Mines Fofana during the June 12–14 meetings in Paris.  Minister of Mines Fofana understood the

issue and, initially, thought that Guinea would be able to fund the future work of the advisors,

including Dentons US, using a $20 million loan Guinea expected to receive from the World

Bank.

18.     Shortly after the Paris meetings, on June 21, 2012, I followed up on this

conversation with an e-mail to Minister of Mines Fofana (mfwind@gmail.com) and Minister of

Finance Yansane (kerfallay@gmail.com) explaining that Dentons US could not continue

working on the Government's behalf without a budget in place, and emphasizing the need for the

Government to provide additional funding if work was to continue.  Ex. 3, DENUS00429556.  I

had doubts from the beginning about the practicality of funding Dentons's engagement using

funding from the World Bank, due to the time it would take to put such arrangements in place.

The Government was operating under strict deadlines imposed by the Settlement Agreement, and

I therefore communicated my concerns to the Ministers that I did not believe that the World

Bank was the solution to their funding problem.  I offered an alternative:  that the Government

request that the Project fund our representation, effectively having the Project Sponsors fund the

advisory services and capitalizing those costs as part of their investment.  As I pointed out to the

Ministers, Rio Tinto and the other Project Sponsors were incurring and capitalizing their

advisory costs in this very manner and were charging them as Project expenses.  The resources

required to devise the Initial Needs Assessment and to prepare for and participate in the first

meetings had already exceeded the funds provided by the World Bank contract.  This e-mail

plainly stated that the Government was responsible for paying or securing resources to fund Dentons US's legal representation.  Ex. 3, DENUS00429556.

19.     The Ministers initially expressed interest in the concept of the Project funding Dentons US's representation of Guinea.  Dentons US, at Minister of Mines Fofana's request, provided advice regarding how the Government might approach Rio Tinto with such a proposal, and the mechanics of how funding might work consistent with the need to maintain the independence of the advisors and attorney-client privilege.  In July 2012, however, the Government decided not to pursue funding of advisory fees from the Project, believing that the Government, whether through the World Bank or other resources, could fund these expenses.

20.     At the same time, Government officials, including Minister of Finance Yansane, were aware of the original World Bank contract, which was set to expire in July 2012, and that the Government needed to secure the support of its advisors.  It was imperative for Guinea to have legal representation at that time because a series of meetings with Rio Tinto already had been scheduled for the fall of 2012, and the deadline under the Settlement Agreement for certain agreements to be reached was approaching, potentially as early as January 1, 2013.

21.     I learned in a July 2012 meeting with Boubacar Boucom of the World Bank that Minister of Finance Yansane was continuing to push for disbursement of a $20 million technical assistance loan from the World Bank to support the Ministry of Mines, and that Minister of Finance Yansane intended $3 million of that amount to be set aside for the advisors.  To support Minister of Finance Yansane's request, Dentons US prepared, at Mr. Boucom's request, and submitted for World Bank review a detailed memorandum describing its services to date, and the work it anticipated the Government would need moving forward.  Ex. 4, DENUS00437037. Minister of Finance Yansane received a copy of this memorandum.  He continued to be

supportive of Dentons representing the Government and wanted to use the World Bank funding to bring Dentons on board.

22.     Soon after Dentons provided support for Minister of Finance Yansane's request to the World Bank, I traveled to Guinea at the request of Minister of Mines Fofana for meetings in Conakry from August 23–25, 2012.  I was accompanied by Laurent Lavigne du Cadet and Ambassador Robert Gelbard, a Dentons US senior advisor.[3]  Ex. 5, DENUS00000189.  During those meetings, I also learned from the inter-ministerial working group ("Inter-Ministerial Group") convened by the Ministry of Mines that Taylor-DeJongh had submitted its final report to the World Bank and had included in the report a recommendation that Guinea accept and enter into the draft agreements prepared by the Project Sponsors, notwithstanding their adverse terms. This recommendation was diametrically opposed to the advice Dentons US was then providing while in Conakry.  When members of the Inter-Ministerial Group learned that Taylor-DeJongh had provided legal advice without consultation with Dentons, Minister Fofana insisted that Guinea have a direct relationship with Dentons rather than work through a consortium.

23.     Taylor-DeJongh also notified the Ministry of Mines that they were withdrawing from the consortium with Dentons and the other advisors.  It now appears that Taylor-DeJongh did so to avoid sharing of fees, in particular the $3 million Taylor-DeJongh hoped it would be in a position to receive from an extension of the World Bank contract.  Since the World Bank's contractual relationship was with Taylor-DeJongh, Dentons US would ultimately not receive any of the original consortium funds, or any of the requested $3 million in advisor funds, which were to have been provided to the consortium.  Ex. 6, DENUS00934430.  To my knowledge, although

---

[3] Dentons US did not bill Guinea for Ambassador Gelbard's time for this trip.

Taylor-DeJongh received payment for the report, the $3 million in funding for additional work never materialized.

24.     During the August 2012 meetings in Conakry, based on Guinea's expressed desire to directly engage Dentons US as its legal counsel and in response to a request from Minister of Mines Fofana, Dentons US made a presentation to Minister of Mines Fofana and Minister of Finance Yansane, along with their teams, outlining a plan for Dentons US's strategic and legal activities for the upcoming months.  Ex. 6, DENUS00934430.  General consensus from the Working Group, including Minister of Finance Yansane, was that Dentons US should take charge.  The Ministry of Mines, accordingly, agreed to use Dentons US to coordinate and integrate legal, financial, and technical advice and thereby also preserve to the extent feasible the confidentiality afforded by the attorney-client relationship under the Dentons US umbrella.

**THE FIRST ENGAGEMENT LETTER AND**
**EARLY PPMC MEETINGS**

25.     During the August trip to Conakry, consistent with the Government's intention to engage Dentons US directly as legal counsel, Minister of Mines Fofana signed the first of two engagement letters executed between the Government and Dentons US.  Ex. 7, DENUS00000001.  Minister of Mines Fofana, with support from the President and Minister of Finance Yansane, specifically stated that Guinea wanted directly to engage Dentons US as its legal counsel, and I advised that a formal appointment as their legal counsel was necessary for ethical reasons and to ensure maintenance of the attorney-client privilege.  *See* Ex. 8, DENUS00443949 ("[T]he GOG [Government of Guinea] made it fully apparent that they want [Dentons US] as their law firm.").  Minister of Mines Fofana and legal counsel to the Ministry of Mines, Saadou Nimaga, agreed.  Dentons US therefore provided a first draft of an engagement letter while on the ground in Conakry.  *See* Ex. 06, DENUS00934430.  Mr. Nimaga reviewed the

letter and made minor adjustments.  Minister of Mines Fofana then had the text placed on his

letterhead, and phoned the President of Guinea for approval.  Mr. du Cadet, Ambassador

Gelbard, and I were in the room with Minister of Mines Fofana on August 25, 2012 when he

called the President.  *See* Ex. 9, DENUS00444555.  It is also my recollection that Mamadi

Conde, Administrateur Général, Administration et Contrôle des Gran Projets ("ACGP"), an

advisor to the President (as part of the Présidence de la République), and a member of the Inter-

Ministerial Group meeting, also got on the phone with the President about engaging Dentons US.

Following these calls with the President, Minister of Mines Fofana executed the agreement.  Ex.

7, DENUS00000001.

26.     Immediately following the meeting in which the engagement letter was signed, a

Government official transported me and my colleagues to a meeting with the President's son,

Alpha Conde.  Ex. 09, DENUS00444555.  We were introduced as the Government's legal

counsel.  Mr. Conde was coordinating the international communications strategy regarding the

Simandou Project, and the Government wanted Dentons US, as the legal representative of

Guinea, to work with Mr. Conde on this strategy.  This introduction to, and meeting with, the

President's son solidified my understanding that Guinea had established an attorney-client

relationship and engagement with Dentons.

27.     On August 28, we delivered formal legal advice to Minister of Mines Fofana as

he requested on August 24, concerning the potential legal implications of Government delays in

negotiating the Investment Framework Agreements and delays in granting various permits.  This

was our first major legal advice to the Ministry, and it was promptly leaked to the press.  It bears

stating that the legal team, after leaking of the memorandum, took great care to ensure

confidentiality of communications, and frequently opted to discuss sensitive issues in person,

requiring our travel to Conakry.  The memorandum, which is now public record, identified a

strategy that we inferred was being prosecuted by Rio Tinto to use all manner of excuses—even

its failure to receive an inconsequential permit—to explain its own delays.  By December of

2012, Rio Tinto would announce a major reduction in budgeted investment in Simandou.  Its

excuse was that it was behind in its schedule.  By January 2013, Rio Tinto would deliver a

Detailed Engineering Assessment that propounded a three-year delay in delivering the Project.

28.     It bears emphasis here that the Government was confronting a multi-dimensional

challenge and had desperately few resources with which to address the challenge.  The Project

Sponsors were in a superior strategic position, and had tabled obviously one-sided agreements.

By our count, the Project Sponsors had retained three law firms with combined deep expertise in

mining, infrastructure and finance, and expertise in the law of Guinea that frequently surpassed

the Government's own knowledge.  The legal documentation, in addition to being lengthy and

one-sided, was also by design not straightforward.  For instance, the contractual deadline of

January 1, 2013 for delivery of the Investment Framework Agreements was buried in Annexure

2 of the Settlement Agreement.  The legal challenge was compounded by a lack of financial,

technical, and negotiating experience.  The Government did not yet have a financial model by

which to evaluate the Project, and therefore could not develop a coherent negotiating position.

Moreover, the Ministry of Mines had available to it only scant technical mining expertise.  It was

therefore an easy matter for the Project Sponsors to overwhelm the Government, which did not

have the resources to efficiently make decisions, respond to the Project Sponsors' requests,

satisfy contractual obligations, or monitor performance.  Minister of Mines Fofana, Minister of

Finance Yansane, and their teams were clear that they wanted us to help even the odds.

29.     On September 8–15, 2012, I attended another series of PPMC meetings between Guinea and the Project Sponsors in Paris.  I did so at the request of the Government and for the purpose of providing its representatives with legal and strategic advice and services.  With me from Dentons US was Mr. du Cadet.  Nicholas Demigneux from Dentons UKMEA LLP also attended.  Among others, Minister of Finance Yansane attended on behalf of the Government.

30.     Acting as the Government's legal representative, my colleagues and I participated in the PPMC meetings with the larger group, including Minister of Finance Yansane.  Ex. 10, DENUS00513553.  During these meetings, Guinea communicated to Rio Tinto, with Minister of Finance Yansane present, that Dentons US was its legal counsel in connection with marking up and finalizing the Investment Framework Agreements.  *Id.*  No Government official, including Minster Yansane, objected to these introductions.  The minutes from that meeting, which were prepared contemporaneously by Dentons US in the regular course of business, and as part of our usual wrap up to the PPMC meetings, accurately reflect this public acknowledgement.  *Id.*  At no point during these meetings did Minister of Finance Yansane, or anyone else within the Government, raise any question about Dentons US's engagement, about the attorney-client relationship that Guinea had requested and established with Dentons, or about the legal advice and services that Guinea had requested and received in connection with the meetings.

31.     Following the signing of the first engagement letter, Dentons continued to review Rio Tinto's draft agreements and to work with the Government to formulate its counter-proposals.  This required Dentons to identify the strategic choices reflected in Rio Tinto's proposals, to determine which might be problematic for the Government, to educate Government officials about these issues, to present the choices necessary to make counter-proposals and to formulate possible solutions, to help the Government to reach consensus on its positions, and

then to incorporate these choices into revised drafts of the Investment Framework Agreements.

To understand Guinea's options and constraints regarding the terms of the Investment

Framework Agreements, we became experts on the 2011 Settlement Agreement.

32.     One aspect of the 2011 Settlement Agreement Dentons analyzed was the Minister

of Mines's ability to bind the state by signing the Settlement Agreement.  Kenyon Weaver, an

associate attorney at Dentons US, prepared a memorandum that addressed this issue, which

underwent several drafts in Fall 2012.  In the context of the Settlement Agreement, Mr. Weaver,

who is not an attorney with knowledge of the law of Guinea, expressed uncertainty about

whether the Minister of Mines could bind Guinea with respect to tax and revenue matters.  *See*

Ex. 5 to Defs.' Mot. for S.J.  In fact, the memorandum includes a placeholder for the opinion of

Guinea local counsel, but such opinion was not subsequently added.

33.     I have been informed that Guinea is now claiming that this memorandum

demonstrates that Dentons US was somehow aware that, according to them, the Minister of

Mines lacked authority to engage a law firm.  That is not correct.  The memorandum concerned

an entirely different question as to whether the Minister of Mines could establish by contract a

"new tax and fiscal regime" for Guinea.  To my knowledge, the Government never claimed the

contract we were analyzing—the 2011 Settlement Agreement—was invalid.  And the

memorandum, in fact, acknowledged that the Minister of Mines *did* have the authority to bind

the State.  It specifically states that, "[t]he Minister of Mines . . . is the individual who has the

capacity to bind the State to a mining agreement and amendments thereto."  Ex. 5 to Defs.' Mot.

for S.J. at 24.  The memorandum did not suggest that that Minister of Mines Fofana did not have

authority to bind the Guinean State, and regarding legal services related directly to mining,

provided no insight into his ability to engage a law firm on Guinea's behalf.

15

34.     Another aspect of the Settlement Agreement Dentons US analyzed was the attached "Fiscal Annex."  The Annex established the fiscal regime for the mine and separately for the rail and port infrastructure.  Based on our own analysis as well as analysis by a consultant to the IMF (an analysis that we found among papers piled up in an official's office and brought to the Government's attention) the Fiscal Annex undermined the economic benefits that the Government sought to gain from the Project, and therefore required renegotiation.

35.     Over the course of the next several months, we developed an economic model of the mine and infrastructure which our team of fiscal experts used to evaluate mining and infrastructure economics and benefits to the State.  We reached the conclusion that the Project's fiscal regime resulted in little to no profits, tax revenues, or other benefits to the Government for the entire life of the Project other than the royalty and the initial $700 million dollar payment. Our own fiscal team had concluded that the Fiscal Annex was one of the most one-sided fiscal regimes they had ever seen; its terms not only were onerous to the State, but had effectively eliminated almost all avenues for amending or re-structuring the Project in order to create a fairer and more equitable deal for Guinea.

36.     In Fall 2012, Dentons was also working to prepare Guinea for the next round of PPMC meetings, which were to take place in December 2012 in Paris.  The Ministry had requested Dentons develop options analyses for the Project, as well as financing strategies, in light of developments suggesting that Guinea was losing negotiating leverage.  Despite its obligations under the Settlement Agreement and repeated affirmations that it was proceeding at full pace on mine development, there were indications that Rio Tinto was slowing Simandou investment and development.  From a negotiation perspective, this raised concerns as to whether there was a risk that Rio Tinto would stop investing in Simandou.

37.     Dentons, recognizing that the Simandou Project was competing not only with other iron ore production globally but also with Rio Tinto's existing production from its Pilbara iron ore operations in Australia, assisted the Government to develop a strategy to achieve economies of scale across Guinea's mining sector for the proposed railroad and port development, and to create a more accountable and transparent mining regime that would make Guinea a less risky and more desirable country for investment.  Developing this strategy required extensive work by and with Government officials at all levels and traveling to Conakry for in-person meetings.

38.     From approximately November 27 to December 5, I conducted intensive strategy sessions with Government officials, including from the Ministry of Finance, to solidify Guinea's negotiating positions in advance of the December 2012 PPMC meetings.  Ex. 11, DENUS00000551–55.  I fielded many requests from Government officials during this visit to Conakry, doing whatever I could to help the Guinean delegation prepare for Paris.  Marian Hagler, a Dentons US partner, and Messrs. du Cadet, Achillas, and Demigneux, joined me in Conakry for part of these preparation sessions.  I also conducted in-person meetings with Minister of Finance Yansane, and Mr. Conde, the President's son.  Ex. 12, DENUS00000638, 643.

39.     During this Conakry visit, the Minister of Finance convened a high-level strategy meeting at the Ministry of Finance for the purpose of seeking advice from Dentons US and investment advisory firm Lazard Freres about courting investors to help fulfill the Government's financing commitment with respect to Project Simandou.  Ex. 12, DENUS00000638.  (Dentons US had engaged Lazard to work for Guinea on the critical issue of securing financing for the Project.)  Ministry of Finance staff, Minister of Mines Fofana, and Ministry of Mines staff all

attended.  Minister of Finance Yansane wanted Dentons US, along with Lazard, to devise a strategy, and develop promotional materials, for fundraising for the rail and infrastructure components of the Project, including to help him prepare for an investor "roadshow."  The critical questions Minister of Finance Yansane was seeking answers to included explanations of the financing structures, explanations of any issues that could arise from the proposed financing structures, and advice as to how to find investors.

40.     I traveled directly from Conakry to Paris to attend the PPMC meetings in December 2012, continuing to assist Guinea with its negotiating strategy with Rio Tinto.  Both Minister of Finance Yansane and Minister of Mines Fofana participated in these meetings.  I consulted with them and provided legal support to both during these meetings.

41.     On December 8, Minister of Finance Yansane convened a high-level meeting together with Minister of Mines Fofana; Alan Davies, Chief Executive, Minerals and Mining of Rio Tinto; and Ismael Diakite of Rio Tinto.  Minister Yansane believed that he would be able to resolve major outstanding issues of critical importance to the State, and that he had sufficient good will and credibility to change Rio Tinto's posture, through high level negotiations with Davies.

42.     Messrs. du Cadet, Demigneux, and I worked directly with the Minister of Mines and the Minister of Finance to prepare them for the December 8, 2012 meeting.  Ex. 12, DENUS00000650.  We briefed them on the issues to be addressed: (1) the fiscal regime that would apply to the mine and infrastructure; (2) the anticipated Date of First Commercial Production (which appeared to be slipping); (3) the scheduled delivery by Rio Tinto of the Detailed Engineering Assessment of the Project (crucial to completing the IFAs); and (4) Dentons's access to critical data for the Project in the Rio Tinto virtual data room.  Also in

attendance at the meeting was a senior Lazard team.  Dentons, in fact, provided the logistics, created and revised the agenda, assembled the documentation, and served as rapporteur.  In the meeting's aftermath, we supported the Government in necessary next steps for response and preparation of a briefing to the President.  Ex. 13, DENUS00522344.

43.     Following the meeting, together with Minister of Mines Fofana, Minister of Finance Yansane—clearly treating us as his legal counsel and angered by Mr. Davies's refusal to budge on the fiscal regime and unwillingness to commit on the Date of First Commercial Production—requested that Dentons fashion a legal strategy to enable the Government to maintain its leverage and keep Simandou on schedule following the signing of the Investment Framework Agreements.  He had become convinced from his meeting with Mr. Davies that Rio Tinto intended to delay implementation of the Project, which would have disastrous political repercussions for the Government, would undermine his projected revenues under the agreed IMF program, and would effectively wipe out the near-term economic benefits to the country.

44.     Minister of Finance Yansane would report back to President Conde on the failure of the meeting to resolve matters to the Government's satisfaction.  It was at that meeting that Minister Yansane came to view Rio Tinto more as adversary than partner, and which in turn fueled his desire that Dentons, as legal counsel, be funded by Guinea and not by the Project Sponsors.  He took the position that our principal value to Guinea was our integrity and steadfast advocacy of Guinea's interests.  He expressly did not want these compromised.  He made this abundantly clear when later in the coming Summer we discussed payment of fees, and he would dismiss the option of resorting to funding from the Project Sponsors because he believed litigation to be a possibility.

45.     Later in December 2012, I returned to Conakry with a team of Dentons attorneys to understand and finalize Guinea's position regarding certain of the Investment Framework Agreements, including the Amended Basic Convention and the BOT Convention.  This was necessary to provide our team with the client input necessary to complete drafts of the agreements.

46.     Accordingly, we met in person with Guinean infrastructure and mining teams to obtain answers to questions critical to finalizing the drafts, which we hoped to accomplish by January 1, 2013, the deadline set in the Settlement Agreement.  Dentons prepared agendas and questions for each of these meetings to focus the teams on decisions necessary to completing the agreements.  Long discussions with Guinean officials regarding the documents occurred during working sessions.  In conjunction with endeavoring to finalize the documents, we also continued to work with Guinean officials on their negotiating positions, and to prepare them for the next round of PPMC meetings, scheduled to take place in January 2013.  One of the challenges was that there were clear divisions of opinion within the Government on many of the most important issues represented in the Investment Framework Agreements.  These differences in opinion would ultimately make it impossible for the Government to approve the draft IFAs we had prepared for delivery to the Project Sponsors by the January 2013 deadline.

47.     A second goal of the December 2012 Conakry trip was to prepare a "teaser" that could be used to interest investors in the prospect of financing the Project.  Dentons US worked together with Lazard to assist with preparing this document, which was done at the request of Minister of Finance Yansane.  Ex. 14, DENUS00518815.  Minister of Finance Yansane expressed to me his appreciation that Dentons had brought Lazard in to advise Guinea and satisfaction with the advisors' work product.

## THE SECOND RETAINER LETTER AND
## DRAFT INVESTMENT FRAMEWORK AGREEMENTS

48.     Also during the December 2012 trip, Guinea entered into the second part of the

engagement agreement with Dentons US.  The earlier August letter had confirmed Dentons US's

appointment as counsel to Guinea, and it had extended the relationship through September 30,

2012.  The December letter confirmed the attorney-client relationship and extended it from

October 2012 forward.

49.     Dentons US provided drafts of the new engagement letter to Guinea in mid-

December 2012.  I engaged in discussions with Minister of Mines Fofana and Bouna Sylla,

economic advisor to the Ministry of Mines, regarding the engagement.  In these discussions, I

explained that it was not feasible to rely on the World Bank alone to fund Dentons US's past-due

invoices, and I made clear that it was necessary for the Government to make a direct

commitment to fund our engagement.  Ex. 15, DENUS00519405.  I also informed Guinea that

on December 20, Peter Wolfson, Chief Executive Officer of Dentons US had instructed that our

team could not continue working without an agreement and without payment.  Guinean officials,

including Minister of Mines Fofana, said that they were pleased with Dentons US's work and

wanted Dentons US to continue working on the matter.  As a result, Minister of Mines Fofana

expressed eagerness to enter into a letter to extend the attorney-client relationship.  The draft

engagement letter was prepared accordingly.

50.     Before finalizing and executing the follow-up engagement letter, Minister of

Mines Fofana insisted on consulting with the President of Guinea.  On December 20, 2012,

Minister of Mines Fofana advised that he had consulted with, and received approval from,

President Conde; he thereafter specifically confirmed the Government's agreement to execute

the additional engagement letter.  Ex. 16, DENUS00519379.  With this commitment in place, the

Dentons US team proceeded to review the draft letter with Mr. Sylla and in-house counsel for the Ministry, Saadou Nimaga.

51.     The day after Minister of Mines Fofana, with the approval of President Conde, confirmed he would sign the additional engagement letter, I met in person with Minister of Finance Yansane to discuss funding options for Dentons US's engagement.  Ex. 16, DENUS00519379.  As always, Dentons US was presented as counsel to the Government. During the meeting, Minister of Finance Yansane expressed a continued interest in funding our engagement using resources from the World Bank.  Minister of Mines Fofana separately communicated to me that the Government was willing to undertake the commitment to fund Dentons US's work in its entirety if necessary.  Minister Yansane did not object to the continued representation of Guinea by Dentons US.

52.     Following these discussions, I delivered by hand the signed letter of engagement on or about December 24, 2012.  Ex. 17, DENUS00017178.  I left the signed agreement, along with Dentons US's invoices from May through November 2012, in Conakry with representatives of the Ministry of Mines for Minister Fofana's signature.  I subsequently e-mailed a copy of the signed engagement to Bouna Sylla, who printed it for Minister of Mines Fofana to sign.  The Minister of Mines thereafter countersigned the agreement.  I received the countersigned version on December 27, 2012.  In signing the engagement letter, Minister Fofana also approved of the tendered invoices, as the engagement letter stated.

53.     We next provided the Government with revised drafts of the BOT Convention and the Amended Basic Convention for review.  Having determined the Government's objectives in late December, this was an extremely fast turnaround time.  Much of the Dentons team worked

throughout the holidays to ensure that the drafts would be delivered to the Government when promised.

54.     A few days later, on or about January 4, 2013, I traveled to Conakry at the request of the Government to discuss and review the draft agreements in advance of the January PPMC meetings.  Ex. 18, DENUS00000779.  The challenge, as we would discover with further consultations with the Government, was that the views of the Inter-Ministerial Group did not coincide with those at the Presidency who, during the last stages, were insisting on final review and approval of the agreements.  Hence, the documents we had delivered had not been provided to the Project Sponsors.

55.     Those differences, however, were eclipsed by Rio Tinto's delivery of its Detailed Engineering Assessment ("DEA") of the Project.  Previously, PPMC meetings, projections, and expectations were based on the Preliminary Engineering Assessment ("PEA").  The DEA, which was delivered on or about January 4 (in English, not French, and so not accessible to most persons in the Government) turned the tables on the Government:

- The DEA fundamentally rewrote the economic basis for investment, the State's anticipated benefits, the timing for investment and impact on Guinea's macro-economy and therefore required a fundamental reevaluation by the State.

- It announced that the Project Sponsors would not achieve their obligation to achieve the Date of First Commercial Production by June 2015.

- It phased investment in a fashion that reduced by 70 percent the benefits to the State in the first four years.

- It contemplated that 100 percent of the rail capacity would be reserved for Rio Tinto, making third-party access for other mines impractical, and undermining the Government's development plans for the mining sector.

56.     Delivery of the DEA required that we provide detailed explanation to the Government of its implications, rethink the drafting of the Investment Framework Agreements, and assist the Government in staking out its position vis-à-vis the Project Sponsors, in light of the impending PPMC meetings.

57.     From Conakry and briefings to the Government, I traveled directly to Paris to represent the Government in person during the next PPMC meetings, which took place on or around January 10–11, 2013.  The DEA was the focus of discussion at these meetings, and the Government delegation was very upset, as they attempted to deal with the new position being taken by the Project Sponsors, which amounted to a reneging on investment commitments.  As usual, Minister of Finance Yansane and Minister of Mines Fofana both attended the meetings.  My colleagues and I continued to assist the Government with review of the draft agreements we had provided in late December and early January and helped them to articulate their positions to the Project Sponsors during the PPMC meetings.  To facilitate understanding, we drafted various "deal summaries" and provided them to the Government.  Colleagues from Dentons joined me in person for these important meetings and assisted with preparation of Minister of Mines Fofana and the Guinean delegation.

58.     The Ministry of Mines, which had wanted to fund our services through a World Bank facility, had decided to reverse course and to pursue funding from the Project at my encouragement.  Even though matters were quite tense due to the DEA, Minister of Mines Fofana realized that some accommodation was required if Dentons US were to continue to serve

24

the Government, given the increasing intensity of the work and the crises that were now ensuing.

Minister of Mines Fofana therefore convened a separate side meeting of the Project Sponsors

during the January PPMC meetings, to seek funding of the advisory services so that the

Government could complete the Investment Framework Agreements, particularly in light of the

new situation implied by the DEA, and could meet its other obligations under the Settlement

Agreement.  During the meeting convened by Minister of Mines Fofana, Rio Tinto publicly

expressed a willingness to fund Guinea's advisory fees.  My recollection is that agreement was

reached with Alan Davies on terms of $700,000 per month plus expenses, beginning in January.

In mid-January, I therefore provided the Government with memoranda outlining a mechanism by

which Rio Tinto might fund Guinea's fees of its advisors, including legal fees.

59.     Meanwhile, Dentons and its subcontractors continued our work for the

Government.  A Dentons team—including Ms. Hagler; Marc Sage, a dual French/U.S. attorney

who had recently joined Dentons US; and me—returned to Paris in late January to conduct

meetings with Government officials to revise and refine the Infrastructure Framework

Agreements.  During these meetings, we provided Government officials with explanations of Rio

Tinto's documents, including difficult-to-understand technicalities.  We created simplified

comparisons with the drafts prepared by Dentons, and explained why those differences were

critical to ensure that Guinea's objectives would be achieved.  Following these meetings, we

continued to revise and refine the drafts in accordance with the Government's instructions,

preparing the documents to be shared with Rio Tinto.  The revised drafts of the Amended Basic

Convention and the BOT Convention were delivered to Guinea on March 25 and 29, 2013,

respectively.

60.     The drafting process had been complicated by the DEA, which reflected a very different position on many points, and which, in turn, triggered changing directions from the Government.  Given the large number of Government actors who needed to understand and provide input into the revision process, and the difficulty of communicating with our clients in Guinea, the Investment Framework Agreements were a complex and sensitive undertaking.  To help mitigate these complications, at the request of Guinea, a Dentons team traveled to Guinea again in late February through early March 2013 to work through revisions in person. Representatives of the Ministry of Finance were in attendance at all of these working-level meetings.

61.     The Dentons team also helped prepare the Government for meetings with Rio Tinto Chief Executive Officer Sam Walsh, scheduled to take place in Conakry on March 9, 2013. Among other things, we prepared briefing papers for the President.  Mr. Walsh had recently replaced CEO Tom Albanese, who had been asked to resign on January 17.  With Mr. Albanese's departure, Guinea no longer had easy high level access to Rio Tinto or a counterparty that the Government felt it could rely upon to convey Rio Tinto's level of commitment to the Simandou Project.

62.     In addition to working on the draft agreements, Dentons and its subcontractors prepared other documents on Guinea's behalf and at its request throughout the early part of 2013. For example, Dentons continued to create and refine "negotiators' notes" to prepare the Government for upcoming negotiations with Rio Tinto.  These notes were critical to ensuring key Government officials were aware of the issues and could undertake the upcoming negotiations.  They would become the central resources used when the Government went into negotiations with Rio Tinto and the other investors.

26

63.     We also supported the Government in its communications strategy as it related to the Project.  We assisted Mr. Conde and Minister of Mines Fofana, for example, in preparations for the World Economic Forum in Davos, including putting together talking points for meetings with the *Financial Times*.  The Government was seeking to bolster the perception of Guinea in the international markets and to counteract Rio Tinto's public relations strategies through its meetings at this conference.  Ex. 19, DENUS00561002.  Similarly, we worked with Lazard to create a presentation for Minister of Mines Fofana for the Indaba Mining Conference in late January 2013, at which Minister of Mines Fofana sought to court potential investors in the Project.

64.     A dedicated "tax team" created a detailed report on the tax implications of Rio Tinto's proposals, and how different choices by the Government could alter what the Government could expect to recover from the Project via taxation.  This tax report was another of the topics addressed during meetings between Dentons and Government officials in Conakry in late February and early March 2013.  The report, which was prepared in two versions, one for general consumption within the Government, and a second report, highly confidential, specifically for the Ministry of Finance to guide it in negotiation strategy, were delivered to the Government, and specifically to Minister of Finance Yansane, on or about March 20, 2013.  The reports were based, in part, on a sophisticated, bespoke financial model created for the Government which included analysis of both the mining and infrastructure operations and the application of the fiscal regime to each.  To my knowledge, this was the only model of its kind created to evaluate the full implications of the fiscal regime and Project economics being adopted as part of the Settlement Agreement.

27

65.     Minister of Finance Yansane appointed a special team of Ministry of Finance staff to review the tax expert report in detail with Dentons US.  To facilitate this review, we prepared a detailed PowerPoint presentation as an introduction to the general tax report.

66.     At no point during any of these meetings, or in response to any of the work product provided by Dentons US, did any representative of the Government question our engagement, disavow our work, or refuse to pay our fees.  Rather, all members of the Government with whom we were acquainted not only accepted Dentons US's work, but expressed appreciation for it, and in many cases requested follow-up or additional work.

67.     Further, in a March 25, 2013 letter, Minister of Mines Fofana wrote to me that he was "honored to confirm with you that the Republic of Guinea, as client, is prepared to perform all of its contractual obligations contained in the agreement between you and the Ministry of Mines and Geology . . . in the event where Rio Tinto does not pay the fees and expenses as indicated above, the Guinean State will pay such fees and expenses which, as with the other fees shall be included in the costs of the Simandou Project."  Ex. 20, DENUS00268105.

## THE $2 MILLION PAYMENT AND
## DELIVERY OF DRAFT AGREEMENTS TO RIO TINTO

68.     My understanding that Dentons US had a valid contract that the Government would honor was confirmed when the Government made a partial payment of our outstanding invoices in April 2013.

69.     Dentons US had been requesting payment for the work we had performed for the Government over the course of almost a year.  In early April 2013, Guinea agreed to make a partial payment to ensure that Dentons US would continue our work on the Simandou Project. The Government was particularly concerned that we continue to work and deliver drafts of the Investment Framework Agreements.

28

70.     In retrospect, I believe that the Government inferred that delays in our preparation of the draft Investment Framework Agreements were due to our failure to receive payment.  In fact, the Government was still struggling with many of the central issues being addressed in the drafts, particularly those triggered by the DEA and the change in Rio Tinto's leadership.  In many instances, as strategic and policy issues were exchanged and evolved, multiple revisions of the documents were required, which at times created uncertainty as to whether the position reflected was that of the Government or only that of the individual official reviewing the work. This uncertainty was exacerbated because of the numerous sources of input within the Government, some less and some more knowledgeable.  Ultimately, we marked the drafts with the legend:  "Version prepared by legal counsel, subject to review by the Republic of Guinea . . ." to avoid a situation in which the Government was limited by an unreasonable choice that had been made in the draft.  Notwithstanding the legend, because of the sensitivity of the issues to the Government, each of the texts had to be carefully reviewed with the client in the French. Trying to manage the challenges in the preparation of large and complex draft agreements (particularly when doing so in two languages) was slow work.

71.     With little advance notice, the Government, via a wire from the Central Bank of Guinea, tendered $2 million to Dentons US in partial consideration for our past work.  Ex. 21, DENUS00613580.  Saadou Nimaga, legal advisor to the Ministry of Mines, and Abdoulaye Magassouba, an advisor to the President of Guinea, coordinated the payment process in conjunction with Guinea's Central Bank.  Ex. 22, DENUS00614054; Ex. 23, DENUS00614024. It is my understanding that the Central Bank of Guinea is the repository for the Government's official accounts, and that approval of the Minister of Finance is required to make payments on the Government's behalf.

72.     Senior decision-makers within the Government directed and approved the $2 million payment to Dentons US.  Ex. 23, DENUS00614024.  To the best of my recollection, I learned about this chain of events from Mr. Magassouba.  Specifically, I was told that Minister of Mines Fofana requested for the President of Guinea to intervene to get the payment made.  It is my understanding that the President then personally directed Minister of Finance Yansane to coordinate with the head of the Central Bank to make the $2 million payment.  In addition, several months later, during in-person conversations with me in August 2013, Minister of Finance Yansane acknowledged that he was involved in, and directed, the $2 million payment. To my recollection, Minister of Finance Yansane recounted being woken up in the middle of the night to approve the payment, which he had not been happy about.

73.     Mr. Magassouba also made clear in contemporaneous e-mail communications that the Ministry of Finance, in connection with the payment, was seeking confirmation from me that the draft documents on which we had been working would be delivered after payment was received.  Ex. 22, DENUS00614054.

74.     Mr. Nimaga, in connection with the payment, requested I provide him a copy of Dentons US's engagement letter.  Ex. 23, DENUS00614024; Ex. 24, DENUS00916099.  This request was further confirmation that the $2 million payment was pursuant to the contract between Guinea and Dentons US as the authorized basis for the payment.

75.     I communicated to Messrs. Nimaga, Magassouba, and Mamady Fofana of the Guinean Central Bank that this payment was in partial satisfaction of the amounts owing under our engagement letter.  Members of the Government were fully aware that they were committing to this payment in advance of any assistance from Rio Tinto, via the Project, to fund our fees. Ex. 23, DENUS00614024.

76.     At no time during this process or thereafter was there ever any suggestion that the Government would get the $2 million back.  This was a payment against very substantial invoices.  To be sure, if Rio Tinto had later funded of Dentons US's fees and expenses, Rio Tinto may have chosen to reimburse the Government.  But the payment from Guinea to Dentons US was not conditional or an "advance," as I understand the Government is now arguing.

77.     At the same time, I was informed that members of the Government at all levels, including the President, Minister of Finance Yansane, and Minister of Mines Fofana wanted Dentons to keep working on their behalf.  Indeed, Mr. Nimaga made this request in connection with his confirmation of the payment. Ex. 23, DENUS00614024.  Moreover, in something of a humorous exchange following receipt of payment, Mr. Magassouba and I spoke on the phone, and he acknowledged that the firm was owed substantially more, and that he was hoping for everyone's sake that they and we would be more organized in handling such payments in the future.  He then committed that he would work with me and the Ministry of Mines to ensure that some order was imposed on the process moving forward.

78.     Following the $2 million payment, in early April 2013, Dentons delivered the next drafts of the BOT Convention and Amended Basic Convention agreements to Rio Tinto on behalf of the Government. Ex. 25, DENUS00618704.  Rio Tinto was not happy with the documents, which eliminated or revised provisions that would have benefitted Rio Tinto at the Government's expense, aggressively advanced the Government's interests, and sought to prevent Rio Tinto from gaining the rights to Simandou without providing in return the infrastructure, social, and tax benefits the Government hoped to gain from the Project.  The Government, on the other hand, was happy that the drafts demonstrated that Guinea was serious about getting a good deal in the Simandou negotiations.  Numerous members of the Government, including advisor to

31

the President Mr. Magassouba, and the President's son Mr. Conde, communicated directly to me

on several occasions that they felt Dentons was advancing Guinea's position and helping it to

avoid being taken advantage of by Rio Tinto.  Ex. 26, DENUS00634451.

### DENTONS'S ONGOING SUPPORT OF GUINEA IN NEGOTIATIONS

79.     Soon after delivery of the draft agreements, Rio Tinto requested a high-level

meeting with the Government of Guinea in Abu Dhabi on April 11, 2013.  Marc Sage and I

attended at the request of the Government.  Minister Fofana and Minister of Finance Yansane

both attended for Guinea.  The ostensible purpose of the meeting was to resolve differences of

position between the Project sponsors and the Government with respect to the Project.

80.     A critical point of difference between the Government and the Project Sponsors

was the Fiscal Annex, and the Government's need to negotiate new fiscal terms.  During these

meetings, we therefore provided by hand to Minister of Finance Yansane the highly confidential

version of our fiscal report that included an aggressive negotiating strategy, along with an

updated, expanded version of the more general tax expert report.  *See* Ex. 27, DENUS00631074.

Minister of Finance Yansane appreciatively accepted this work product.  No one official,

including Minister of Finance Yansane, complained of or remarked regarding the $2 million

partial payment of the Dentons US fees.

81.     Dentons US's role in the meeting was, among other things, to defend the draft

agreements that we had worked on with the Government and to demonstrate that, contrary to Rio

Tinto's assertions, they were not inconsistent with Guinea's obligations under the 2011

Settlement Agreement.  We were largely successful in this endeavor, but Rio Tinto insisted that

the next meetings among Guinea and the Project Sponsors be conducted in small groups, with

third-party facilitators, and would exclude attorneys on all sides.  In my view, Rio Tinto was

threatened by the strong support Dentons was providing to Guinea, and wanted Dentons out of the picture.  We were keenly aware, after our initial advice had been leaked to the press, that Rio Tinto was likely aware of much of the progress we had made, and of the growing sense within Government that they were getting a handle on the Project.  To illustrate the benefits Dentons provided to the entire Government:

- On three separate occasions, under stringent deadlines, we had prepared draft Investment Framework Agreements rather than permitting Rio Tinto's legal counsel to lead the drafting.

- We had uncovered the Joint Development Agreement ("JDA") between Rio Tinto and Chalco (not previously read or understood by the Government).  This agreement provided the Government with leverage and insight into the relationship between the lead Project Sponsors.

- Our discovery of the JDA also enabled the Government to secure participation in the marketing company for the Project.  Rio Tinto, in accordance with the JDA, was to incorporate a marketing company in Singapore which would market and sell all saleable product from the mine.  The marketing company was originally to be owned by Chalco and Rio Tinto only.

- We uncovered that Rio Tinto would benefit from undisclosed management fees to be charged to the Government through the Project, a fact undisclosed but embedded in Rio Tinto's economic model of the Project.

- We had constructed the only integrated economic model of the rail and mining projects, identifying billions of dollars in potential value that Government could achieve in negotiations.

- We prepared comprehensive reports for the Government on the Sponsors' ability to strip profits from the Project using tax loopholes and transfer pricing.

- We uncovered the fact that Rio Tinto's proposed rail alignment would undermine an airport and an international hydro power project (a fact never previously brought to Government's attention).

- And we provided early warning to President Conde (in January 2013) that economic fundamentals could influence Rio Tinto to delay, "put on hold," or sell its investment in Simandou.

82.     It is important here to underscore how vulnerable Guinea then was, and the strategy being employed by Rio Tinto and the other Sponsors.  Rio Tinto was slowing its investment in Simandou, which was having a disastrous effect on Guinea's economy, leaving many people unemployed, contracts with local suppliers terminated, and wrecking the Government's economic development plans.  The Sponsors were aware that Guinea was desperate for investment, and intended to use that desperation as leverage to exact advantageous terms.

83.     Rio Tinto, in Abu Dhabi, insisted on three points:  (1) first, that the Inter-Ministerial Group the Government had relied upon be replaced by a group of senior government officials (the "Presidential Working Group") which could effectively bind the Government and endorse the agreements that would be reached; (2) that attorneys were to be officially excluded from these meetings in order to facilitate agreements in principle that could then be incorporated, in ministerial fashion, into the legal documentation; and (3) that a "side letter" or memorandum of understanding would be entered into "interpreting" the Settlement Agreement, and reflecting the two sides' resolution of outstanding issues.

84.     Guinea, sensing a trap, requested that Dentons train the new Presidential Working Group, and even asked that we recruit a team of professional negotiating coaches.  In the end, at the Government's request, we set up a command center at Dentons' offices in Paris, which would support the newly formed Presidential Working Group for the negotiations, provide behind-the-scenes assistance during meetings on a real-time basis, and provide counsel in other areas, such as with respect to strategic communications during the negotiations (*e.g.*, preparation of meeting summaries, presentations, etc.).  *See, e.g.* Ex. 28, DENUS00628314.  It is my understanding that, within the Government, Minister of Finance Yansane was given a central role with respect to these meetings.  This support strategy was undertaken at the request of the Government by consensus decision of various members of the Government, including Minister of Finance Yansane, Minister of Mines Fofana, Mr. Magassouba, and Idrissa Thiam (an advisor to the President and one of Minister of Finance Yansane's closest advisors), that Dentons should provide support for all of the meetings.  As the Government's legal counsel, we agreed to do so.

85.     Along with other members of the Dentons US team, I attended at least five additional meetings at Guinea's request during the Spring and Summer of 2013.  The first of these meetings took place in April 2013.  Marc Sage and I met with various members of the Government in Conakry and Paris.  We also added Daniel Wouters, a Francophone expert in African mining and infrastructure contracts, to our team for negotiation preparations.

86.     The new Presidential Working Group lacked much of the background on the Project, requiring that we provide extensive briefing and background materials for the upcoming meetings.  In effect, the Project Sponsors, by insisting on a new working group, had eliminated the expertise and institutional memory that we had worked so hard to develop for Guinea over the previous months.  At the request of the Presidential Working Group, we provided legal, fiscal

and financial advisory support for each of the five negotiating sessions between the Presidential

Working Group and the Project Sponsors.  Each negotiating session required:

- A Presidential Working Group briefing to prepare the group for the issues;

- Assistance and consultation on the Presidential Working Group agenda to be agreed with the investors;

- Presentations for each agenda item;

- Briefing books and negotiation materials for use by the Presidential Working Group; and

- Real-time support for the Presidential Working Group including position analysis, intelligence gathering and legal analysis.

87.     During the in-person meetings requested by the Government, Mr. Sage and I

labored to develop the Presidential Working Group, into a real negotiation team.  This included

the development of a negotiation roadmap and materials that would inform each of the

negotiating sessions.  The Presidential Working Group included representatives of the Ministry

of Finance, including Sidi Mouctar Dicko, appointed by the Minister of Finance and Mr. Thiam,

who answered to both Minister Yansane and the President.  Bringing the Presidential Working

Group up to speed on the history and complex documentation that was integral to understanding

the Project was an enormous task.  For instance, we briefed the team on the key provisions of the

Settlement Agreement and prepared a communications plan for Guinea, which I presented in

person to Minister of Mines Fofana. Ex. 29, DENUS00001112–15.

88.     Toward the end of April 2013, Dentons US provided an additional set of invoices

to Guinea.  In response, certain members of the Ministry of Mines, including Saadou Nimaga,

began complaining that the invoice amounts were too high. We informed Guinea that our bills

were in line with what would be expected for a project of this magnitude, and we agreed to provide the Government with translated versions to facilitate their review of the invoices.  In many ways we, like the Government, were at the mercy of the Project Sponsors, and with each new demand made by the Sponsors, we were required to do additional work.

89.     At the same time, Guinea continued to express satisfaction with Dentons's work, and to request additional work from Dentons.  There was no claim that the letter of engagement was invalid, or that there was no attorney-client relationship, or that Guinea was not obligated to pay.  To the contrary, Guinean officials were concerned about the amounts owed because they had agreed that Guinea was ultimately responsible for the bills.

90.     The next meetings with the Project Sponsors were scheduled for May in Fontainebleau, France (just outside of Paris).  Dentons assembled its team in Paris to help the Presidential Working Group, including Ministry of Finance officials, prepare and to debrief in between sessions.  Dentons representatives therefore were on the ground in France from approximately May 17–22.  In advance of these in-person meetings, Dentons created a significant amount of work product to prepare the new Working Group.  This included hundreds of pages of briefing materials addressing issues of potential disagreement with the Project Sponsors—including issues important to the Ministry of Finance such as tariffs, the fiscal regime, taxes, and the Government's participation in financing the Project—as well as the Project timetable, expected date of commercial production, dispute resolution, and many others.  We also developed negotiating strategies for the Presidential Working Group, such as educating them about the Joint Development Agreement between Rio Tinto and Chinalco, and discussing how that agreement could be used to Guinea's advantage during the negotiations.

91.     I heard no mention of the validity of Dentons US's engagement agreement, nor any question about the Government's attorney-client relationship with Dentons, nor any refusal to accept our legal advice and services during any of these meetings in April or May of 2013, including those I attended in person with Minister of Finance Yansane.  Instead, Government officials continued to accept Dentons's work and to request additional support, advice, and services from Dentons.

92.     In late May 2013, I learned that the Ministry of Mines would be submitting our invoices to the Ministry of Finance for approval.  I also heard for the first time that Minister of Finance Yansane was taking the position that he had not been informed of Guinea's internal selection process to hire legal counsel.  This assertion seemed incorrect to me because I had met with Minister of Finance Yansane multiple times, beginning in May 2012, and during those meetings, had discussed with him Dentons US's need for a letter of engagement and for payment.  The complaint also seemed unprincipled because Minister of Finance Yansane had repeatedly accepted, and been pleased with, Dentons's work.  I viewed Minister of Finance Yansane's position as a negotiating tactic because the Government was seeking a reduction in our costs and fees.

93.     All of the legal services referenced in ¶¶ 13, 15, 21, 24, 29–30, 38–41, 47, 57, 64, 79–80, 87, 94 and 115 were accepted without objection by the Government of Guinea, including Minister of Finance Yansane and/or other members of the Ministry of Finance where indicated.

94.     The Government assured me that Minister of Finance Yansane would approve the invoices, and that Dentons US would be paid.  I heard this from Minister of Mines Fofana and from advisor to the President Abdoulaye Magassouba.  I was also told that close advisor to Minister of Finance Yansane, Idrissa Thiam, thought the quality and quantity of our work was

38

excellent, and that he would support payment of the invoices. On the basis of these representations, and at the Government's request, Dentons US continued to work on Guinea's behalf.

95.     I returned to Conakry in June, along with Mr. Sage, to prepare the Presidential Working Group—again including the Ministry of Finance representatives—for the next round of meetings with the Project Sponsors in Paris, scheduled on or around June 16–18. In preparation for these meetings, and at the request of Guinea, I met with members of the Chinese steel industry to gain insights about the iron ore market, which I shared with Guinea. Ex. 30, DENUS00661985. The Dentons US team, meanwhile, prepared additional briefing notes, which I presented to the Presidential Working Group in person. Ex. 31, DENUS00001294–1312. We also, along with certain of the subcontractors, worked on, critiquing a number of other issues, including critique of fiscal analyses provided by Rio Tinto and assessment of the accuracy of Rio Tinto's estimated effective tax rate. Ex. 32, DENUS00666605.

96.     Following the preparations in Conakry, I traveled to Paris to continue providing behind-the-scenes support to the Presidential Working Group for the Project sponsor meetings. As usual, I did so pursuant to the consensus reached during the Abu Dhabi meetings about Dentons providing support for the Project sponsor meetings, and this time, at the specific request of Mr. Magassouba. Ex. 30, DENUS00661985. All the while I was receiving assurances from members of the Government that they were "eager to solve the payment issue." *Id.*

97.     At the same time, Mr. Wouters traveled to Conakry to discuss Dentons US's invoices with the Government, with the approval of Mr. Magassouba. Ex. 30, DENUS00661985. At the instruction of Minister Fofana, Mr. Wouters engaged in a painstaking and careful review of Dentons US's invoices with the financial controller of the Ministry of

Mines, Toure Keita.  Through this review, Ms. Keita and Mr. Wouters discovered some non-substantive mathematical errors in the calculation of the amounts owed, which were corrected.  By the end of this process, Ms. Keita was satisfied with the accuracy of the invoices and certified them for approval.

98.     Minister Fofana ensured me during the June 2013 Paris meetings that, following the invoice audit, he would approve Dentons US's invoices and send them to Rio Tinto for funding.  We also discussed a discount on Dentons US's fees looking backward, and a reduced fee structure and cap on fees moving forward.  Despite assurances, however, Minister Fofana delayed sending our invoices to Rio Tinto until July 18.  Ex. 33, GUINEA00001498.

99.     In the meantime, although I was under pressure from Peter Wolfson, Chief Executive Officer of Dentons US to cease all work on the Guinea matter until we received payment, my team continued to assist the Government with preparations for Presidential Working Group meetings scheduled for July 15–20.  Ex. 34, DENUS00671785.  At the request of the advisor to the President, we reviewed and provided comments on the draft agenda to a subset of the Presidential Working Group members.  We also assisted the Government with presentations for its representatives to make at the meetings.  Ex. 35, DENUS00671431.

100.     The July 15–20 meetings were particularly important, as they related to how the Project would be financed and the State's role in seeking financing.  The Sponsors were increasingly using as an excuse for delay of the Project that Guinea had not yet secured funding for its share of investment in the rail and port infrastructure.  This was a material change, in our view, to the agreements, which we argued obliged the Sponsors unconditionally to fund and proceed with the Project.  Guinea's equity participation was an option, we submitted, that the Government possessed, and not an obligation.  Indeed, what Guinea, for the first time came to

understand clearly, was that the Project Sponsors were contemplating a range of issues that had

never been anticipated by Guinea:  (i) a Date of First Commercial Production of 2018 rather than

June 2015; (ii) restructuring of the economics and terms of the Project to accommodate third-

party investors; (iii) introduction of contingencies/conditions to performance of Full Production;

(iv) a requirement of project financing of the infrastructure and mine (note that the central

assumption of the Settlement Agreement was that there was no financing contingency); (v) Rio

Tinto internal and external "management fees" to enhance Rio Tinto's rate of return; and a host

of other fundamental issues that the Project Sponsors had decided to inject that materially would

have changed the Project and its benefits to Guinea.  Upon providing our analysis of the

situation, Mr. Magassouba thanked us for a "very good job," and a "good piece."  Ex. 36,

DENUS00672150.

> 101.    Dentons US has not invoiced Guinea for any of the work product, time, or travel

incurred after June 2013.  Nor is it claiming those fees or expenses as damages in this lawsuit.

### RIO TINTO'S REFUSAL TO PAY GUINEA'S LEGAL FEES AND GUINEA'S RECOGNITION OF ITS OBLIGATION TO PAY

> 102.    After Dentons prepared Guinea to advocate aggressively its positions at the July

meetings, Warrick Ranson, Chief Commercial Officer and Vice President, Iron Ore of Rio Tinto

made clear that the Project would not be funding Dentons US's fees.  He tied this decision

directly to the fact that Rio Tinto was not happy with Dentons US's draft agreements.

> 103.    Following Rio Tinto's decision not to fund Guinea's legal fees, we received

additional assurances that Minister Fofana would submit our invoices to the Minister of Finance

for payment by Guinea.  In addition, Mr. Magassouba, advisor to the President, specifically

sought confirmation that "the $2 million paid by the GoG [Government of Guinea] [w]ill be

deducted from the agreed balance."  Ex. 37, DENUS00679093.

104.     Guinea also continued to request—and accept—work product from Dentons US after it was clear that the Project would not fund Guinea's legal fees and expenses.  In particular, multiple members of the Government sought to ensure that we would continue working on an agreement with Rio Tinto known as the Letter of Intent, or the "side letter"—a document intended to clarify some of the principle accords of the 2011 Settlement Agreement.  Ex. 38, DENUS00678924 (requesting "that the side letter's review won't stop" after learning that Rio Tinto would not fund Dentons US's fees).

105.     I received direct assurance that the Government would pay Dentons US's fees from Minister Fofana on August 7, 2013.  On that date, Minister Fofana wrote in an e-mail to me that it was "urgent" for me to be in Conakry that Friday because "[t]he Government has taken the decision to pay everything."  Ex. 39, DENUS00679873.  He also requested that I bring the "financial guy who works with my department on your invoices":  Daniel Wouters.  *Id.*  The purpose of this trip was twofold:  to validate Dentons US's past invoices, and to put a system in place moving forward to make future invoices and payments more palatable and administrable.

106.     After this communication, but before traveling to Conakry, I spoke telephonically with Mr. Magassouba regarding Dentons US's payment.  Mr. Magassouba was very reasonable during this conversation and was willing to do what he could to help Dentons US get paid.  I followed up with an e-mail memorializing a possible discount on our legal fees and expenses, consistent with a plan I had discussed with Minister Fofana in June 2013.  Mr. Magassouba expressed concern that the discounted amount of approximately $6.2 million was still too high, but he did not deny that Guinea owed Dentons US.  He understood that Dentons had spent significant time and expense assisting Guinea, and understood our position about needing to be paid.

107.     According to Minister Fofana's instruction, at Dentons US's expense, I traveled to Conakry on August 9, 2013.  Messrs. Wouters and Sage accompanied me on this trip.

108.     Mr. Wouters, who arrived in Conakry before I did, worked with Minister of Mines Fofana and Mr. Magassouba to arrange a meeting with Minister of Finance Yansane regarding our outstanding invoices.  Both the Ministry of Mines and the Office of the Presidency, therefore, were assisting in the process of getting the payment of our invoices approved.  Ex. 40, DENUS00680451.  In this process, the Government never raised any question about the existence of an attorney-client relationship between Dentons US and Guinea; and it never denied that Guinea had requested and received thousands of hours of legal services from Dentons or that it continued to considered the services to be excellent.

## MINISTER YANSANE'S RECOGNITION OF THE FEES OWED AND NEGOTIATIONS REGARDING PAYMENT

109.     On August 10, 2013, Mr. Wouters and I met with Minister of Finance Yansane in person.  Minister of Mines Fofana and Mr. Magassouba arranged this meeting with the intention of getting Dentons US paid, consistent with the Government's obligation.  They also attended the meeting.  At this meeting, Minister of Finance Yansane informed us that Guinea had not, at that point, budgeted to pay our fees and expenses because certain internal approval processes had not been followed.  He did not deny, however, that Guinea was responsible for Dentons US's legal fees or that Dentons US needed to be paid if we were to continue working.  Nor did he raise any question about the existence of an attorney-client relationship between Dentons US and Guinea, or deny that Guinea had requested and received thousands of hours of legal services from Dentons and continued to consider the services to be excellent.  Nor could he, given that he himself had personally participated in requesting and receiving those legal services.

43

110.     Instead, Minister of Finance Yansane expressed interest in an arrangement in which the World Bank would fund, at least in part, our fees and expenses.  Under this arrangement, Minister of Finance Yansane represented, Guinea would be responsible for any reasonable amounts that exceeded the World Bank's funding.  To my knowledge, the World Bank does not provide funding for advisory fees that have already been incurred, nor do they fund negotiation support, which Dentons had been providing.  Accordingly, I did not think World Bank funding would satisfactorily address outstanding indebtedness.  Instead, I suggested that the Government pay another installment towards their balance—this time of $3 million—while it continued to work on finding other funding sources and/or including our legal fees in their upcoming budget projections.

111.     During my trip to Conakry, Minister of Finance Yansane made clear to me that he not only knew about, but had approved the payment of $2 million to Dentons US in April 2013. He said that he had received a request from the President, and had then given approval to the Central Bank.  Minister of Finance Yansane expressed regret about the disorganized process for the payment, but he nonetheless confirmed that it had taken place with his approval.

112.     Minister of Finance Yansane also acknowledged, in an exchange with Minister of Mines Fofana, that the two had consulted regarding the terms of the letter of engagement that the Ministry of Mines had entered into with Dentons US.  He remonstrated Minister Fofana for having agreed to engage Dentons US on an hourly basis rather than as he had recommended, based on fixed sums for contractually specified deliverables.  (We had an extended exchange as to whether Minister of Finance Yansane's approach would have been reasonable under the circumstances, given the highly fluid situation and the unpredictable nature of the assignments.)

Nevertheless, it was quite clear based on that exchange that Minister of Finance Yansane had been consulted prior to Minister of Mines Fofana's entering into our letter of engagement.

113.    In a subsequent in-person meeting with Messrs. Wouters, Sage, and me, advisor to the President Thiam proposed that Guinea make a $1 million payment immediately using funding already made available to Guinea by the World Bank.  Ex. 41, DENUS00023159. Minister of Finance Yansane appointed Mr. Thiam to manage the payment issue.

114.    During these meetings in August 2013, Minister of Finance Yansane, like many other Government officials, continued to express appreciation for the quality of our work and our deliverables.  He had seen firsthand the amount of time and effort Dentons had devoted to the matter throughout the year—particularly at in-person meetings in Paris, Conakry, and Abu Dhabi.

115.    Even though our mission was to discuss the overdue invoices, while we were on the ground in Conakry, the Government continued to request, and my team and I continued to provide, substantive legal work.  Minister of Finance Yansane was one of the Government officials requesting this work.  Specifically, we reviewed and helped to complete the side letter, which was delivered to Minister of Finance Yansane, among other members of the Government. Ex. 42, DENUS00263700.  Minister of Finance Yansane expressed his deep appreciation for our work.  Ex. 43, DENUS00415697 (E-mail from K. Yansane saying "thank you so much" in response to update from J. Cahn on completion of the side letter.).  We also worked on a set of "Agreed-Upon Principles" for the Presidential Working Group, to help it prepare for ongoing negotiations with Rio Tinto.

116.    The importance of this final effort by our team cannot be overemphasized.  The Project Sponsors were seeking to re-negotiate the Settlement Agreement in the guise of a binding

letter that would "re-interpret" its terms.  The Government realized that they desperately needed

lawyers to help avoid a trap that would have led to relinquishment of many of the rights and

benefits conferred by the Settlement Agreement.  The Project Sponsors, most volubly Rio Tinto,

aggressively sought to exclude us as Guinea's legal counsel from the negotiation of the side

letter but Guinea, and in particular Minister of Finance Yansane, insisted on our participation.

The Project Sponsors were hoping to force Minister of Finance Yansane's and Minister of Mines

Fofana's execution of the side letter.  In the end, the document was executed by Mr. Thiam, who

had led the Presidential Working Group negotiations in France, and every person of Ministerial

rank refused to sign the side letter.  Dentons US had rendered the letter into a document that was

non-binding, made limited if any concessions, and had scant if any symbolic value.

### THE GOVERNMENT'S ULTIMATE FAILURE TO PAY

117.    Following the August meetings, members of the Ministry of Mines, including

Minister of Mines Fofana and Ministry legal advisor Saadou Nimaga, as well as Mr.

Magassouba, represented that a letter from Minister Fofana approving the first $1 million

payment to Dentons US had been sent to Minister Yansane. Ex. 44, DENUS00682039.

Members of the Ministry of Finance, however, claimed they had never seen such a letter, and

that they continued to await its arrival.  Mr. Magassouba continued to point us to Mr. Thiam—

again, a key advisor to both the President and Minister of Finance Yansane—as our point of

contact, but Mr. Thiam refused to respond to calls or e-mails.

118.    Minister of Mines Fofana continued to claim that he would follow up with Rio

Tinto and secure funding from it, from the Project, or elsewhere.  But Minister of Finance

Yansane had already rejected Rio Tinto as a source of funding, and given Rio Tinto's earlier

refusal to fund Guinea's legal and advisory fees, Minister of Finance Yansane stated that he

thought the situation with Rio Tinto was approaching litigation and that it would not be feasible to secure support from them under these circumstances.

119.    I explained to various members of the Government that we would have to stop working unless we received an interim payment of at least $3 million in short order.  Ex. 44, DENUS00682039.  By the end of August 2013, without any assurance of payment, Dentons US management directed me to start refusing requests for work from Guinea.

120.    In early September 2013, we were finally able to connect with Mr. Thiam on his pre-planned visit to Washington, D.C.  On September 3, Mr. Thiam met with Mike McNamara, the Managing Partner of Dentons US, and myself to discuss the payment issue.  Ex. 45, DENUS00684625.  During this meeting, consistent with the Government's previous representations, Mr. Thiam assured us that Guinea thought our work was excellent and that we were a valued contributor to the Project.  We then discussed the possibility of a negotiated discount on the invoices.  But the meeting did not result in any agreement.

121.    During a subsequent meeting on September 4, 2013, Mr. Thiam met with Peter Wolfson, Chief Executive Officer of Dentons US and myself to discuss payment.

122.    On September 10, Mr. Wolfson sent a follow-up letter to Minister of Mines Fofana.  In it, he summarized our meeting with Mr. Thiam and made an offer for Guinea to pay a reduced amount by September 12, after which the offer would be withdrawn.  Ex. 46, DENUS00268489.

123.    Guinea did not respond to the offer.  Instead, different Government actors continued to point us toward others, and then stopped communicating with us all together.  As before, the Government never raised any question about the existence of an attorney-client relationship between Dentons US and Guinea; and it never denied that Guinea had requested and

received thousands of hours of legal services from Dentons and that it continued to considered the services to be excellent; and never asserted that it did not owe legal fees and expenses in return for that work.

124.     Nevertheless, Dentons US attempted for nearly a year to negotiate with Guinea in good faith and attempt to reach an amicable solution without resorting to litigation. As recently as July 22, 2014, Minister Yansane (who by that point had become Minister of Mines and Geology), confirmed in writing the Government's desire to resolve the issue of our unpaid invoices. Ex. 47, GUINEA00001505.

I declare under penalty of perjury that the foregoing is true and correct.

Jonathan D. Cahn, Esq.

Executed on December ___, 2017

48