IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DENTONS US LLP, | ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) Case No. 1:14-cv-1312-RDM |
| THE REPUBLIC OF GUINEA et al., | ) ) |
| *Defendants*. | ) ) ) |
| THE REPUBLIC OF GUINEA et al., | ) ) |
| *Counterclaim and Third Party Plaintiffs*, | ) ) ) |
| v. | ) ) |
| DENTONS US LLP et al., | ) ) |
| *Counterclaim and Third Party Defendants*. | ) ) ) ) ) |

### DECLARATION OF MARC SAGE, ESQ.

I, Marc Sage, declare as follows:

1. I make this Declaration in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment in the above-captioned action. Unless otherwise stated, I have personal knowledge of the facts stated in his Declaration. If called upon to do so, I could and would competently testify to these facts.

2. I am a practicing attorney, currently Senior Counsel at Dentons Europe's office in Paris and a member in good standing of the bar of the State of New York and the city of Paris. I have been at Dentons Europe since May 2017, and was previously Counsel at Dentons US from approximately October 2014 through December 2015. I have worked at several law firms

throughout my career in the United States and France, including Orrick, Herrington & Sutcliff LLP from 2006 through 2008 and Salans from 2008 until its merger with SNR Denton in October 2014. I obtained my LL.B. from the Université Panthéon-Assas in 1978 and a Master of Law degree from Université Panthéon-Assas in 1979.

3. I have focused my legal career on international matters, specifically cross-border investments and dispute resolution. In addition to practicing law in the United States and France, I have spent almost twenty-five years working on matters in Africa. This includes advising governments from the Ivory Coast, the Republic of the Congo, Nigeria, Madagascar, Liberia and the Republic of Guinea on matters ranging from negotiating investment and financing contracts, including Structural Adjustment Programs with the International Monetary Fund and World Bank; drafting legislation and regulations; representing clients before arbitration courts and foreign jurisdictions; as well as providing legal counsel to private businesses regarding interests and investments in Africa.

4. While I was Of Counsel at Salans, in its New York City office, I assisted the representation of the Republic of Guinea regarding the Simandou Project in 2013. The Simandou Project is a massive infrastructure development plan for mining a large iron ore deposit in eastern Guinea. It requires the construction of a deepwater port and a railway over 600 kilometers long through dense forest. Guinea had previously granted a mining concession to the international mining company Rio Tinto and signed several binding agreements, including a "Settlement Agreement" in 2011. Guinea retained Dentons US in May 2012 to provide urgently needed legal advice regarding the ongoing negotiations with Rio Tinto, Chalco and the International Finance Corporation ("IFC"), and to coordinate the retention of subcontractors to provide expertise on relevant subjects including engineering, finance and tax.

5. At the request of Dentons US's Jonathan Cahn, I joined the team of attorneys and subcontractors representing Guinea on or about January 2, 2013. I am bilingual in French and English, and had extensive professional experience in French-speaking Africa. I immediately assisted the team's drafting and editing of the Investment Framework Agreements, which included overseeing their translation into French for Guinea's review and comment. Because the key documents had to be in French for the client but in English for delivery to Rio Tinto and the other project sponsors, near-simultaneous translation of technical contractual language was often required. As changes were made during the review and editing process, I helped ensure those changes were accurately reflected in both the French and English versions.

6. As background, Guinea and Rio Tinto had to negotiate and finalize several binding agreements that would govern the construction and development of the mine and associated infrastructure. Rio Tinto had tendered drafts of the Investment Framework Agreements prior to Dentons US's representation that unsurprisingly favored its interests over Guinea's. We decided to offer alternative drafts to help protect and accomplish Guinea's objectives for the Simandou Project, which included tangible benefits for its citizens in addition to significant royalty and tax revenue, which was of obvious interest to the Government.

7. Throughout my time assisting Dentons US's representation of Guinea, I focused on preparing Guinean government officials for direct negotiations with the Simandou Project sponsors, including Rio Tinto, Chalco and the IFC. This preparation included: collecting and reviewing all documents regarding the Project provided by the various Government agencies involved in the Project; delivery of substantive work product on key issues including tables of comparison between the initial agreements, the Settlement Agreement, the new agreements proposed by Rio Tinto and an analysis of Guinea's best options; developing strategic options for

Guinea, including their impact on the country and our recommendations; coaching the officials on how to approach and conduct the negotiations; and providing in-person support before, during and after negotiation sessions.

8. I regularly met with and provided legal advice to Guinean officials at several meetings during 2013. Depending on the specific meeting and location, these officials included: Mr. Abdoulaye Magassouba, a Special Advisor to the President who was intimately involved with the Simandou Project; Mr. Idrissa Thiam, another advisor to the President and Head of the Guinean delegation to the "Working Group" meetings that were established in April 2013; Minister of Mines Mohamed Lamine Fofana and Legal Advisor Saadou Nimaga as well as employees of the Ministry of Mines; Minister of Finance Kerfalla Yansane and Mr. Sidi Mouctar Dicko, a tax specialist and Senior Advisor to Minister Yansane, as well as other employees of the Ministry of Finance; employees of the Ministry of Budget, including Mr. Mamady Kaba, an Advisor to the Minister of Budget; and high-level employees of SOGUIPAMI, Guinea's state-owned mining company.

9. I first met with Guinean officials during the middle of January 2013 when I traveled to Paris to provide support for the "PPMC Meetings" that were being held there—negotiation sessions with the Simandou Project sponsors. Minister of Finance Yansane and Minister of Mines Fofana were present, as were approximately 20 other Guinean officials who represented the Ministries of Mines and Finance, the offices of the Presidency and the Prime Minister, and SOGUIPAMI. I joined other members of the Dentons US team, including Jonathan Cahn, Laurent Lavigne du Cadet, Marian Hagler and Imogen Harding as we provided legal advice and negotiation strategy regarding the key terms of the Investment Framework Agreements.

10. I traveled to Conakry during the first week of March 2013 with several Dentons US attorneys and representatives of financial advisor Lazard. We met with Guinean officials to discuss and finalize the current draft Investment Framework Agreements for delivery to Rio Tinto by answering questions and incorporating Guinea's input. We also briefed and prepared Guinea for a meeting with Rio Tinto's CEO Sam Walsh which was scheduled to take place in Conakry on March 9, 2013.

11. After incorporating Guinea's feedback and direction, we delivered finalized drafts of the Amended Convention de Base and BOT Convention to Rio Tinto on or about April 2, 2013.

12. I next met with Minister of Mines Fofana and Minister of Finance Yansane in Abu Dhabi on or about April 11, 2013. I traveled with Dentons US attorney Jonathan Cahn at the request of Minister Fofana, who was with Minister Yansane in Abu Dhabi for a conference and intended to speak with representatives of Rio Tinto, Chalco and the IFC to discuss progress on the Simandou Project negotiations based on the draft contracts that were delivered to the Project Sponsors. The Guinean Government was eager to learn about the Sponsors' positions and whether there were any outstanding issues that would delay the start of production of the mine. While in Abu Dhabi, we presented Minister Yansane with a draft report on the Simandou Project's fiscal terms, a substantial piece of work product that had been compiled by several attorneys and our "tax experts," a team of subcontractors that included James Otto and Andrew Thompson. The report analyzed how the various fiscal terms under negotiation would affect Guinea's future revenue once the development and mining of Simandou began. Minister Yansane accepted the report and was told that it had been drafted by Dentons US and its subcontractors.

5

13. During the discussions in Abu Dhabi, Rio Tinto stated that future meetings regarding the Simandou Project should be conducted in small groups with party representatives focused on the technical details that were in dispute following our submission of the draft Infrastructure Agreements, and without any attorneys. Ministers Fofana and Yansane agreed in the interest of progressing towards the start of construction and production, but we thought that Rio Tinto was concerned that Dentons US was, and would continue to, effectively advocate for Guinea's interests and wanted to mitigate our efforts by negotiating with Guinea directly, as it had been prior to our retention.

14. After the Abu Dhabi meetings I traveled to Conakry on or about April 17, 2013 with Mr. Cahn and Daniel Wouters, a subcontractor hired by Dentons US, to start preparing the Guineans who would be part of the delegation to the new "Working Group" negotiations. I interacted with several officials, including Presidential Advisor Magassouba, Presidential Advisor Idrissa Thiam (who was designated as the leader of Guinea's Working Group delegation), Minister Fofana, Ministry of Mines Legal Counsel Saadou Nimaga, Ministry of Mines Financial Advisor Bouna Sylla, and Ministry of Budget representative Mr. Kaba. We focused on preparing a negotiations roadmap to guide Guinea over the next few months of meetings. I also helped prepare a letter from Minister Fofana to Rio Tinto based on their meetings, and provided background and advice on several issues that Guinea and Rio Tinto had discussed.

15. I next met with the Guinean delegation to the Working Group in France on or about May 17–22, 2013 to provide in-person support before, during and after the negotiation meetings. I provided advice and support to Messrs. Magassouba, Thiam, Dicko and Kaba. As part of our efforts to prepare the Guinean delegation, we assembled a significant amount of work

product that was based on hundreds of hours of research, document review and discussions to create detailed "briefing books" with relevant background information and updated memoranda on a precise global strategy to meet and achieve Guinea's objectives with a corresponding description of each issue and how to resolve them, as well as an evolving Strategic Communications Plan. At no point throughout this process (until August 2013) was I aware of any Guinean official raising any question about the validity of the Letter of Engagement. To my knowledge, Guinean officials have never denied the existence of an attorney-client relationship between Dentons US and Guinea. Nor did anyone deny that Guinea had requested and received thousands of hours of legal services from Dentons and that it continued to consider the services to be excellent.

16. I accompanied Mr. Cahn to Conakry on or about June 12, 2013, to meet with Minister Fofana and update him as to the current strategic options based on what was discussed during the May Working Group meetings. Together we reviewed briefing materials from May and reviewed the strategy for the next round of negotiations.

17. Mr. Cahn and I also discussed the lack of payment for our legal fees and expenses with Minister Fofana. He stated that the overall amount of legal fees and expenses that had been invoiced was too high, and sought a discount, as well as a cap on our legal fees and expenses moving forward. He did not assert that Guinea was not responsible for the fees and expenses.

18. I traveled to Paris on or about June 17, 2013, to support Guinea during the Working Group meetings. We continued to provide the Guinean delegation, which included Messrs. Magassouba, Dicko and Kaba, with work product as part of their ongoing briefing and preparation. It included: an analysis of studies that had been commissioned by Rio Tinto, Ex. 1, DENUS00669252; an analysis of the various Effective Rate of Taxation performed by our tax

expert Andrew Thompson, Ex. 2, DENUS00669300; and an analysis of how other countries set up the regulatory framework for massive infrastructure projects, Ex. 3, DENUS00669400.

19. I also assisted the Dentons US team with preparing the Guinean delegation for the July Working Group meetings in Paris. We provided additional advice and work product, including: comments on the draft agenda, Ex. 4, DENUS00410556; and assistance with presentations that the officials were going to make. Ex. 5, DENUS00671431. Several Guinean officials stated at many times during our meetings that they appreciated our advice and support. This included Mr. Magassouba, who wrote as such in an email dated July 14, 2013. Ex. 6, DENUS00672150.

20. In August 2013, I joined Mr. Wouters and Mr. Cahn in Conakry to discuss, negotiate and draft the Letter of Intent that would incorporate the agreement reached by the parties during the Working Group meetings, including the date of first commercial production. During our stay in Conakry, we met with Ministers Fofana and Yansane as well as Presidential Advisor Magassouba to discuss options for paying Guinea's accumulated legal fees and expenses. Minister Yansane offered to pay $1 million dollars right away as a partial payment towards the outstanding invoices, and then designated Idrissa Thiam to serve as an interlocutor to work with Dentons US to request additional funding from the World Bank.

21. At no point during those discussions in August 2013 did Minister Yansane declare that the December 24, 2012 Letter of Engagement between Dentons US and Guinea, pursuant to which Dentons US acted, was void. He noted that the Letter of Engagement had not been approved through the typical internal approval process, which affected the budgeting process, but he did not disavow the contract. Nor did he raise any question about the existence of an attorney–client relationship between Dentons US and Guinea. Further, Minister Yansane never

stated that Dentons US could not be paid by Guinea for the thousands of hours of legal advice and services that the Government had requested and received from Dentons US. In fact, as noted above, Minister Yansane expressed a willingness to tender a $1 million payment while the parties jointly discussed funding with the World Bank.

22. Throughout these meetings and discussions in August 2013 regarding payment, Dentons US continued to provide legal, technical and financial advice to Guinea at its request. For example, Mr. Cahn circulated a prior memorandum to Minister Fofana, Minister Yansane, Mr. Magassouba and Mr. Thiam on August 12, 2013 to remind them of the potential strategic options in advance of further negotiations with Rio Tinto that were upcoming. Ex. 7, DENUS00680543. We also drafted and helped edit the "Side Letter," a document that sought to clarify Guinea's view of certain terms set forth in the 2011 Settlement Agreement that were a key part of the ongoing negotiation process and was prompted by the parties' Working Group meetings.

23. Minister Yansane continued to accept our services and work product without disputing the validity of the Letter of Engagement or questioning the attorney-client relationship between us and his Government. In fact, he explicitly thanked us on at least one occasion for the updates and service that we were providing upon the signing of the Letter of Intent by the parties involved in the Simandou Project which, importantly, stated the agreement of Rio Tinto and Chalco to begin production at the mine in 2018. Ex. 8, DENUS00415605.

24. Other than the one occasion in August 2013, I never heard Minister Yansane or any other Guinean official question Guinea's review and signature of the Letter of Engagement. The one comment that I did consistently hear from Guinean officials is that they were impressed by the quality of our work, and thankful for our presence as legal counsel.

9

I declare under penalty of perjury that the foregoing is true and correct.

_____
Marc Sage, Esq.

Executed on December 7, 2017

10