**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DENTONS US LLP,

          *Plaintiff*,

    v.

THE REPUBLIC OF GUINEA, et al.,

          *Defendants*.

Civil Action No. 14-1312 (RDM)

THE REPUBLIC OF GUINEA, et al.,

          *Counterclaimants and Third-Party Plaintiffs*,

    v.

DENTONS US LLP, et al.,

          *Counterclaimants and Third-Party Defendants*.

## MEMORANDUM OPINION AND ORDER

This is an action against the Republic of Guinea and its Ministry of Mines and Geology (collectively "Guinea") for fees and costs that Dentons US LLP ("Dentons") claims it is owed for work it performed for Guinea on a large natural resources development project. Shortly after the complaint was served, Guinea moved to dismiss on the ground that it is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.* Guinea argued, among other things, that Dentons could not invoke the commercial activity exception to the FSIA because this lawsuit, as Guinea conceived it, is based on Dentons's advice to the Guinean "government on how to exercise its sovereign authority over national assets" and is not based on

an ordinary commercial transaction. Dkt. 15-1 at 11–12 (discussing 28 U.S.C. § 1603(d)). The Court was unconvinced and held that (1) the activity on which the suit is based—contracting for legal services—is the type of "activity in which private parties regularly engage" and (2) the suit is therefore subject to the FSIA's commercial activity exception. *Dentons U.S. LLP v. Republic of Guinea*, 134 F. Supp. 3d 5, 9 (D.D.C. 2015) ("*Dentons I*"). After the Court denied Guinea's motion to dismiss, Guinea answered the complaint, counterclaimed against Dentons, and filed third-party claims against various Dentons affiliates. Dentons and its affiliates, in turn, moved to dismiss Guinea's counter- and third-party claims, and the Court granted in part and denied in part that motion. *Dentons US LLP v. Republic of Guinea*, 208 F. Supp. 3d 330, 347 (D.D.C. 2016) (*Dentons II*).

The case is now before the Court on Guinea's motion for summary judgment. Dkt. 84. In this motion, Guinea again asserts that it is immune from suit under the FSIA, but on a different theory. This time, Guinea argues that its Minister of Mines and Geology ("Minister of Mines"), who signed the engagement letters that Dentons relies upon, did not have authority to bind Guinea because the Guinean public procurement law vests the Minster of Finance with exclusive authority to approve public contracts. According to Guinea, the engagement letters are therefore invalid and, as a result, cannot support application of the commercial activity exception to the FSIA. In other words, to the extent the Court previously held that an action to enforce a contract for legal services is based upon the commercial activity of private contracting, that theory of jurisdiction must fall away if the contracts at issue were invalid from the outset. Guinea further argues, in the alternative, that it is entitled to summary judgment on the merits because the engagement letters are unenforceable for the same reason.

As explained below, the Court concludes that Guinea has failed to carry its burden of demonstrating that it is immune from suit or that, based on the undisputed material facts, the engagement letters are unenforceable. The Court will, accordingly, **DENY** Guinea's motion for summary judgment. Guinea remains free, however, to renew either argument at a later stage of the proceeding.

## I. BACKGROUND

Except as otherwise noted, the following facts are either undisputed or established by uncontroverted evidence. *See Okpara v. District of Columbia*, 174 F. Supp. 3d 6, 11 (D.D.C. 2016) ("Summary judgment is appropriately granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'") (quoting Fed. R. Civ. P. 56(a)). Where necessary and appropriate, however, the Court will make findings of fact relating to Guinea's assertion of sovereign immunity. *See Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) ("When the defendant has . . . challenged the factual basis of the court's jurisdiction, . . . the court must . . . resolve any [relevant] disputed issues of fact").

### A. Factual Background

In an effort to develop extensive iron ore deposits discovered in the Simandou region of Guinea, the Republic of Guinea and its Ministry of Mines instituted the "Simandou Project" with the sponsorship of several investors and the World Bank. Dkt. 60 at 5 (Answer to Countercl. ¶ 15). In May 2012, the World Bank awarded a short-term contract to a consulting firm, which assembled a group of financial, technical, and legal advisors to assist Guinea with the project. Dkt. 94-3 at 23–24 (Dentons SMF ¶ 37); Dkt. 99-2 at 17 (Guinea Resp. ¶ 37); *see also* Dkt. 1-2 at 1 (First Retainer Agreement). Dentons served as the legal advisor within this advisory group. Dkt. 94-3 at 24 (Dentons SMF ¶ 37); Dkt. 99-2 at 17 (Guinea Resp. ¶ 37).

While members of the Dentons team were in Guinea for meetings in August 2012, senior Guinean officials indicated that they wanted directly to engage Dentons as Guinea's legal counsel on the Simandou Project.  Dkt. 94-3 at 28–29 (Dentons SMF ¶ 53); Dkt. 99-2 at 18 (Guinea Resp. ¶ 53).  On August 25, 2012, Guinea's Minister of Mines, Lamine Fofana, executed the first of two retainer agreements with Dentons.  Dkt. 94-3 at 28–29 (Dentons SMF ¶ 53); Dkt. 99-2 at 18 (Guinea Resp. ¶ 53).  That agreement "confirm[ed] the appointment by the Republic of Guinea's Ministry of Mines . . . of" Dentons "as its Legal Counsel" as of May 2, 2012.  Dkt. 1-2 at 1 (First Retainer Agreement); Dkt. 94-3 at 8 (Dentons SMF ¶ 11).  Under the agreement, "[a]ll billing related to the activities related to the assignment . . . w[ould] be performed in accordance with the World Bank Agreement and, insofar as it would not be handled by the World Bank, w[ould] be subject to, and in line with, the financial arrangements that w[ould] be agreed upon between [Dentons] and the Ministry."  Dkt. 1-2 at 3 (First Retainer Agreement).  The agreement specified that the "appointment" would continue until September 30, 2012.  *Id.* at 1.  The agreement recognized, however, that Dentons might continue to provide legal services to Guinea (or the Ministry of Mines and Geology) after the World Bank contract expired in September 2012, and Dentons, in fact, did so.  *Id.*; Dkt. 94-3 at 9 (Dentons SMF ¶ 12).

During a visit to Guinea by members of the Dentons team in December 2012, the parties once again discussed the terms of Dentons's engagement, leading to the execution of the second retainer agreement.  Dkt. 94-3 at 34 (Dentons SMF ¶ 72); Dkt. 99-2 at 19-20 (Guinea Resp. ¶ 72).  The second retainer agreement, which was signed by Minster Fofana and Dentons partner Jonathan Cahn, covered Dentons's work following the expiration of the World Bank contract and into the future.  *See* Dkt. 85-6.  The agreement "confirm[ed] the agreement of the Minister of Mines and Geology . . . to engage . . . [Dentons] . . . and its affiliates . . . to provide services . . .

as Legal Advisor to the Ministry and to the Government of the Republic of Guinea in relation

with the development and financing of the Simandou iron ore mining project." *Id.* at 1. With

respect to compensation, the agreement specified the hourly rates of the Dentons lawyers

working on the project and provided that the firm's "costs and fees are due upon receipt of [the

firm's] invoice." *Id.* at 5. In the very next sentence, however, Dentons "confirm[ed] its intention

to defer payment" because "neither the Ministry nor the Government of the Republic of Guinea"

had "the necessary funds to pay for . . . the representation" at that time." *Id.* The Ministry of

Mines and Geology agreed to "implement in good faith all efforts necessary to secure funding

for this representation, either through the Ministry's budget or through external funding," and,

"as long as the Ministry [of Mines] continue[d] to make these efforts," Dentons agreed to "defer

collection of fees and expenses billed . . . until the appropriate financing is in place." *Id.*

Finally, the agreement "authorize[d] [Dentons] to seek" financing from third parties to cover its

costs and fees and "to present [any such] options in the form of a written proposal to the Ministry

for its consideration," and the Ministry of Mines agreed to "consider the proposals, in good faith,

subject" to the Ministry's "right to ensure that" the financing was consistent with the firm's

ethical duties of loyalty and independence. *Id.*

The parties disagree about whether, and to what extent, senior Guinean officials outside

the Ministry of Mines and Geology knew about and approved this agreement. According to

Kerfalla Yansane, who served as the Guinean Minister of Finance at the time, the December

2012 engagement letter "was never brought to [his] attention[,] and [he] never approved it in

[his] capacity as Guinean Minster of Finance." Dkt. 84-10 at 3 (Yansane Aff. ¶ 11). Dentons

partner Jonathan Cahn, in contrast, attests that the letter was signed "with the approval of

[Guinean] President Condé," Dkt. 95-4 at 21–22 (Cahn Decl. ¶¶ 50–51); that Minister Yansane

knew that Dentons had expressed a need for a letter of engagement and payment, *id.* at 38 (Cahn Decl. ¶ 92); and that "it was quite clear" to Cahn, "based on [an] exchange that" he witnessed between Ministers Yansane and Fofana, that Minister Yansane "had been consulted prior to . . . Minister . . . Fofana's entering into [the December 2012] letter of engagement," *id.* at 44–45 (Cahn Decl. ¶ 112). Guinea does not offer any evidence controverting Cahn's assertion that the agreement was signed with President Condé's approval but, rather, argues that Cahn's testimony is inadmissible—presumably, as hearsay—and immaterial. Dkt. 99-2 at 20 (Guinea Resp. ¶ 74).

In its statement of material facts in dispute, Dentons catalogues the extensive legal services that it provided to Guinea after the World Bank contract expired, and, although Guinea challenges the materiality of these facts, it does not (at least for present purposes) dispute that Dentons provided these services. The firm's lawyers, for example, helped prepare Guinea for negotiations with project sponsors in Paris in December 2012, Dkt. 94-3 at 32 (Dentons SMF ¶ 63); Dkt. 99-2 at 19 (Guinea Resp. ¶ 63); traveled to Conakry, Guinea from November 27 through December 5, 2012, "to conduct intensive strategy and training sessions with Government officials, including from the Ministry of Finance, to solidify Guinea's negotiating positions," Dkt. 94-3 at 32 (Dentons SMF ¶ 64); Dkt. 99-2 at 19 (Guinea Resp. ¶ 64); traveled to Paris to provide "support to Guinea during" the negotiations, Dkt. 94-3 at 33 (Dentons SMF ¶ 66); Dkt. 99-2 at 19 (Guinea Resp. ¶ 66); "returned to Conakry . . . to understand and finalize Guinea's position regarding certain of the Investment Framework Agreements" and met with "Guinea's infrastructure and mining teams to address key remaining questions" regarding those agreements, Dkt. 94-3 at 33 (Dentons SMF ¶¶ 69–70); Dkt. 99-2 at 19 (Guinea Resp. ¶¶ 69–70); "prepare[d] a 'teaser' to interest investors in the prospect of financing the Project," Dkt. 94-3 at 34 (Dentons SMF ¶ 71); Dkt. 99-2 at 19 (Guinea Resp. ¶ 71); "delivered revised drafts of the two Investment

Framework Agreements to Guinea," Dkt. 94-3 at 36 (Dentons SMF ¶ 77); Dkt. 99-2 at 20

(Guinea Resp. ¶ 77); returned to Conakry "to review the draft Investment Framework

Agreements in preparation for" continued negotiations in January 2013, Dkt. 94-3 at 36 (Dentons

SMF ¶ 78); Dkt. 99-2 at 20 (Guinea Resp. ¶ 78); attended further negotiations in Paris in January

2013 and "drafted and delivered to the Government various deal summaries," Dkt. 94-3 at 36

(Dentons SMF ¶ 79); Dkt. 99-2 at 20 (Guinea Resp. ¶ 79); returned to Paris later that month "to

conduct meetings with Government officials to revise and refine the Infrastructure Framework

Agreements" and "continued to revise and refine the drafts in accordance with the Government's

instructions," Dkt. 94-3 at 37 (Dentons SMF ¶ 81); Dkt. 99-2 at 20 (Guinea Resp. ¶ 81);

provided communications and tax advice, Dkt. 94-3 at 38 (Dentons SMF ¶¶ 84–85); Dkt. 99-2 at

21 (Guinea Resp. ¶¶ 84–85); delivered draft agreements to Rio Tinto, a mining company with

which Guinea negotiated repeatedly in planning the Simandou Project, in April 2013, Dkt. 94-3

at 44 (Dentons SMF ¶ 106); Dkt. 99-2 at 23 (Guinea Resp. ¶ 106); "traveled to Abu Dhabi at

Guinea's request, where they met with Minsters Yansane and Fofana" and to "defend the draft

agreements" in in meetings with the project's sponsors, Dkt. 94-3 at 44–45 (Dentons SMF ¶¶

108–10); Dkt. 99-2 at 23 (Guinea Resp. ¶ 108–10); "traveled to Conakry in April 2013 to start

preparing the Guinean delegation," including representatives from the Ministries of Mines and

Geology and Finance, "that would attend" future negotiations, Dkt. 94-3 at 46 (Dentons SMF ¶¶

112–13); Dkt. 99-2 at 23 (Guinea Resp. ¶ 112–13); met with Guinean officials in France in May

2013, "delivered hundreds of pages of briefing materials to Guinea for preparation," and

"continued to develop the evolving negotiation strategy . . . and a strategic communications plan

for Guinea," Dkt. 94-3 at 47 (Dentons SMF ¶ 116); Dkt. 99-2 at 24 (Guinea Resp. ¶ 116); met

with Guinean officials in Conakry in June 2013 to prepare "for the next round of meetings

scheduled for June 16–18 in Paris" and then "traveled to Paris . . . to continue providing legal advice and support" for the negotiations, Dkt. 94-3 at 49–50 (Dentons SMF ¶¶ 120–21, 127); Dkt. 99-2 at 24–25 (Guinea Resp. ¶¶ 120–21, 127); and "delivered legal advice and work product to Guinea in July 2013," Dkt. 94-3 at 51 (Dentons SMF ¶ 128); Dkt. 99-2 at 25 (Guinea Resp. ¶ 128).

Dentons also contends, and Guinea does not dispute, that the Ministry of Finance—and Minster Yansane, in particular—were aware of many of the services that the law firm provided and that, on several occasions, Minister Yansane requested and accepted Dentons's services. Minister Yansane, for example, requested that Dentons prepare him and Minister Fofana for a December 8, 2012 meeting with Rio Tinto, Dkt. 94-3 at 33 (Dentons SMF ¶¶ 67–68); Dkt. 99-2 at 19 (Guinea Resp. ¶¶ 67–68); Minister Yansane attended the January 2013 meetings in Paris with members of the Dentons team, where he accepted "legal services" from Dentons "without objection," Dkt. 94-3 at 36–37 (Dentons SMF ¶¶ 79, 81); Dkt. 99-2 at 20 (Guinea Resp. ¶¶ 79, 81); Dentons delivered a "report on the tax implications of Rio Tinto's proposal" to Minister Yansane in March 2013, Dkt. 94-3 at 39, 45 (Dentons SMF ¶¶ 85–86, 109); Dkt. 99-2 at 21, 23 (Guinea Resp. ¶¶ 85–86, 109); Minister Yansane was "aware that Dentons . . . helped prepare, draft, edit and deliver various drafts of the Investment Framework to Rio Tinto" and did not object, Dkt. 94-3 at 44 (Dentons SMF ¶ 107); Dkt. 99-2 at 23 (Guinea Resp. ¶ 107); Minister Yansane "participated in and/or agreed with" the decision that Dentons "help [Guinea] prepare for [certain] meetings, to provide behind-the-scenes assistance during the meetings, and to provide counsel in other areas," Dkt. 94-3 at 45 (Dentons SMF ¶ 111); Dkt. 99-2 at 23 (Guinea Resp. ¶ 111); Dentons attended other meetings to provide support to the Ministry of Finance and others, *e.g.*, Dkt. 94-3 at 50–51 (Dentons SMF ¶ 127); Dkt. 99-2 at 25 (Guinea Resp. ¶ 127); and

Minister Yansane requested substantive work product from Dentons as late as August 2013, Dkt. 94-3 at 55 (Dentons SMF ¶ 145); Dkt. 99-2 at 27 (Guinea Resp. ¶ 145). At least for present purposes, moreover, Guinea does not dispute that this work was performed for and accepted by the government of Guinea, and not simply the Ministry of Mines. Dkt. 99-2 at 7 ("Whether Plaintiff provided service to Guinea, as opposed to the Ministry of Mines alone, is undisputed for purposes of this motion . . . ."). Minister Yansane testified, however, that he assumed that the services were provided on a pro bono basis. Dkt. 99-1 at 5 (Yansane Dep. at 37).

On March 25, 2012, Minister Fofana wrote to Jonathan Cahn, "confirm[ing] that the Republic of Guinea, as client, is prepared to perform all of its contractual obligations contained in the agreement between [Dentons] and the Ministry of Mines." Dkt. 95-5 at 253. The letter further explained that Guinea anticipated that Rio Tinto would pay Denton's fees. *Id.* If Rio Tinto failed to do so, however, the letter represented that "the Guinean State" would pay the fees, "which, as with the other fees shall be integrated into the costs of the Simandou Project." *Id.* Finally, the letter stressed "the urgency of the delivery of the documents" that Dentons was drafting on Guinea's behalf "and the pressing need to respect all delivery timetables agreed to for the required documents, many of which are on the critical path to completion of the project." *Id.*

Several days later, on March 29, 2013, $2 million was wired to Dentons from the Central Bank of Guinea. Dkt. 94-3 at 40 (Dentons SMF ¶ 90). Although Guinea questions the sufficiency of Dentons's evidence regarding this transfer, Dkt. 99-2 at 21 (Guinea Resp. ¶ 90) ("[t]he cited materials are self-serving conclusory statements [that] do not create genuine issues of material fact"), Dentons has supplied the Court with a copy of the wire transfer, which shows that the transfer was made from Banque Centrale De La Republique de Guinee to Dentons's account at Citibank in New York and that the "ordering customer" was the "Ministry of Mines

and Geology of Guinea," Dkt. 95-5 at 256–57.  The source and circumstances of the $2 million payment remain a bone of contention.

Dentons maintains that the payment was made with the authorization of the Minster of Finance.  For support, it points to the testimony of Saadou Nimaga, who "served as assistant legal counsel to the Ministry of Finance from 1998–2008," Dkt. 94-3 at 40–41 (Dentons SMF ¶¶ 93–94), and "legal counsel to the [M]inistry of [M]ines" between 2008 and 2016, Dkt. 95-3 at 75 (Nimaga Dep. at 13).  Nimaga testified that, so far as he knows, it is the Minister of Finance—and not the President or the Minister of Mines—that approves payments from the Central Bank.  *Id.*  According to Jonathan Cahn, moreover, Abdoulaye Magassouba, an advisor to the President of Guinea, informed him that Minister of Mines Fofana requested that the President "intervene and ensure [that] the payment was made," and "[t]he President then directed Minister of Finance Yansane to coordinate with the Central Bank to make the payment."  *Id.* at 41 (Dentons SMF ¶ 95).  Cahn further attests that "[s]everal months later" Minister Yansane "acknowledged that he was involved in, and aware of, the $2 million payment" and, indeed, complained "that he had been 'woken up in the middle of the night to approve the payment' in March 2013."  *Id.* (quoting Dkt 93-4 at 30 (Cahn Decl. ¶ 72)).  A contemporaneous email from Magassouba to Cahn, moreover, reports that the Central Bank was completing the paperwork to effectuate the wire transfer; requests that Dentons send an email "confirming" its "commitment and the completion of the draft version of remaining documents by tomorrow;" and explains that "we need to provide it to the [G]overnor [of the Central Bank] and the Ministry of Finance."  Dkt. 95-5 at 260.  Magassouba explained at his deposition that "the exchange was about" Dentons delivering the work product in return for the payment and that Dentons's "commitment" needed "to go to

the Ministry of Finance" because it was "part of the process" for Dentons to receive payment. Dkt. 94-5 at 35–36 (Magassouba Dep. at 73–74).

Guinea raises a host of arguments in response. First, in its answer to the complaint, Guinea admitted that it paid Dentons an "'advance' of $2,000,000 . . . in response to demands by . . . [Dentons] and its affiliates," but did so "on the understanding that the advance would be repaid once [Dentons] received the funds from another source." Dkt. 25 at 14 (Answer ¶ 42); *see also id.* at 30 (Countercl. ¶ 44) ("Guinea advanced $2 million to [Dentons] with the understanding that [Dentons] would secure those funds from another source and repay Guinea."); Dkt. 99-1 at 18 (Yansane Dep. at 84). In its reply brief, Guinea now asserts that "the $2 million payment received by Dentons was made by a third party and not by the Government of Guinea." Dkt. 99 at 17. Minister Yansane, for his part, testified that he did not participate in any discussion about making the payment to Dentons; he did not learn about the payment until after it was made; he had not seen the payment document until being shown it at his deposition, and, to this day, he does not know who authorized the payment. Dkt. 99-1 at 11–15 (Yansane Dep. 77–81). He did acknowledge, however, that the payment was made from Guinea and that the Ministry of Mines lacked authority to direct that the Central Bank make the payment. *Id.* at 14–17 (Yansane Dep. at 80–83). Finally, Guinea disputes Dentons's characterization of the Nimaga and Magassouba testimony and argues that the Court should disregard Cahn's account of various statements made by Guinean officials in August 2013 on the ground that those statements were made in the context of settlement discussions and they are thus inadmissible under Federal Rule of Evidence 408. Dkt. 99 at 17–19 & n.10.

## B.     Guinean Law Relating to Government Contracts

The parties also disagree about the governing public procurement laws applicable to the contracts. According to Guinea, its procurement laws require a competitive bidding or tender

process in most circumstances involving the provision of "goods or services in exchange for payment of a price," Dkt. 84-12 at 1–2 (Law L/2012/No. 020/CNT (Oct. 11, 2012), Title I, Art. 1), and require that "[a]ny other method of procurement . . . must be authorized by the Finance Minister," Dkt. 84-10 at 3 (Yansane Aff. ¶¶ 5–7) (quoting Dkt. 84-12 at 2 (Law L/2012/No. 20/CNT (Oct. 11, 2012), Title III, Article 11(1)). "In certain exceptional circumstances," a procurement contract may be awarded without "a call for tenders," but only with the Minister of Finance's "prior consent." *Id.* ¶ 8. But even when a contract is awarded in this manner— referred to as a "restricted" or "special consultation"—procurement contracts "must be authorized in advance by the Minister of Finance." Dkt. 84-12 at 3 (Decree D/2012/128/PRG/SGG (Dec. 3, 2012), Art. 38); *see also* Dkt. 84-10 at 3 (Yansane Aff. ¶ 8). Contracts that do not comply with either set of procedures, according to Guinea, are "null and void." Dkt. 84-10 at 3 (Yansane Aff. ¶ 9) (quoting Decree D/2012/128/PRG/SGG (Dec. 3, 2012), Art. 74). Finally, Guinea asserts that Minister Yansane never approved the Dentons retainer agreement, and thus it "does not constitute a valid or binding contract" under Guinean law. *Id.* at ¶ 12.

Dentons does not dispute that the Minister of Finance must authorize public procurement contracts but, instead, argues that the second retainer agreement is not a "public procurement contract[]" or "public service delegation[]." Dkt. 94-2 at 22. For support, Dentons proffers the report of Dr. Amara Soumah, who is a member of the bar of Guinea and whose legal practice "focuses on commercial disputes in Guinea and other West African countries." Dkt. 95-11 at 2. Dr. Soumah asserts that the public procurement law applies to situations in which the government contracts for projects, such as, for example, "toll highway construction," "airport construction," or "exploration of an offshore oil block," and that the procurement law "is

inapplicable . . . to instances where Guinea enters the private market to secure services from a private entity." *Id.* at 3. In a situation where Guinea is contracting with a law firm, Soumah opines, "there is no specific rule" and "[e]ach ministry . . . has certain inherent authority based on its semi-autonomy." *Id.* at 3–4. Dentons also relies on the deposition of the current Minister of Mines, Abdoulaye Magassouba, who testified that he "ha[s] the authority" to "enter into contracts with mining companies" and "external advisers" unless the "commitment[] . . . go[es] beyond the Ministry's mandates." Dkt. 95-3 at 45 (Magassouba Dep. at 140–41). Finally, Dentons points to a contract between Guinea and another law firm, Jones Day, which was signed by Minister of Mines Magassouba, and not by the Minister of Finance. Dkt. 94-2 at 22. Guinea, for its part, does not disavow the Jones Day contract but, rather, posits that the Minister of Finance's authorization was not required because the law firm's fees were paid by an outside grant, and "no funds were paid out of the Guinea[n] government budget." Dkt. 95-3 at 5–6.

## C.    Procedural History

Dentons commenced this action in August 2014 seeking payment pursuant to the first and second retainer agreements on unpaid invoices from May 2012 to June 2013. *See* Dkt. 1 at 1–3, 6–15 (Compl. ¶¶ 2–7, 19–59). In response, Guinea moved to dismiss on grounds of foreign sovereign immunity, *forum non conveniens*, and failure to state a claim. *See* Dkt. 15 at 1–2. The Court denied that motion in all respects. Of particular relevance here, the Court held that Guinea is not immune from suit under the FSIA because (1) the activity of contracting for legal services in support of a project to "fund[] and develop[] a mine . . . 'constitutes "'commercial activity'"'" within the meaning of the commercial activity exception to the FSIA, and (2) "the activities involved in the . . . case include performance of services in" the United States "as well as payment to be made to [Dentons's] U.S. bank." *Dentons I*, 134 F. Supp. 3d at 8–9 (first quote quoting *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 862 F. Supp. 2d 152,

159 (D.D.C. 2013)).  After the Court denied Guinea's motion to dismiss, Guinea answered the complaint, filed counterclaims against Dentons, and filed third-party claims against various Dentons affiliates, seeking, among other relief, recoupment of the $2 million "advance" it paid to Dentons in August 2013.  Dkt. 25 at 30–31.  Dentons and its affiliates, in turn, moved to dismiss Guinea's counter- and third-party claims, Dkt. 39; 40, and the Court granted in part and denied in part those motions, *Dentons II*, 208 F. Supp. 3d at 341, 344.

Guinea now moves for summary judgment.  *See* Dkt. 84.  In this round of briefing, Guinea argues that (1) it is entitled to sovereign immunity because the Minister of Mines did not have the authority to bind Guinea, and therefore, the commercial activity exception to the FSIA does not apply; and (2) even if Guinea is not immune from suit, it is entitled to summary judgment on Dentons's breach of contract claim because the Minister of Mines lacked the authority to bind Guinea.  In February 2019, the Court directed that the parties submit supplemental briefs, and declarations if necessary, addressing Guinea's contention that the Court should disregard certain evidence cited by Dentons because the discussions at issue "allegedly occurred 'during compromise negotiations' subject to" Federal Rule of Evidence 408.  Minute Orders (Feb. 5 & 6, 2019).

## II.  ANALYSIS

The Court begins, as it must, by examining its jurisdiction to consider Dentons's claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990) (court must resolve jurisdiction under the FSIA at the outset).  The Court then turns, briefly, to Guinea's motion for summary judgment on the merits.

## A.    Sovereign Immunity

The exclusive "basis for obtaining jurisdiction over a foreign state in our courts" is set forth in the FSIA.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see* 28 U.S.C. §§ 1604, 1330(a).  Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  "If no exception applies, a foreign sovereign's immunity under the FSIA is complete: The district court lacks subject matter jurisdiction over the plaintiff's case." *Phoenix Consulting*, 216 F.3d at 39.  If the sovereign is immune from suit, the sovereign has "an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Id.* (quoting *Foremost–McKesson*, 905 F.2d at 443).

The only exception invoked in this case is the "commercial activity" exception, which provides in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a).  The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d). Because the FSIA "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity first endorsed by the State Department in 1952," the Supreme Court has interpreted the commercial activity exception in a manner consistent with the restrictive theory, which permitted suits in U.S. "courts in cases 'arising out of purely commercial transactions.'" *Republic of*

*Argentina v. Weltover, Inc.*, 504 U.S. 607, 612–13 (1992) (second quote quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703 (1976) (plurality op.)).  Under this approach, "foreign sovereign immunity [does] not bar a suit based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation." *Id*. at 614. That is, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.*

In assessing the commercial character of an act, courts must consider "the nature of the course of conduct or particular transaction or act, rather than . . . its purpose."  28 U.S.C. § 1603(d).  "[T]he question," accordingly, "is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives" but, rather, "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Weltover*, 504 U.S. at 614 (quoting Black's Law Dictionary 270 (6th ed. 1990)).  Consider two examples: on the one hand, "a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party," while, on the other hand, "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Id*. at 614–15.

Applying this test, the Court previously held that "contract[ing] for the provision of legal services constitutes 'commercial activity' under section 1605(a)(2)." *Dentons I*, 134 F. Supp. 3d at 10 (quoting *Lanny J. Davis*, 962 F. Supp. 2d at 159).  That is because "retaining an attorney is the type of activity by which private parties engage in commerce." *Nnaka v. Federal Republic of*

*Nigeria*, 238 F. Supp. 3d 17, 28 (D.D.C. 2017). It does not matter why the foreign government retained counsel or whether the foreign government's ultimate objective in retaining counsel was to further a sovereign interest, just as it does not matter why a foreign government might contract to purchase army boots or bullets. *See id.* What matters is whether the suit is based upon "the *type* of action[] by which a private party engages in 'trade and traffic or commerce.'" *Weltover*, 504 U.S. at 614 (quoting Black's Law Dictionary 270 (6th ed. 1990)).

Guinea does not seek to retread this ground. It accepts for purposes of the current motion that a suit to enforce a contract for legal services in exchange for an agreed-upon fee falls within the commercial activity exception. Guinea now argues, however, that this is not such a case because a foreign state acts—if at all—only through the conduct of its duly authorized agents and, in Guinea's view, the Minister of Mines lacked authority to bind the Guinean state to the contracts at issue. In support of this theory, Guinea relies on several out-of-circuit precedents holding that "the commercial activity exception to the FSIA may be invoked against a foreign state (and its agents) '*only* when its officials have actual authority' to bind the sovereign." *Allfreight Worldwide Cargo, Inc. v. Ethiopian Airlines Enterprise*, 307 F. App'x 721, 724 (4th Cir. 2009) (quoting *Velasco v. Indonesia*, 370 F.3d 392, 400 (4th Cir. 2004)); *see also Dale v. Colagiovanni,* 443 F.3d 425, 428–29 (5th Cir. 2006); *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 306–07 (9th Cir. 1997). Guinea also offers the affidavit of Minster Yansane, who describes the requirements of Guinean procurement law, asserts that the contracts at issue required his approval, and attests that he never provided the required approval. Dkt. 84-10 at 2–5 (Yansane Aff. ¶¶ 4–14). "[A] foreign government's official declaration clarifying its laws must," according to Guinea, "be accepted as 'conclusive.'" Dkt. 99 at 8 (quoting *D'Angelo v. Petroleos Mexicanos*, 422 F. Supp. 1280, 1284 (D. Del. 1976)). Finally, Guinea has provided the Court

with a copy of the Guinean law upon which it relies and points to evidence supporting its contention that "Dentons knew or should have known that" contractual language providing for a substantial payment from the Guinean fisc "needed to be approved by the Minister of Finance." Dkt. 84-1 at 13.

Dentons disagrees on multiple grounds. It argues that, regardless of the legal sufficiency of the engagement letters alone, Guinea indisputably retained Dentons to serve as its counsel and accepted legal services for more than a year and, by doing so, engaged in commercial activity. It disagrees with the premise of Guinea's argument that Minister of Mines Fofana lacked authority contractually to bind Guinea. It contends that, in any event, Guinea ratified the engagement letters when senior Guinean officials, including Minister of Finance Yansane, "asked Dentons . . . to perform extensive, time-sensitive work," accepted those services, and paid Dentons $2 million for services rendered. Dkt. 94-2 at 7, 28. It argues that Guinea waived any claim of immunity by asserting third-party claims seeking to enforce the contracts at issue and by participating in this "litigation for almost two years after its [initial] sovereign immunity motion was denied." *Id.* at 8. Finally, it argues that its claims extend beyond the four corners of the engagement letters and include equitable claims for unjust enrichment, *quantum meruit*, and account stated.

1.     *Legal Standards*

Before turning to the merits of the parties' respective arguments, it is worth reviewing the relevant legal standards. Most importantly, although Guinea asserts its immunity in a motion for summary judgment, the typical summary judgment standard does not apply. In the ordinary course, the Court would consider whether the party moving for summary judgment had carried its burden of demonstrating "that there is no genuine dispute as to any material fact and" that,

based on those undisputed facts, it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the face a genuine dispute of a material fact, the Court must deny the motion and reserve judgment pending further factual development and, if necessary, trial on the merits. But, because the FSIA protects foreign states "from suit," and does "not merely" establish "a defense to liability, more than the usual is required of trial courts in making pretrial factual and legal determinations." *Foremost-McKesson*, 905 F.2d at 449. "In order to preserve the full scope of that immunity, the district court must make the 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible.'" *Phoenix Consulting*, 216 F.3d at 39. For this reason, the D.C. Circuit has held on multiple occasions that, "if [a] defendant challenges 'the factual basis of the court's jurisdiction, the court may not deny [a] motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff' and must, instead, "resolve any disputed issues of fact the resolution of which is necessary to ruling upon the motion.'" *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127 (quoting *Phoenix Consulting*, 216 F.3d at 40)). That same conclusion applies, *a fortiori*, when—as here—the foreign state files a motion for summary judgment supported by exhibits and affidavits.

This rule is, of course, in tension with the notion that "a court is [often] poorly equipped to resolve factual disputes at an early stage in a litigation—as reflected in the ordinary rules of procedure." *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004). Two additional precepts, however, at least reduce this tension. First, although the Court must resolve disputed issues of fact, that "resolution . . . is 'not a conclusive determination' but is 'instead subject to change in light of further development of the facts.'" *Id.* (quoting *I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003)). Second, the foreign sovereign "bears the burden of establishing its immunity, including the burden of proof

that no exception applies." *Phaneuf*, 106 F.3d at 306; *see also Price*, 389 F.3d at 197; *Kilburn*, 376 F.3d at 1131; *Phoenix Consulting*, 216 F.3d at 40; H.R. Rep. No. 1487, 94th Cong., 2d Sess. ("the burden will remain on the foreign state to produce evidence in support of its claim of immunity"). Although the plaintiff bears the initial burden of production, that burden falls way where, as here, the plaintiff produces evidence that the exception applies, and "the ultimate burden of persuasion" then lies with the foreign state. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). Taken together, these principles establish that the Court must provide the foreign state with a meaningful opportunity to develop the relevant facts and must resolve disputed issues of fact raised by the foreign state's motion and the plaintiff's opposition, but, if the foreign state fails to carry its burden of proof, the case may proceed subject to further factual development and litigation regarding any issues the foreign state continues to contest.

Finally, although Guinea argues that "a foreign government's official declaration clarifying its laws must be accepted as 'conclusive,'" Dkt. 99 at 8, the Supreme Court has recently clarified that "[a] federal court should accord respectful consideration to a foreign government's submission, but is not bound to accord conclusive effect to the foreign government's statement[]" of the law." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865, 1869 (2018). Under Federal Rule of Civil Procedure 44.1, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. The Rule further "specifies that a court's determination of foreign law 'must be treated as a ruling on a question of law.'" *Animal Sci. Prods.*, 138 S. Ct. at 1873 (quoting Fed. R. Civ. P. 44.1).

Applying these principles, the Court concludes that—at least on the existing record—Guinea has failed to carry its burden of demonstrating that Dentons's suit is based on activity that is not subject to the commercial activity exception. Guinea devotes the bulk of its argument to contentions that a foreign state can act only through the conduct of its authorized agents and that, here, Minister Fofana was not authorized to enter a contract requiring payment from the Guinean government budget. Dkt. 84-1 at 9–13. For present purposes, the Court assumes that Guinea is correct and that, as a matter of Guinean procurement law, Minister Fofana lacked the authority to bind the Guinean government to pay Dentons for its services in that manner. But, even given those assumptions, the Court is convinced that the commercial activity exception applies for two reasons. First, regardless of whether Minister Fofana was authorized to enter a procurement contract on behalf of the Guinean state, there is ample evidence that the Guinean state engaged in commercial activity sufficient to trigger the exception with respect to Dentons's claims for *quantum meruit*, unjust enrichment, and account stated. Second, there is also ample evidence that senior Guinean officials—including Minister Yansane—ratified the contracts that Minister Fofana signed.

To be sure, Guinea may have substantial defenses to all of these claims on the merits. For present purposes, however, the Court is focused on jurisdiction and sovereign immunity, and nothing in Guinea's motion or accompanying exhibits establishes that Dentons's claims are not "based upon" Guinea's commercial activity. *See* 28 U.S.C. § 1605(a)(2).

    2.    *Dentons's Equitable Claims*

The Court must, as usual, start with the relevant statutory text. *See Sebelius v. Cloer*, 569 U.S. 369, 377 (2013). Dentons relies on the third clause of the FSIA's commercial activity exception, which exempts from the FSIA's jurisdictional bar "any case . . . in which the action is

based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  As explained above, the foreign state's purpose plays no role in determining whether a course of conduct, act, or transaction is commercial; rather, the Court must look to the "nature" of the activity, 28 U.S.C. § 1603(d), and must ask whether the foreign state was acting as a regulator of a market or as a participant—"in the manner of a private player"—in that market, *Weltover*, 504 U.S. at 614.

For present purposes, Guinea does not dispute that its acts caused a direct effect in the United States—lawyers employed by Dentons performed substantial work on the Simandou Project while in the United States.  How the remainder of the third clause applies here, however, raises more substantial questions.  As an initial matter, although not briefed by the parties, the Court assumes—without deciding—that each separate claim that Dentons asserts must satisfy the relevant test.  This, then, leaves the question whether each of Dentons's equitable claims are "based . . . upon an act outside the . . . United States in connection with a commercial activity of" the Guinean state.

The phrase "based upon" is best read to refer to "conduct that forms the 'basis' or 'foundation' for a claim," and thus to refer to "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Nelson*, 507 U.S. at 357; *see also Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146 (D.C. Cir. 1994).  This does not necessarily mean that "each and every element of a claim" must constitute "commercial activity by [the] foreign state," *Nelson*, 507 U.S. at 358 n.4, and, at least in the context of the third clause of the commercial activity exception—which applies to an action based on acts taken "in connection with a commercial activity," as opposed to an action based on the "commercial

activity" itself—"a mere connection with, or relation to, commercial activity" might suffice, *id.* at 357–58 (noting distinction between the first and third clause). Taken together, these principles establish following test: The Court must consider whether each of Dentons's equitable claims is based upon "particular actions" taken by Guinean officials that were "the *type* of actions by which a private party engages in 'trade and traffic or commerce'" or the *type* of actions a private party undertakes in connection with trade or commerce. *Weltover*, 504 U.S. at 614 (quoting Black's Law Dictionary 270 (6th ed. 1990)); *see also Nelson*, 507 U.S. at 357–58.

Although a binding contract with a foreign government is often sufficient to invoke the commercial activity exception, *see Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines*, 965 F.2d 1375, 1384–85 (5th Cir. 1992) (collecting cases), it is not a necessary condition to satisfy the above test, *see*, *e.g.*, *BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 686 (8th Cir. 2002) (holding that a government company's "attempts . . . to contact American vendors to produce goods . . . were obviously 'commercial' in character"). Indeed, it is not uncommon for parties to bring tort claims, such as claims for fraud, negligence, misrepresentation, libel, and intentional infliction of emotional distress, based on the commercial activity exception to the FSIA. *See Nnaka*, 238 F. Supp. 3d at 25, 29–30 (involving claims of misrepresentation, libel, and intentional infliction of emotional distress); *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016) ("Here, of course, Plaintiffs are asserting tort claims, not contract claims."); *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 52 (D.D.C. 2014) (involving claim of fraud); *Kirkham v. Societe Air France*, 429 F.3d 288, 292 (D.C. Cir. 2005) (negligence suit).

Here, even if one assumes that Minister Fofana lacked the authority to enter a public procurement contract without the authorization of Minister Yansane, there is little doubt that a

variety of Guinean officials—acting within the scope of their authority—acted "in the manner of private player[s]" operating within a market. There is no dispute that Guinea requested and accepted extensive legal services from Dentons. *See supra* at 6–8. Lawyers from Dentons attended meetings around the globe on Guinea's behalf; they attended negotiations; they drafted and revised numerous, complex documents; they advised senior Guinean officials, including the Ministers of Mines and Finance, on matters of extraordinary importance to the nation; they prepared hundreds of pages of briefing materials; they helped formulate Guinea's negotiating strategy; and they prepared materials to generate interest among potential investors in the Simandou Project. *Id.* Senior Guinean officials, including the Minister of Finance, moreover, were aware of much of Dentons's work, and, indeed, at times, requested Dentons's assistance. *See supra* at 8–9. Minister Yansane, for example, requested that Dentons brief him and Minister Fofana for a meeting with Rio Tinto in December 2012; he attended multiple, important meetings with lawyers from Dentons; he received reports and drafts from Dentons; and requested work product from Dentons as late as August 2013. *Id.* Finally, there is no dispute that—from whatever source—Dentons received a payment of $2 million for its work months before August 2013. *See supra* at 9–11.

Although the parties dispute whether Minister Yansane authorized the $2 million payment and where the funds came from to make the payment, *see infra* 32–34, for present purposes, those disputes are beside the point. Guinea concedes that the transfer was made in order to induce Dentons to continue providing legal services to Guinea, and, regardless of who authorized the payment and where it came from, the activity at issue was decidedly commercial in nature. Guinea wanted to obtain legal services from Dentons; it obtained those services; and it arranged—one way or the other—for a payment of $2 million to ensure that Dentons would

continue to perform. Regardless of who paid, Guinea was the consumer of legal services, and, in acquiring those services, Guinea engaged in the same "*type* of actions by which a private party engages" in commerce, *Weltover*, 504 U.S. at 614, or, at the very least, engaged in the type of actions that private parties undertake in "connection with, or relation to, commercial activity," *Nelson*, 507 U.S. at 358. Private parties, for example, routinely participate in the market for legal services with the understanding that a third party will pay the associated fees. *See, e.g.*, D.C. Rules of Professional Conduct, Rule 1.8, cmt. 10 ("Lawyers are frequently asked to represent a client under circumstances in which a third person will compensate the lawyer, in whole or in part."). Thus, even assuming that Guinea did not itself pay the $2 million that Dentons received, and even assuming that it merely contracted to make its best efforts to find third-party funding for Dentons's work, those facts do not remove the transaction from the traditional realm of commercial activity, and there is nothing about Guinea's engagement of Dentons to represent it on the Simandou Project that differs from "the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Weltover*, 504 U.S. at 614 (quoting Black's Law Dictionary 270 (6th ed. 1990)); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 453 cmt. b (1987) ("An activity is deemed commercial . . . if it is concerned with . . . performance of . . . services.").

This is not, in any event, the occasion for the Court to decide who is right on the facts or who should prevail as a matter of law on any particular version of the facts. Those questions do not go to the Court's jurisdiction, but rather to the merits. For present purposes, the Court need only decide whether Dentons's case "is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state," 28 U.S.C. § 1605(a)(2), and the relevant facts and circumstances are undeniably commercial in nature. Dentons alleges, for

example, that it "provided valuable services for the benefit of Defendants and at the request of Defendants," Dkt. 1 at 16 (Compl. ¶ 68); that "Defendants were aware that Dentons was providing these services, which Defendants accepted and from which they benefited," *id.* (Compl. ¶ 69); that "Defendants knew that Dentons expected to be paid for its services," *id.* at 17 (Compl. ¶ 71); that "Defendants accepted and retained the benefits of Dentons'[s] services," without paying Dentons for all those services, *id.* (Compl. ¶¶ 77–78); and that Dentons sent Defendants invoices "for the legal services," which Defendants accepted without objection, thereby "induc[ing] Dentons to continue to provide services," *id.* at 18 (Compl. ¶¶ 83–85). These allegations form the basis for Dentons's equitable claims, and they all involve acts that Guinea allegedly engaged in "in connection with a commercial activity"—that is, the provision of legal services. 28 U.S.C. § 1605(a)(2); *see also Nelson*, 507 U.S. at 357. Guinea may well have substantial factual and legal defenses to these claims. But Guinea has yet to make those arguments—and correctly so because they go to the merits of Dentons's claims and not to Guinea's sovereign immunity.

For these reasons, Guinea's reliance on the line of cases—all from outside this circuit—holding that "the commercial activity exception to the FSIA may be invoked against a foreign state (and its agents) '*only* when its officials have actual authority' to bind the sovereign." *Allfreight Worldwide Cargo*, 307 F. App'x at 724 (quoting *Velasco*, 370 F.3d at 400); *but see Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1227 (11th Cir. 2018); *First Fidelity Bank v. Gov't of Antigua*, 877 F.2d 189, 194 (2d Cir. 1989); *Themis Capital, LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508, 522–26 (S.D.N.Y. 2012), is misplaced for present purposes. In each of those cases, the gravamen of the plaintiff's claim focused on purportedly unauthorized conduct. *Velasco v. Government of Indonesia*, 370 F.3d 392, 395 (4th

Cir. 2004), for example, involved an "action to compel the payment of a promissory note . . . issued by former staff members of the National Defense Security Council of the Republic of Indonesia ('NSDC')." One of those staff members, however, "admitted that[,] at the time he issued the note[], he knew he was not authorized to do so," and the former Secretary General of the NSDC "declared that two 'letters of authorization' purportedly signed by him and empowering" the two individuals "to issue the instruments on behalf of the [agency] were forgeries." *Id.* at 395–96. Similarly, in *Dale v. Colagiovanni*, 443 F.3d 425, 426–27 (5th Cir. 2006), the plaintiffs, receivers for various insurance companies alleging that the companies had been looted, argued that the Vatican was subject to suit under the commercial activity exception because a senior member of the Vatican government had allegedly aided in the "fraudulent" scheme. The plaintiff did not allege, however, that the Vatican—or any Vatican official acting with authority—knew about, authorized, or participated in the acts upon which the plaintiffs' suit was based. *Id.*

Here, in contrast, there can be no dispute that the Guinean government as a whole—and not merely a rogue officer or employee—was intimately involved in a relationship with Dentons and that, however conceived, that relationship bore the hallmarks of commercial activity. Indeed, it is difficult to imagine a case that involves greater participation and buy-in at the highest levels of a foreign state than this one. To the extent that there is some arguable basis, moreover, to resist this understanding of the facts, the Court finds that Guinea has failed to carry its burden of proof of establishing that it is immune from suit. The evidence before the Court supports a finding that senior Guinean officials—acting within their authority—requested and accepted extensive legal assistance from Dentons; did not disavow Dentons's bills or dispute Dentons's requests for payment; and, instead, paid Dentons $2 million in order to induce the law

firm to continue providing Guinea with badly needed legal services. At least with respect to Dentons's equitable claims, Guinea's sole response posits that, "[u]nder [Dentons's] interpretation, any party contracting with a foreign state can do an end-run around the actual authority requirement by simply pleading equitable remedies." Dkt. 99 at 6. But, as explained above, Dentons has done far more than that. Accordingly, on the present record, the Court must reject Guinea's contention that it is immune from Dentons's equitable claims.

      3.    *Contract Ratification*

Although Dentons raises a host of additional arguments with respect to its claim for breach of contract, the Court need reach only one of those contentions, which is both persuasive and dispositive: that is, even if Minister Yansane was required to approve the retainer agreements, and even if he did not do so at the outset, the government of Guinea, in general, and Minister Yansane, in particular, ultimately ratified the agreements. In reaching this conclusion, however, the Court once again cautions that this holding does not decide the case on the merits. The Court merely holds that Guinea has had ample opportunity to engage in discovery and to develop its sovereign immunity defense, and that it has—at least at this stage of the proceeding—failed to carry its burden of showing that the commercial activity exception is unavailable. *See Price*, 389 F.3d at 197 (court must resolve any disputed issues of fact, but that resolution "is not a conclusive determination" and "subject to change in light of further developments of the facts" (quoting *I.T. Consultants*, 351 F.3d at 1188)).

Dentons identifies two decisions that have applied the agency law concept of ratification to the commercial activity exception to the FSIA. In the first case, *Reiss v. Societe Centrale de Groupe des Assurances Nationales*, 246 F. Supp. 2d 273 (S.D.N.Y. 2003), the plaintiff sued three French governmental entities to recover a finder's fee he was allegedly owed based on an

oral agreement with Alain Juliard, the chairman of one of the French entities. In response, the

defendants argued that Juliard was not authorized to enter into the purported contract. *Id.* at 276.

The district court, however, concluded that an evidentiary hearing was necessary to determine

whether the defendants had ratified Juliard's engagement with the plaintiff. *Id.* at 283–85. As

the court noted, "[r]atification is a form of retroactive activity that occurs where a principal,

having knowledge of the material facts, accepts the benefits of the agent's actions already made

on his behalf." *Id.* (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l

Bank*, 850 F. Supp. 1119, 1213 (S.D.N.Y. 1994)). Such ratification, accordingly, "cures any

defect in actual authority at the time of the engagement." *Id.*

In the second case, *GDG Acquisitions LLC v. Government of Belize*, 849 F.3d 1299, 1302

(11th Cir. 2017), the plaintiff sued the government of Belize, "seeking . . . $10 million in unpaid

rent" under a lease agreement and promissory note for telecommunications equipment. On

interlocutory appeal, the government of Belize argued that the Belizean official who negotiated

and signed the agreement, the Minster of Budget Management, Investment, and Home Affairs

("Minister of Budget"), lacked authority to bind Belize. The Eleventh Circuit declined to decide

whether the Minister of Budget "had actual authority to enter into the" agreement, however,

"because the [g]overnment subsequently ratified his actions and, therefore, agreed to be bound

by them as if they were done with actual authority." *Id.* at 1308. As the court explained,

"ratification" constitutes "the affirmance of a prior act done by another, whereby the act is given

effect as if done by an agent acting with actual authority." *Id.* (quoting Restatement (Third) of

Agency § 4.01(1) (2006)). If a party with actual authority ratifies a prior act, "the legal

consequence is that the [principal's] legal relations are affected as they would have been had the"

initial act been taken "with actual authority at the time of the act." *Id.* (quoting same at cmt. b)

(alteration in original).  In other words, "ratification retroactively creates the effects of actual authority."  Restatement (Third) of Agency § 4.02(1).  "[A] person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations or (b) conduct that justifies a reasonable assumption that the person so consents."  *GDG Acquisitions*, 849 F.3d at 1308 (quoting Restatement (Third) of Agency § 4.01).

Applying that test, the Eleventh Circuit held that the government of Belize ratified the Minister of Budget's actions in two ways.  First, "the [g]overnment made forty payments of $337,409.46[,] each in accordance with the lease schedules for the entirety of the two concurrent five-year leases."  *Id*. at 1309.  Second, it "retained the telecommunications equipment for the duration of the two leases and, indeed, . . . still has not returned the equipment to" the plaintiff.  *Id*. at 1309–10.  Concluding that "neither the act of retaining the telecommunications equipment for nearly six years nor the act of making payments can be understood absent the assumption that the [g]overment intended to be bound by the agreement," the Eleventh Circuit held that "the [g]overnment of Belize consented to and affirmed [the Minister of Budget's] actions by ratification" and that, as a result, the lease agreement was "binding and enforceable."  *Id*. at 1310.

In Dentons's view, this case is on all fours with *GDG Acquisitions*.  It argues, in particular, that "[o]fficials at all levels of the Guinean government, including the Minister of Finance and advisors to the President, requested, accepted, and retained legal services from Dentons;" that "Guinean officials, including the Minister of Finance, continued to request and accept work product from Dentons . . . after they were aware of the [l]etter of [e]ngagement;" and that "Guinea ratified the [l]etter of [e]ngagement by making a payment pursuant to it" in late March 2013 with the approval of the Minister of Finance.  Dkt. 94-2 at 27–28.  In response,

Guinea fails to identify any U.S. or Guinean law that differs from the approach taken in *GDG Acquisitions*.[1]  It does, however, take issue with almost every factual premise underlying Dentons's ratification argument.  As explained below, the factual record is—to say the least— confused.  The parties offer contradictory accounts of a number of events, and Guinea's own account of events is inconsistent in certain respects.  The Court would, undoubtedly, benefit from hearing from the key witnesses in person—or at least by videoconference for witnesses based in Guinea—and the Court invites Guinea to renew its motion with a request for an evidentiary hearing.  On the present record, however, the Court finds that Dentons's ratification theory is convincing.

Guinea's first disagreement is about whether Minister Yansane was aware of the retainer agreement that Minister Fofana signed.  Minister Yansane, for his part, testified that he was unaware of the agreement before he became Minister of Mines in 2014, long after the relevant events occurred.  Dkt. 95-3 at 56 (Yansane Dep. at 39).  The former legal counsel to the Ministry of Mines testified, however, that he was told in March 2013 that Minister Yansane initially declined to authorize partial payment to Dentons because Minister Fofana "did not act in respect of the procedures which needed to be followed"—that is, Minister Yansane apparently objected that Minister Fofana had signed the agreement without obtaining his prior approval.  *Id.* at 81

---

[1]  Guinea does assert in a single sentence in a footnote that Guinean—as opposed to U.S.—law should govern the inquiry.  Dkt. 99 at 15 n.7.  It cites no case in support of that assertion, however, and, more importantly, it fails to identify any Guinean law that is inconsistent with the ratification doctrine.  It is implausible, moreover, that Guinean law contemplates that those government officials *authorized* to bind the state may accept valuable services with the knowledge that the service provider believes that it is entitled to payment; that those officials may make a partial payment to the service provider to induce the continued provision of services; and that they can later assert that the agreement was *unauthorized*.  If any such law exits, Guinea had the burden of bringing it to the Court's attention, and it failed to do so.

(Nimaga Dep. at 40). According to the Cahn declaration, moreover, Minister Yansane acknowledged in August 2013 that he was aware of the agreement, apparently from the time it was initially negotiated. Dkt. 95-4 at 44 (Cahn Decl. ¶ 112). Cahn attests that, in an exchange between the two ministers, which he witnessed, Minister Yansane "remonstrated Minister Fofana for having agreed to engage Dentons . . . on an hourly basis rather than[,] as [Minister Yansane] had recommended, based on fixed sums for contractually specified deliverables."[2] *Id.* Even after that meeting, moreover, Minister Yansane continued to request Dentons's assistance. Dkt. 94-3 at 55 (Dentons SMF ¶ 145); Dkt. 99-2 at 27 (Guinea Resp. ¶ 145).

Guinea also disputes Dentons's contention that Minister Yansane authorized the $2 million payment that Dentons received in March 2013 and, indeed, disputes that the payment was made by the government of Guinea. In support of its position, Dentons has produced a copy of the wire transfer, which reflects a transfer of $2 million from the Central Bank of Guinea to Dentons's Citibank account in New York on March 29, 2013. Dkt. 95-5 at 256–57. An email

---

[2] Guinea challenges the admissibility of this evidence, both as hearsay and as a statement made in the context of settlement discussions. *See* Dkt. 99-2 at 22 (Guinea Resp. ¶ 95); Dkt. 103; Dkt. 99 at 19 n.10. The statement is not hearsay, however; rather, it is an admission of a party opponent. Fed. R. Evid. 801(d)(2). Nor is the statement inadmissible under Fed. R. Evid. 408. For Rule 408 to apply, "there must first be an actual dispute, or at least an apparent difference of view between the parties, concerning the validity or amount of the claim." 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 408.06 (Mark S. Brodin, ed., Mathew Bender 2d ed. 1997). Here, Guinea points to evidence that the parties were engaged in discussions regarding securing payment to Dentons, including the timing and source of the payment. Dkt. 103 at 2–3. But it does not identify any evidence that Guinea had already disputed the validity of Dentons's claim to fees and costs. The fact that Guinea lacked the funds to make payment, that the parties were discussing other sources of payment, and that Guinea had engaged in an audit of Dentons's bills is unrelated to the present dispute between the parties. It is not unusual for client to audit or review its attorneys' bills, or to negotiate regarding a payment schedule, in the absence of any claim or dispute regarding the validity or enforceability of the retainer agreement. Such discussions do not fall within the scope of Rule 408 unless the dispute at issue—or the statement the opposing party seeks to admit—involves the sufficiency or accuracy of the audited bills.

from a presidential advisor dated that same day, moreover, shows that "[t]he guys at the central bank" were working on the transfer and requested confirmation for the Governor of the Central Bank and the Ministry of Finance that Dentons would "complet[e] . . . the draft version of" certain documents that Guinea needed by the following day.  Dkt. 95-5 at 260.  The advisor to the President testified in deposition, moreover, that the payment was coordinated while seeking Dentons's promise to deliver the documents and that the Ministry of Finance needed Dentons's commitment because it was "part of the process" by which Dentons would receive payment. Dkt. 94-5 at 35–36 (Magassouba Dep. at 73–74).  The evidence further shows that the President of Guinea intervened to ensure that Dentons received the payment and that he personally "directed Minister of Finance Yansane to coordinate with the Central Bank to make the [$2 million] payment.  Dkt. 94-3 at 41 (Dentons SMF ¶ 95); Dkt. 99-2 at 22 (Guinea Resp. ¶ 95). Months later, in August 2013, moreover, Minister "Yansane acknowledged that he was involved in, and directed, the $2 million payment," and, indeed, complained to Cahn that he had been awakened "in the middle of the night to approve the payment."[3]   Dkt. 97-4 at 31 (Cahn Decl. ¶ 72).

In response, Guinea does not offer a coherent, alternative explanation of the source and authorization for the payment.  In its counterclaim against Dentons, Guinea alleges that it made the $2 million payment as an advance "to [Dentons] in a good faith effort to allow [the law firm] time to arrange for third party funding."  Dkt. 25 at 26–27 (Countercl. ¶¶ 23–24); *see also id.* at 30 (Countercl. ¶ 44); *id.* at 14 (Answer ¶ 42); Dkt. 99-1 at 18 (Yansane Dep. at 84).  But in its reply brief, Guinea disavows that it made the payment at all and argues, instead, that the payment

---

[3]  Guinea also challenges the admissibility of this evidence and, for the reasons provided above, that challenge also fails.

"was made by a third party and not by the Government of Guinea." Dkt. 99 at 17; *see also* Dkt. 95-3 at 15–16 (Nimaga Decl. at 1–2). Guinea asserts, "[t]he evidence revealed that Minister of Mines Fofana made third party arrangements to have the $2 million paid from sources outside the Government because Minister of Finance Yansane refused to pay the $2 million." Dkt. 99 at at 18. It is difficult to fathom, however, that Guinea would not know who supplied the funds or how those funds made their way through the Guinean Central Bank to Dentons's Citibank account in New York. To the extent Guinea is correct about this, it has unique access to the relevant evidence, yet has failed to provide that evidence to the Court.

Although difficult to reach any firm conclusions without live testimony, the existing record supports the following findings: Minister Fofana executed the December 2012 agreement with Minister Yansane's knowledge, but without his express authorization; Minister Yansane did not regard the contract as legally binding at that time "because the minister of finance is the only person [who may] commit the government contractually and financially," and he had not approved the contract, Dkt. 99-1 at 4 (Yansane Dep. at 36); for this reason, Minister Yansane resisted making the $2 million payment to Dentons in March 2013, but he eventually authorized the payment at the request or direction of the Guinean President; and Minister Yansane—along with other Guinean officials—requested and received substantial legal services from Dentons while aware that Minister Fofana had signed the agreement and aware that Dentons expected payment, and, indeed, requested additional assistance from Dentons even after the August 2013 meeting. These findings are not conclusive, and they remain "subject to change in light of further developments of the facts." *Price*, 389 F.3d at 197 (quoting *I.T. Consultants*, 351 F.3d at 1188). But, they constitute the Court's findings of fact for purposes of the pending motion, and they support Dentons's theory that, even if Minister Yansane did not provide advance approval

for the December 2012 retainer agreement, through his subsequent actions—and those of other senior Guinean officials—the retainer agreement was ratified.

Accordingly, the Court finds that Guinea has failed to carry its burden of demonstrating that the activities upon which Dentons's claims are based fall beyond the scope of the commercial activities exception to the FSIA. The Court will, accordingly, deny Guinea's motion for summary judgment on grounds of sovereign immunity, but will do so without prejudice to Guinea renewing the motion based on further evidence, including evidence offered at a live hearing.

**B.     The Merits**

Finally, Guinea also argues that, even if the Court has jurisdiction, it is entitled to summary judgment on the merits of Dentons's breach of contract claim because "Minister Fofana lacked authority to contract on behalf of Guinea." Dkt. 84-1 at 14. The parties agree that D.C. law governs this claim and that the elements of the claim include "'(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach.'" *Id.* (citation omitted); *see also* Dkt. 94-2 at 37 (Dentons Mem. in Opp. Summ. J. at 32). They also agree that, under D.C. law, a valid contract may exist by virtue of ratification by an official with authority to bind the party. Dkt. 94-2 at 37 (Dentons Mem. in Opp. Summ. J. at 32); *see also* Dkt. 84-1 at 14. In Guinea's view, the December 2012 retainer agreement does not constitute a valid contract because Minister Fofana lacked authority to bind Guinea. Dkt. 84-1 at 15. Dentons, in contrast, argues—among other things—that the agreement was ratified through the actions of senior Guinean officials, including Minister Yansane. Dkt. 94-2 at 37–38 (Dentons Mem. in Opp. Summ. J. at 32–33).

This dispute, accordingly, raises the same factual and legal issues discussed above. For purposes of Guinea's motion for summary judgment, however, the Court need not resolve—even

inconclusively—the factual dispute between the parties.  It is enough to conclude that the parties'

conflicting factual contentions are sufficient to create a "genuine factual issue[]" that may affect

the substantive outcome of the litigation and may "reasonably be resolved in favor of either

party."  *Liberty Lobby*, 477 U.S. at 250.  Here, for the reasons explained above, Dentons has

easily met its burden of "com[ing] forward with 'specific facts showing that there is a genuine

issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587

(1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis removed).

The Court must, accordingly, deny Guinea's motion for summary judgment.

## CONCLUSION

For the reasons set forth above, the Guinea's motion for summary judgment, Dkt. 84, is

denied.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 16, 2019